**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THEOPHALIS (BINKY) WILSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CITY OF PHILADELPHIA,** | ) |
| **PENNSYLVANIA; FORMER** | )  Case No. 2:21-cv-02057-JMY |
| **DISTRICT ATTORNEY LYNNE** | ) |
| **ABRAHAM; FORMER ASSISTANT** | ) |
| **DISTRICT ATTORNEY DAVID** | ) |
| **DESIDERIO, et al.** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS
FORMER ASSISTANT DISTRICT ATTORNEY DAVID DESIDERIO AND
FORMER DISTRICT ATTORNEY LYNNE ABRAHAM'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Plaintiff Theophalis (Binky) Wilson ("Wilson"), by and through his attorneys, hereby submits his response to Defendants Assistant District Attorney David Desiderio ("ADA Desiderio") and District Attorney Lynne Abraham's ("DA Abraham") Motion to Dismiss the Complaint of Plaintiff.

## INTRODUCTION

Theophalis Wilson spent over twenty-eight years wrongfully imprisoned for the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds, crimes he did not commit. After spending decades fighting for his freedom, Mr. Wilson and his co-defendant's efforts finally uncovered that the only evidence linking Wilson to the crime – the statement of James White, the State's only eyewitness – was fabricated and false. Indeed, White recanted his identification of Mr. Wilson under oath and confirmed that prosecutors and police coerced and fed White a confession of the three homicides in order to implicate Mr. Wilson and his co-defendants in the crimes. In addition

to proving Mr. Wilson had no involvement in the murders, White's recantation revealed Mr. Wilson's wrongful conviction was not an innocent mistake, but the result of startling misconduct on the part of ADA Desiderio and Philadelphia police officers. Sadly, the misconduct in Mr. Wilson's case was not an isolated incident, but part of a long-standing pattern of investigative misconduct made possible by supervisors and policymakers in the Office of the Philadelphia District Attorney ("OPDA") and the Philadelphia Police Department ("PPD").

On January 21, 2020, after the OPDA filed a motion to vacate Mr. Wilson's convictions on behalf of the Commonwealth of Pennsylvania, a judge overturned Mr. Wilson's conviction, the charges against him were dismissed, and he was released from prison. The OPDA additionally filed Joint Stipulations of Fact of Petitioner Theophalis Wilson and Respondent Commonwealth of Pennsylvania, attached as Exhibit A to the Complaint, and an Answer in Wilson's Post-Conviction Relief, attached as Exhibit B to the Complaint, wherein the OPDA admitted that no evidence – apart from White's coerced and now-recanted testimony – connected Wilson to the crime, that Wilson's trial was unfair, and that the trial was "infected by serious prosecutorial misconduct."

Mr. Wilson filed this civil rights action on May 4, 2021, seeking redress against former Assistant District Attorney Desiderio and his supervisor, former District Attorney Lynn Abraham, as well as the City of Philadelphia (the "City"), and individual police officers of the Philadelphia Police Department. Relevant to this Motion, Mr. Wilson has asserted § 1983 claims against ADA Desiderio and DA Abraham for malicious prosecution, fabrication of evidence, and intentional infliction of emotional distress, and a § 1983 claim against DA Abraham for supervisory liability. Defendants did not (and cannot) argue in their Motion to Dismiss that Mr. Wilson's Complaint is not well pled. Instead, Defendants have only moved to dismiss the counts against them based on

absolute prosecutorial immunity. However, Defendants cannot succeed because their Motion to Dismiss misstates the law and ignores critical allegations, namely: that ADA Desiderio took an active investigatory role in White's fabricated and coerced confession and that Abraham held a supervisory role in the OPDA at critical times in this matter. Defendants cannot hide behind immunity while simultaneously ignoring settled precedent and the well-pleaded facts. For the above reasons, which are examined in greater detail below, Defendants' Motion to Dismiss should be denied and this case should move on to the discovery phase.

## COUNTER QUESTIONS

1.      Should ADA Desiderio be entitled to absolute immunity for the pre-arrest fabrication and coercion of a false statement of the State's only alleged eyewitness, which created the basis for the ADA's probable cause for Mr. Wilson's arrest and later conviction as set out in Counts I, II, III, VIII, and IX?

**Suggested Answer**: **No.**

2.      Should DA Abraham be entitled to absolute immunity for her failure to supervise ADA Desiderio and for the pattern and practice of misconduct in the DA's Office, for which she was the final policymaker, including the withholding of exculpatory evidence and the coercion of fabricated witness statements to convict innocent individuals as set out in Counts I, II, III, VI, VIII and IX?

**Suggested Answer**: **No.**

## COUNTER-STATEMENT OF FACTS

The relevant factual allegations, many of which Defendants omit, are as follows:

**I. Mr. Wilson is innocent of the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds.**

**A.  The Triple Homicide Investigation Lasted Over Two Years.**

3

In between the late-night hours of September 25, 1989 and early morning hours of September 26, 1989, brothers Kevin and Gavin Anderson, and their associate, Otis Reynolds, were murdered in Philadelphia (the "Anderson/Reynolds Murders"). Compl. ¶ 3, 52-56, 69-70, 75-76.[1] All three men were shot in the head, their bodies were found within a two-mile radius, and officers concluded that their deaths were only hours apart. *Id.* Police quickly concluded the three murders were related and likely committed by the same perpetrator(s). *Id.* at ¶ 3, 93. During the investigation of these murders, officers determined the victims were associated with the Jamaican Shower Posse, a drug gang in the midst of a feud with the Junior Black Mafia, another gang, over territory. *Id.* at ¶ 3-5, 89-90, 92. Although numerous eyewitness accounts, 911 calls, and statements from the victims' friends and family were provided to the officers – many of which connected the crimes to a well-known enemy of the victims and a notorious drug dealer named Noel Grierson, also known as "Steplight" – police arrested no suspects for two years. *Id.* at ¶ 6, 53-85, 121-140.

### B.  ADA Desiderio Fabricates James White's statement, the first – and only – evidence implicating Mr. Wilson in the crimes.

Months after the Anderson/Reynolds Murders, James White, a 19-year-old, was arrested for two unrelated murders. *Id.* at ¶ 142-144. As a part of a plea deal with Defendant ADA Desiderio, the assistant district attorney for the Commonwealth handling the murder cases, White pled guilty to these two murders and implicated other individuals who allegedly participated in the crimes, including Chris Williams. *Id.* at ¶ 146. At the time, police suspected Williams of several murders and drug related activity and wanted him off the streets. *Id.* at ¶ 146-147. *Over a year later*, White was interviewed by police in relation to several other crimes. *Id.* at ¶ 148-152. *Four months after that*, a jailhouse informant in prison with White falsely reported to ADA Desiderio

---

[1] References to "Complaint" refer to the Complaint filed in this matter as Doc. No. 1.

that White was involved in another three murders of "Jamaicans." *Id.* at ¶ 153. In reality, White had told this jailhouse informant that police and ADA Desiderio questioned him about Chris Williams' involvement in the Anderson/Reynolds Murders, but that White had no knowledge of the crimes. *Id.* at ¶ 154. White spoke with ADA Desiderio on the phone and again told Desiderio he did not commit the Anderson/Reynolds Murders. *Id.* at ¶ 156. Desiderio threatened to charge White with all six murders (of the three Jamaicans and the three other murders he made statements about) and further threatened to seek the death penalty, despite White's prior plea deal. *Id.* White, who was then interrogated by police, continued to maintain his innocence, but no statement was taken or recorded. *Id.* at ¶ 157. Next, White was transported to the OPDA to speak with ADA Desiderio – without his attorney present – so Desiderio could interrogate him about the Anderson/Reynolds Murders. *Id.* at ¶ 157-158. Despite the fact that White knew nothing about the triple homicide – something he told police and ADA Desiderio numerous times – Desiderio coerced White into making a new plea deal that included testifying about the Anderson/Reynolds Murders and implicating Chris Williams and his associates. *Id.* at ¶ 158. Because of Desiderio's threats and false promises of an early release, White agreed to lie. *Id.* at ¶ 160.

Desiderio told White if he wanted to save his own life, White needed to come up with a plausible story. *Id.* When White reminded Desiderio he did not know how the murders occurred, Desiderio concocted a confession based off of White's statement in the Haynesworth case, explaining to White that he must implicate himself, as well as others, or no one would believe his testimony. *Id.* To do this, Desiderio, along with detectives, gave White descriptions of Kevin Anderson, Gavin Anderson, and Reynolds, as well as facts about the murders known only to police and prosecutors, showing White photographs of the crime scene and the victims' body positions at the time of death. *Id.* Desiderio also told White that he never believed what Craig Vaughn (the

jailhouse informant) told him about White's involvement in the murders and that no one else would either. *Id.* After White and Desiderio fabricated how the murders took place, White gave his first formal statement about the Anderson/Reynolds' Murders on November 4, 1991 to Detectives Cimino and Ansel. *Id.* at ¶ 161. At that time, White repeated the fabricated confession, implicating himself and Williams – as he had done three times before – and also named Rick Bennett, "Steve," "Binky," and "Opie" as associates of Chris Williams involved in the Anderson/Reynolds Murders *from two years prior*. *Id.* White's fabricated story of the murders included an attempted robbery of the victims that ended in all three men being killed and driven around Philadelphia to dump their bodies. *Id.* at ¶ 162. In another interrogation of White on November 13, 1991, White apparently identified (from photographs) Mr. Wilson, among others, as one of the individuals involved in the Anderson/Reynolds Murders, although the statement was not recorded. *Id.* at ¶ 167.

### C.  Mr. Wilson is wrongfully arrested and convicted.

Although police and ADA Desiderio had White's alleged confession, including his implication of Wilson in the Anderson/Reynolds Murders, Wilson was not arrested *for over three months after White's statement*. *Id.* at ¶ 172. Before any arrest was made, on December 19, 1991, police requested that Wilson voluntarily come to the PPD's Homicide Unit to speak with PPD Detectives about the murders to which White had previously confessed. *Id.* at ¶ 170. Wilson complied, and once there, PPD Officers told Wilson that they only wanted Chris Williams and that if Wilson cooperated, he would not be charged with any crimes. *Id.* Nevertheless, Wilson refused to implicate Williams, stating he had no knowledge of any of the murders and could not testify falsely. *Id.* Wilson was not charged or arrested and was instead sent home. *Id.* The next day, Wilson was asked to come to the OPDA, where ADA Desiderio threatened Wilson with prosecution if he did not implicate Williams in the crimes for which White had already confessed. *Id.* at ¶ 171.

Wilson was informed that White had implicated Wilson in the Anderson/Reynolds Murders. *Id.*
Desiderio told Wilson that he knew Wilson did not commit the murders, but that Wilson would be
prosecuted if he did not cooperate in the prosecution of Williams. *Id.* Wilson again denied
involvement and again no charges or arrest was made. *Id.* It was not until February 1992 – *over
two months later* – that Wilson was finally arrested, solely on the basis of White's fabricated
confession. *Id.* at ¶ 172-173. Based only on the testimony of White, on August 6, 1993, Williams,
Bennett, and Wilson were tried for the Anderson/Reynolds Murders as co-defendants. *Id.* at ¶ 177.
Wilson and Williams were convicted on August 6, 1993 and Wilson was sentenced to life in prison.
*Id.* at ¶ 188.  In exchange for Desiderio's plea offer to let White avoid the death penalty, White
provided his testimony against Wilson, and pleaded guilty to all six murders, including the
Anderson/Reynolds Murders on September 13, 1993. *Id.* at ¶ 190.

In 2013, Wilson's co-defendant, Chris Williams, was granted an evidentiary hearing in a
post-conviction proceeding. *Id.* at ¶ 192. During that hearing, White explicitly recanted his trial
testimony, stating his statement about the Anderson/Reynolds Murders was false and fabricated,
that White knew nothing about the triple homicide and that, to his knowledge, neither Williams
nor Wilson had anything to do with the crimes. *Id.* White further testified that he was coerced by
ADA Desiderio and police to lie about the murders and testify against Williams and Wilson in
exchange for a guaranteed pardon hearing after serving 15 years, among other things. *Id.* White
also described further unethical behavior by ADA Desiderio, including buying White and his
family numerous meals, meeting with White while his attorney was not present, and using
deceptive threats and promises to coerce White into pleading guilty to six murders. *Id.* White
further testified that police officers and prosecutors knew that he had no knowledge of or
involvement in the Anderson/Reynolds Murders before he made his statement regarding the

crimes. *Id.* at ¶ 196. When White informed Desiderio that he did not know who committed the murders, Desiderio told White to lie and to use to the same concepts from the Haynesworth case in his statement about the Anderson/Reynolds Murders so the story would be convincing. *Id.* Among other things, this exculpatory evidence was suppressed by ADA Desiderio and police before, during, and after Wilson's interview, arrest, conviction, and exoneration. *See generally compl.* at ¶¶ 142-221. On December 18, 2019, the OPDA, on behalf of the Commonwealth of Pennsylvania, filed a motion to vacate Chris Williams' convictions, acknowledging that White – the only alleged eyewitness – testified falsely during trial and that the physical evidence demonstrated the falsity of his account of the Anderson/Reynolds Murders. *Id.* at ¶ 210. On January 14, 2020, the Commonwealth filed a similar motion to vacate Wilson's convictions, the charges were dismissed, and he was finally released on January 21, 2020. *Id.* at ¶ 211.

**II.   Abraham was ADA Desiderio's Supervisor and the Final Policymaker of the OPDA.**

Former District Attorney Lynne Abraham, nicknamed "America's deadliest DA," by the New York Times in 1995 for the high rate at which her office sought the death penalty, was at all relevant times the chief policymaker in the OPDA, and espoused a fundamentally incorrect and unconstitutional interpretation of a district attorney's constitutional requirements. *Id.* at ¶ 229. Moreover, ADAs faced significant pressure because Abraham expected that any case that was screened and accepted should result in a conviction. *Id.* at ¶ 230. This policy created a "win at all costs" mentality among the ADAs in the OPDA. Moreover, prosecutors in the OPDA weren't attuned or informed about their constitutional and ethical responsibilities. *Id.* Additionally, the OPDA perpetuated these violations by implementing a policy wherein ADAs did not review underlying OPDA files in evaluating and responding to post-conviction claims of constitutional violations. *See* Ex. B, at 29, n. 18; *Id.* at ¶ 230. Prior to and at the time of the unlawful investigation

into the Anderson/Reynolds Murders, the OPDA, by and through its final policymaker, Abraham, maintained policies, customs, or patterns and practices of fabricating incriminating evidence and coercing false confessions, in violation of the Fifth and Fourteenth Amendments. *Id.* at ¶ 244. These policies, customs and practices of the OPDA were the moving force behind the suppression of exculpatory alternative suspect identifications, witness statements regarding the Anderson/Reynolds Murders, and impeachment information regarding White's coerced confession, the only evidence against Wilson at trial. This directly caused Wilson's wrongful conviction on January 6, 1993. *Id.* at ¶ 233.

In addition to the Wilson case, the PPD and OPDA used unconstitutional techniques during the investigation phase of numerous cases to coerce inculpatory statements or confessions from suspects and witnesses by giving those suspects and witnesses details about the crime that the police knew (or believed) to be true, as well as making false promises, including the promise that a suspect would be given lenient treatment or favorable sentencing; making false and improper threats, including threats to use statements made in prior plea negotiations to seek the death penalty; the use or threat of physical violence; making improper assertions of guilt, including confrontation with false inculpatory evidence; and providing false assurances that the suspect would benefit from making an inculpatory statement minimizing the suspect's own involvement. *Id.* at ¶ 245. These techniques are employed to make false and coerced statements seem credible and reliable. *Id.*

These policies, practices, and customs were well-known to the OPDA and the City of Philadelphia and its policymakers – of which DA Abraham is one – and began long-before the investigation into Wilson and his arrest and continued long-after Wilson's conviction. *Id.* at ¶ 246. These policies, practices, and customs have resulted in similar violations committed by the OPDA

and PPD, which illustrate the departments as a whole, and as a matter of custom, practice, and policy, disregarded their obligations to not coerce and fabricate false evidence in order to close cases. *Id.* at ¶ 246. At all relevant times the OPDA's policy, custom, and practice of unconstitutionally coercing and fabricating witness and suspect statements to close cases was not conducted in a prosecutorial or judicial role, but as an investigative function normally performed by a detective or police officer. *Id.* Indeed, the unconstitutional acts described herein – namely the coercion and falsification of James White's statement incriminating Wilson in the Anderson/Reynolds Murders – were conducted *before* Wilson was arrested, charged, or even mentioned as a suspect. Instead, to further the investigation of the Anderson/Reynolds Murders, for which there had been no arrests in over two years, ADA Desiderio, in conjunction with PPD officers, used unconstitutional techniques to coerce, falsify, and threaten White into confessing and implicating Wilson before any prosecution or judicial proceeding began. *Id.* Thus, in an attempt to find a suspect to arrest for the Anderson/Reynolds Murders, ADA Desiderio, in concert with PPD officers, acted as an investigator and not as an advocate for the Commonwealth. *Id.* at ¶ 247.

Likewise, during the investigation and prosecution of Wilson for the Anderson/Reynolds Murders, the OPDA had policies, practices or customs of arresting, charging, and interrogating purported witnesses in criminal investigations without legal cause and with the intent to coerce and/or fabricate statements from these persons, under threat of punishment or false promise of material benefit. *Id.* at ¶ 249. These interrogations were conducted without voluntary consent and without the benefit of advice of counsel. *Id.* Further, because the bulk of information in this case came from one informant who had been coerced – and who had already falsely implicated other individuals in crimes he later confessed to – supervisors, other detectives at the PPD, ADA

Desiderio, and the OPDA knew or should have known that White's statement was unreliable. *Id.* at ¶ 264. But supervisors and other detectives nonetheless used the information to arrest and convict Wilson and clear tough cases that were over two years old. *Id.* The multiple red flags in this investigation, including without limitation the failure to conduct basic investigatory steps, the absence of proper documentation of investigatory steps, the absence of inculpatory information other than one dubious and unsupported eyewitness account from a self-professed murderer, the failure to gather or analyze any physical evidence, the failure to develop any evidence of motive did or should have alerted superiors that this case was part of the pattern of misconduct described above, that the entire investigation was unreliable, and that the arrest and prosecution of Wilson for these crimes was wrongful. *Id.* at ¶ 263.

### III.  The District Attorneys' Motion to Dismiss the Complaint.

Based on this pattern of misconduct, Mr. Wilson filed this federal civil rights action asserting claims of malicious prosecution under both federal and state law (Counts I and VIII); fabrication of evidence, suppression of exculpatory evidence, and fabrication and coercion of White's confession in violation of his right to a fair trial (Count II and III); civil rights conspiracy (Count V); failure to intervene (Count IV), supervisory liability (Count VI), and municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count VII). Despite tacitly acknowledging the sufficiency of Plaintiff's core allegations of misconduct, Defendants move to dismiss all counts against former DA Abraham and former ADA Desiderio alleging malicious prosecution, fabrication of evidence and withholding of exculpatory evidence, coercion of a false statement, supervisory liability, and intentional or reckless infliction of emotional distress under Pennsylvania state law – i.e., all core claims – on the basis of absolute immunity and DA Abraham's lack of personal involvement. For the following reasons, the Motion should be denied.

## LEGAL ARGUMENTS

### I.  Motion to Dismiss Standard of Review.

Under Rule 12(b)(6), the Defendants bear the burden of demonstrating that Plaintiff has failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *Hedges v United States*, 404 F.3d 744, 750 (3d Cir. 2005). In reviewing a motion to dismiss, the Court will "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, [viewing] them in the light most favorable to plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007); *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). The pleading requirements of the Federal Rules are clear and unequivocal. As the Third Circuit recently reiterated, "[t]he Rules demand 'only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also* Fed. R. Civ. P. 8(a). A court considering a motion to dismiss conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, the court "must accept all of the complaint's well-pleaded facts as true," *id.* at 210, including "all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant," *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (quotations and citations omitted). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). This plausibility analysis is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* But "the plausibility standard does not impose a heightened

pleading requirement" or require a plaintiff to "plead 'specific facts' beyond those necessary to state a valid claim." *Schuchardt v. President of the United States*, 839 F.3d 336, 347–48 (3d Cir. 2016). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

## II. The Defendants Are Not Protected by Prosecutorial Immunity.

In their Motion to Dismiss, Defendants Desiderio and Abraham (collectively, "Defendants") mischaracterize Plaintiff's allegations: the individual counts against Defendants are not about the use of perjured testimony or the suppression of exculpatory evidence *at trial* – although the OPDA admits both occurred in this case. Compl. at ¶¶ 217-221; Ex. B. Rather, Plaintiff alleges the Defendants *fabricated and coerced* a false witness statement during the investigation of the Anderson/Reynolds Murders, which provided Defendants with the *only evidence connecting Mr. Wilson to the crimes* and thus was the only basis for probable cause. Unlike a prosecutor's typical duties as an advocate, the fabrication and coercion of James White's statement occurred *prior* to the arrest or questioning of Mr. Wilson (or any other suspect), let alone the initiation of Mr. Wilson's prosecution. This undoubtedly falls into the realm of investigative conduct by a prosecutor, thus excluding Defendants from absolute immunity.

Likewise, DA Abraham, the supervising attorney of ADA Desiderio and the final policymaker of the OPDA at all relevant times knew of and acquiesced to Desiderio's misconduct, resulting in Wilson's wrongful conviction; this, too, is conduct not entitled to absolute immunity. Regardless, DA Abraham failed to train, supervise, and discipline ADA Desiderio and other prosecutors regarding their obligations to avoid the coercion and fabrication of false evidence and to disclose their own misconduct. Because the management of a district attorney's own office is administrative in nature, Abraham's managerial functions– like overseeing the investigation by

13

Desiderio – is not protected by immunity.  Neither Defendant is shielded from liability for their actions, and the case should proceed to discovery.

The Defendants, as the officials seeking absolute immunity, "bear the burden of showing it is justified for the function in question." *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993). "To earn the protections of absolute immunity *at the motion-to-dismiss stage*, a defendant must show that the conduct triggering absolute immunity clearly appear[s] on the face of the complaint." *Weimer v. Cty. of Fayette, Pennsylvania*, 972 F.3d 177, 187 (3d Cir. 2020) (emphasis added) (internal quotations omitted). Every prosecutorial immunity analysis begins with "'[t]he presumption ... that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties' and the observation that the Supreme Court has been 'quite sparing' in its recognition of absolute immunity." *Carter v. City of Philadelphia*, 181 F.3d 339, 355 (3d Cir. 1999) (citing *Burns v. Reed,* 500 U.S. 478, 486-87 (1991)). The United States Supreme Court has outlined a "functional" approach to immunity issues, which looks to the "nature of the function performed, not the identity of the actor who performed it." *Buckley,* 509 U.S. at 269. The Supreme Court has made clear that prosecutors are only entitled to absolute immunity from liability for § 1983 claims when "initiating and pursuing a criminal prosecution." *Imbler v. Pachtman*, 424 U.S. 409, 422 (1976); *Burns,* 500 U.S. at 491-92. Thus, absolute immunity "attache[s] only to actions performed in a quasi-judicial role, such as participation in court proceedings and other conduct intimately associated with the judicial phases of litigation." *Carter,* 181 F.3d at 356 (internal quotations omitted). Further, absolute prosecutorial immunity does not apply when prosecutors act as administrators or investigative officers. *Id.* (*citing Imbler,* 424 U.S. at 430-31).

Similarly, in *Floyd v. Grossman,* this court held that "[a] prosecutor's entitlement to absolute immunity is not automatic," and instead prosecutors "bear a 'heavy burden' to establish the right." *Id.* at 291. The court further held that:

> Analysis of prosecutorial immunity questions is a two-step process. First, the court "must ascertain just what conduct forms the basis for the plaintiff's cause of action." This stage of the process "focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions." Second, the court "must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." Absolute immunity applies when a prosecutor is engaged in judicial or "quasi-judicial" functions, through acts such as preparing to initiate a judicial proceeding or appearing in court to present evidence in support of a search warrant application. Otherwise, the immunity is qualified, which "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."

*Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 292 (E.D. Pa. 2015) (internal citations omitted).

Instead of acknowledging their substantial burden to prove entitlement to any layer of immunity, let alone absolute immunity, Defendants cite generally to Supreme Court and Third Circuit cases for the proposition that prosecutors – including Desiderio and Abraham here – should be absolutely immune from civil liability based on public policy considerations. (Motion, p. 10-11) Those considerations do not apply here, where the conduct alleged is not only outrageous and clearly unlawful, but is not "intimately associated with the judicial phase" of the criminal process, and instead involves conduct occurring *before* and *outside* the context of trial testimony and prosecutorial functions. Indeed, in the cases Defendants cite, the prosecutors' actions were either related to a judicial court proceeding and thus entitled to immunity *see Imbler v. Pachtman*, 424 U.S. 409, 422 (1976) (prosecutor was absolutely immune for misconduct *during trial*, including the knowing use of false testimony), or administrative and investigatory in nature and therefore

*not* entitled to absolute immunity. *See Burns,* 500 U.S. at 478 (prosecutor was absolutely immune for participating in a probable-cause hearing, but not for giving legal advice to the police prior to an arrest); *Schrob v. Catterson,* 948 F.2d 1402, 1413-1419 (3d Cir. 1991) (prosecutor was absolutely immune for initiating an in rem proceeding, seeking a seizure warrant from the court and participating in a related court proceeding, but not for his retention and mismanagement of seized property).

### III.   ADA Desiderio is Not Entitled to Absolute Immunity on Counts I, II, and III because his Conduct is Investigatory.

Defendant Desiderio does not argue Plaintiff failed to plead *prima facie* claims under Counts I, II and III. Instead, Desiderio argues *only* that he is entitled to absolute immunity (Motion, p. 9). Without any factual basis, Desiderio asserts the conduct underlying Counts I (Malicious Prosecution), II (fabrication of evidence, withholding of exculpatory evidence), and III (fabrication and coercion of a false confession) occurred "during trial." Desiderio's assertions are false. His unconstitutional conduct, which occurred well before trial, was investigatory and is not intimately associated with trial or any other judicial proceeding. Accordingly, Desiderio is not entitled to absolute immunity and his motion to dismiss Counts I, II, and III should be denied.

### A.  Malicious Prosecution

In a strikingly similar case to the one at bar, the Third Circuit recently held that a prosecutor was **not** immune from liability for his actions providing the basis for malicious prosecution claim *Weimer v. Cty. of Fayette, Pennsylvania*, 972 F.3d 177, 189 (3d Cir. 2020). There, a § 1983 plaintiff alleged that she spent more than eleven years in prison for a crime she did not commit. *Id.* at 180. After her convictions were vacated, Weimer filed suit against the County, its former District Attorney, the City, and several police officers for violations of her constitutional rights.

*Id.* Like this case, the police in *Weimer* did not arrest any suspects for "over twenty months after the murder…" *Id.* at 181. Also, similar to the case here, a jailhouse informant "over two and a half years since the murder…contacted police from prison and said that a fellow inmate…had confessed that he was involved in [the] murder." *Id.* The police used this statement – despite the fact that it conflicted with other evidence – as the basis for a criminal complaint against Weimer, after which Weimer was arrested. *Id.* at 181-182. Further, like this case, it was revealed that the only witness connecting Weimer to the crime recanted, that the police had "walked him through his testimony," and that the informant lied at trial about requesting no deals or benefits in exchange for their testimony against Weimer. *Id.* at 182.

In the resulting civil action, Weimer alleged that District Attorney Vernon "maliciously prosecuted her in violation of her Fourth and Fourteenth Amendment rights, conspired with police to violate her civil rights, and failed to intervene to prevent officers from violating her constitutional rights" *Id.* On interlocutory appeal, the court addressed only one issue: "whether absolute immunity or, where raised, qualified immunity shields District Attorney Vernon from proceeding to discovery on certain of Weimer's claims." *Id.* at 189. The court then systematically addressed each action that Weimer alleged the district attorney took during the investigation of the case, including the DA's involvement at the crime scene, his participation in interviews and reliance on non-credible witnesses, and the approval of the criminal complaint. *Id.* at 188-190. The court found Vernon's "approval of the criminal complaint is protected by prosecutorial immunity." *Id.* But the court held the prosecutor's other conduct was "investigative in nature," stating: "investigating leads before criminal charges have been filed – is more akin to 'the detective's role in searching for the clues and corroboration that might give h[er] probable cause to recommend that a suspect be arrested" than "the advocate's role in evaluating evidence and interviewing

witnesses as [s]he prepares for trial." *Id.* (citing *Buckley,* 509 U.S. at 273). Accordingly, the court held, "[t]o the extent that this investigatory conduct forms the basis of Weimer's malicious prosecution, civil rights conspiracy, and failure to intervene claims against Vernon, we will affirm the…denial of Vernon's motion to dismiss these claims based on absolute immunity." *Id.*

Like the District Attorney in *Weimer,* Desiderio participated in the involvement of the police investigation by interviewing witnesses and relied on the statements of James White, made *two years* after the crimes – at a time when no suspects had been arrested nor criminal complaints filed – despite White's inconsistent accounts of the other murders he was charged with. Compl. at ¶¶ 142-162. Also, like *Weimer*, White's statement was only obtained *after* a jailhouse informant falsely informed on White. *Id.* at ¶¶ 153-155. In fact, Wilson's allegations here go beyond those in *Weimer* and allege that Desiderio himself coerced and fabricated White's statement and fed White information about the crime to make his statements seem more credible, knowing all the while that White had no actual knowledge of the crimes and that the jailhouse informant's information was not credible. *Id.* at ¶¶ 158-161. Such conduct is clearly investigative and is not intimately associated with the judicial phase of litigation. This is especially true given the fact that Wilson was not arrested for *over three months* after Desiderio concocted White's confession. *Id.* at ¶¶ 168-172. Defendant's Motion argues that such actions were simply "preparing for, initiating, and prosecuting criminal charges" (Motion, p. 14). However, Defendant only cites to distinguishable cases where absolute immunity was granted for the presentation and solicitation of perjured testimony *at trial* or in *grand jury proceedings* and for the withholding of exculpatory evidence *at trial*, (Motion, p. 13); neither is at issue here. Instead, the coercion of White's confession – what Defendant deems "merely…one specific action taken by ADA Desiderio" (*Id.* at 16) – did not occur as Desiderio was "serving as an advocate during a judicial proceeding" like

Defendant alleges. Further, it was the only (false) evidence connecting Wilson to the crimes and the only basis for probable cause. Compl. at ¶ 271. Accordingly, the conduct that provides the basis for Count I against Desiderio is investigatory and, therefore, not protected by absolute immunity. Desiderio's Motion to Dismiss Count I should be denied, and the claim should proceed to discovery.

### B.  Fabrication of Evidence and Coercion of a False Statement

It is beyond dispute that "[p]rosecutors, [] are not entitled to absolute immunity when they are accused of fabricating evidence." *Quintana v. City of Philadelphia*, No. CV 17-996, 2017 WL 3116265, at *6 (E.D. Pa. July 21, 2017). Indeed, the Supreme Court in *Buckley v. Fitzsimmons* – a case Defendants cite frequently in their Motion – concluded that a prosecutor sued under § 1983 was **_not_** entitled to absolute immunity after allegedly fabricating evidence against a murder suspect and making false statements to the press. 509 U.S. 259, 269 (1993). The *Buckley* court held that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* at 273. Additionally, the court held that "[t]hose acts must include the professional evaluation of the evidence ***assembled by the police*** and appropriate preparation for its presentation at trial or before a grand jury ***after a decision to seek an indictment has been made***." *Id.* (emphasis added). The question at issue in *Buckley* was "whether the prosecutors …were functioning as 'advocates' when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot." *Id.* at 274. The court noted that "the conduct of the prosecutors ***during the period before they convened a special grand jury to investigate the crime*** provides the answer." *Id.* (emphasis added). There, the court recognized that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable

19

cause to have anyone arrested." *Id.* The court ultimately found that, where evidence was allegedly fabricated *before* the grand jury was empaneled and the plaintiff was arrested 10 months *after* the grand jury was convened, the "prosecutors' conduct occurred well before they could properly claim to be acting as advocates." *Id.* at 275. Thus, when prosecutors fabricate evidence "during the preliminary investigation of an unsolved crime," they are not entitled to absolute immunity. *Id.*

*Buckley* is particularly instructive here, as Desiderio, like the prosecutor in *Buckley*, is alleged to have fabricated evidence against a murder suspect before he had probable cause to arrest or indict. Compl. at ¶¶ 142-162. Desiderio did not simply "evaluate" evidence assembled by the police, as a prosecutor should.  Rather, he was actively interrogating and coercing James White to confess to murders and to implicate other suspects when no evidence against those suspects even existed. Such conduct is inherently investigative and, under *Buckley,* not entitled to immunity.

Similarly, in *Fogle v. Sokol*, the Third Circuit held that "'investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.'" 957 F.3d 148, 160 (3d Cir. 2020) (citing *Buckley*, 509 U.S. at 273)). In *Fogle,* the Third Circuit directly addressed "the narrow doctrine of absolute immunity" for prosecutors once again. *Id.* at 156. There, the court identified when prosecutors are not entitled to immunity, stating:

> Determining the precise function that a prosecutor is performing is a fact-specific analysis. For instance, **"[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Before probable cause for an arrest, a prosecutor's "mission at that time [i]s entirely investigative in character."** "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, ... a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." **It follows that when prosecutors function as investigators, rather than advocates, they enjoy no right to absolute immunity.**

*Id.* at 160 (internal citations omitted) (emphasis added). The *Fogle* court ultimately held that the prosecutor was not immune from liability because his conduct involved investigative, not prosecutorial, activity. *Id.* at 161.

The prosecutor's conduct in *Fogle* – which involved procuring a witness's statement by undue suggestion and trumping up probable cause to arrest – is almost identical to the allegations in this case. *Id.* at 161. As *Fogle* held, such conduct "was not entitled to absolute immunity because the prosecutor …choreograph[ed] and secur[ed]" a confession and "played 'the detective's role' to 'search for the clues and corroboration.'" *Id.* at 162. The court further held the prosecutor was not entitled to absolute immunity for his acts of obtaining another false and fabricated statement, even though such statements were obtained *after* arrest. *Id.* at 163.

Like *Fogle,* Plaintiff's allegations here include the fabrication of evidence – specifically, witness statements – prior to probable cause, arrest, or indictment. Compl. at ¶¶ 142-162. Also, similar to this case, the prosecutors in *Fogle* "collectively 'misrepresented in written and oral reports that Dennis Fogle had volunteered the 'confession' and subsequent statement without coercion or suggestion.'" *Id.* at 163. In the same way, the Plaintiff here alleges not only that Desiderio fabricated a false statement of James White to implicate Mr. Wilson, among others, for the crimes, but also that the prosecutor and police suppressed the misconduct by failing to report the fabrication and misconduct and by stating the confession was given without coercion or suggestion. Compl. at ¶¶ 142-211. Accordingly, Desiderio's conduct providing the basis for Count II and III against him is investigatory and not protected by absolute immunity. Desiderio's Motion to Dismiss Counts II and III should be denied, and the parties should proceed to discovery.

### C.  <u>Withholding of Exculpatory Evidence</u>

In addition to the fabrication of false and coerced evidence, Claim II also includes allegations that police and ADA Desiderio withheld exculpatory evidence. Despite Defendant's citation to two cases for the proposition that deliberately withholding exculpatory evidence is protected by absolute immunity, several courts in this Circuit have held the exact opposite. *See Fogle,* 957 F.3d at 163 (prosecutor not entitled to absolute immunity "for his role in obtaining Dennis Fogle's statement ***or concealing the methods leading to his confession.***"); *Henderson v Fisher*, 631 F.2d 1115, 1120 (3d Cir.1980) (prosecutor not entitled to absolute immunity for "failing to stop the removal of exculpatory material"); *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1082-1083 (E.D.Pa.1980) (prosecutor not entitled to absolute immunity for discarding a tape-recorded confession to a crime by one person on the eve of plaintiff's trial for that same crime); *Coleman v. Turpen*, 697 F.2d 1341, 1345-1347 (10th Cir.1983) (prosecutor not entitled to absolute immunity for post-trial mismanagement of evidence). Accordingly, because Desiderio withheld or concealed his coercion and fabrication of James White's confession before his role as an advocate began and after it ended, he is not entitled to absolute immunity at this stage in the proceedings. *Fogle,* 957 F.3d at 163.

Defendant also cites *Yarris v. Cty. of Delaware*, 465 F.3d 129, 138 (3d Cir. 2006) in an attempt to argue that courts routinely find withholding of exculpatory evidence and procurement of perjured testimony are "quintessential advocatory acts protected by absolute immunity." (Motion, p. 15). However, the *Yarris* case specifically held that "***where the role as advocate has not yet begun…or where it has concluded, absolute immunity does not apply.***" *Id.* (citing *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir.2003)) (emphasis added). Indeed, the court in *Yarris* denied absolute immunity to prosecutors because "at this stage of the proceedings, the

22

ADAs cannot establish that they are entitled to absolute immunity for allegedly fabricating Yarris's confession." *Id.* at 138-139. Further, the court held that "[a]fter a conviction is obtained, the challenged action must be shown by the prosecutor to be part of the prosecutor's continuing personal involvement as the state's advocate in adversarial post-conviction proceedings to be encompassed within that prosecutor's absolute immunity from suit." *Id.*

Here, Desiderio withheld the exculpatory information relating to his coercion and fabrication of James White's statement *before* acting as an advocate (as mentioned above) and which continued *after* Wilson's conviction into his post-conviction proceedings. Compl. at ¶¶ 142-162. Because Desiderio was not acting as an advocate during Wilson's post-conviction proceedings, he is not protected for his continued suppression of exculpatory evidence. *Yarris*, 465 F.3d 129, 138. In fact, the *Yarris* court held that "[b]ecause the ADAs have not yet shown how the handling of DNA evidence related to ongoing adversarial proceedings in which they ***were personally involved***, we conclude that the prosecutors may have been "function[ing] as…administrator[s] rather than as…officer[s] of the court" and, thus, may be "entitled only to qualified immunity." *Id.* (emphasis added). Additionally, the Third Circuit has recently held that prosecutors were not entitled to absolute immunity for claims alleging the withholding of exculpatory evidence, stating that "[i]n *Odd*, we noted that some acts, 'presumably by virtue of their egregiousness…fall wholly outside the prosecutorial role no matter when or where they are committed.'" *Munchinski v. Solomon,* 747 F. App'x 52, 57 (3d Cir. 2018) (discussing allegations that a prosecutor concealed and tampered with a report was tantamount to destruction of evidence and was "precisely this type of act"). The court then addressed both *Yarris* and *Buckley*'s holdings, reiterating that "the Third Circuit in *Yarris v. Cty. of Delaware*, 465 F.3d 129, 138 (3d Cir. 2006) also held that 'the key question is whether the ADAs were functioning as the state's advocates

when they engaged in the conduct that gave rise to the evidence-fabrication allegations. *See Buckley*, 509 U.S. at 274, 113 S. Ct. 2606.' In *Buckley*, the Supreme Court denied absolute immunity to prosecutors who had allegedly fabricated evidence that was used to obtain a criminal conviction after it determined that "the prosecutors' conduct occurred well before they could properly claim to be acting as advocates." *Id*. This is the precise case at bar, as both the fabrication of White's statement and the suppression and concealment of the prosecutorial misconduct all occurred *before* and *after* the Defendant acted in an advocate capacity.

Further, in *Thomas v. Commonwealth*, 1986 WL 1976 (E.D.Pa.1986), the court declined to extend Section 1983 absolute immunity to a prosecutor for alleged misconduct related to the policy of keeping exculpatory evidence in "street files" concealed from criminal defendants including plaintiff. *Id.* at *1. Citing *Henderson v. Fisher*, the court stated that "[s]uch conduct might be characterized as administrative, rather than prosecutorial, and subject the District Attorney to liability," because the keeping of evidence is deemed an administrative function and not prosecutorial. *Id.* Likewise, the court held that since the prosecutor "may be violating plaintiff's rights by such a dual filing system…this claim may proceed." *Id.* Here, Plaintiff alleges – as a part of Claim II – that Desiderio not only deliberately and improperly fabricated false inculpatory evidence by way of White's confessions, as well as other fabricated false evidence to support the coerced and false confession, but suppressed the misconduct as well as other exculpatory evidence that would have contradicted White's false confession. Compl. at ¶ 280-281. Accordingly, the concealment of Desiderio and police's misconduct of fabricating White's false confession and evidence contradicting the confession, including that White denied any involvement in the crime, that police and ADA Desiderio used coercive or otherwise improper tactics to elicit a false confession, and the true terms of White's plea deal were withheld before, during, and after

24

Wilson's arrest deprived Wilson of a fair criminal trial. *Id.* at ¶¶ 283, 287, 288, 292. Further, the PPD and OPDA's policy at the time, to withhold "police activity sheets" from criminal defendants such as Wilson, caused or contributed to Wilson's arrest and continued confinement and prosecution, as such exculpatory information was known only to the Commonwealth but not to Wilson. *Id.* at ¶ 272. Such a policy regarding the maintenance and concealment of the exculpatory police activity files, are investigatory and administrative functions, not discretionary prosecutorial acts made in furtherance of a judicial proceeding. Indeed, this exact type of "dual system" was not entitled to absolute immunity under *Thomas v. Commonwealth*, 1986 WL 1976 (E.D.Pa.1986), and this portion of Claim II, should be allowed to continue to discovery.

### D.  Defendant Desiderio's Arguments are Unavailing

The cases cited by Defendant, holding that when initiating or presenting the state's case the prosecutor enjoys absolute immunity, are inapplicable here. Indeed, Mr. Wilson agrees that making false statements in judicial proceedings and eliciting knowingly false testimony from witnesses at trial (*Bums,* 500 U.S. at 490; *Tate v. Grose.* 412 F. Supp. 487, 488 (E.D. Pa. 1976)), and soliciting false testimony for use in grand jury proceedings (*Rose v. Bartle.* 871 F.2d 331, 347 n.12 (3d Cir. 1989), typically arise during a judicial proceeding and are thus immunized. The numerous other cases relied on by the Defendant likewise entail the invocation of absolute immunity for core prosecutorial functions at or during trial. (Motion, at 11-16). But again, Mr. Wilson's case does not rest on such assertions. Rather, Mr. Wilson has specifically claimed that before and during the prosecutor's consideration of whether to even charge Mr. Wilson with the triple homicide, that is, in the investigative phase of the case, Desiderio fabricated and coerced a false statement from James White – knowing such a statement was false – the fact of which was exculpatory to Mr. Wilson but suppressed. Compl. at ¶¶ 156-162, 183. Defendant ADA Desiderio

25

improperly and unconstitutionally concocted the only evidence connecting Mr. Wilson to the crime, the existence of which was the very exculpatory evidence that would have exonerated Mr. Wilson of the murders. These were not core prosecutorial decisions but improper investigative functions of policemen and thus Desiderio is not entitled to absolute immunity.

Further, because Desiderio recognizes that the timing of his actions in this case suggest a non-prosecutorial function, he cites *Kulwicki* and *Rose v. Bartle* in an attempt to argue "when" Desiderio's actions took place are not dispositive in the "investigatory" analysis. (Motion, p. 12-13). Even if the timing of Desiderio's actions were not dispositive, the court in *Kulwicki* declined to extend prosecutorial immunity "to protect a district attorney who manufactured evidence." *Crawford v. Commonwealth,* 2003 WL 22169372, *82 (M.D. Pa. 2003) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259). Likewise, in *Rose v. Bartle,* the conduct at issue was subornation of perjury and disclosure of secret grand jury testimony – not fabrication and coercion of statements and evidence prior to obtaining probable cause to arrest – as Wilson alleges here. 871 F.2d 331, 343 (3d Cir. 1989). Indeed, the *Rose* court specifically held that "there may well be situations in which the allegations establish that the solicitation or coercion of false statements from a witness occurred while the prosecutor was acting in an investigative capacity, this does not appear to be one of them." *Id.* at 344. Further, although the "mere invocation of the catch-word 'investigatory'[] cannot suffice…to forestall dismissal on immunity grounds,' the *Rose* court held that it was the plaintiffs' own pleadings that indicated the alleged solicitations of perjury occurred "in preparation for the grand jury proceedings, not in an investigatory capacity." *Id.* at 345. Clearly different here are the extensive allegations in Plaintiff's Complaint, which sufficiently explain how, among other things:

26

> The unconstitutional acts described herein – namely the coercion and falsification of James White's statement inculpating Wilson in the Anderson/Reynolds Murders – was conducted before Wilson was arrested, charged, or even mentioned as a suspect. Instead, to further the investigation of the Anderson/Reynolds Murders, for which there was no arrests in over two years, ADA Desiderio, in conjunction with Defendant PPD Officers, used unconstitutional techniques to coerce, falsify, and threaten James White into confessing and implicating Wilson before any prosecution or judicial proceeding began. Thus, in an attempt to find a suspect to arrest for the Anderson/Reynolds Murders, ADA Desiderio, in concert with the PPD Officers, acted as an investigator and not as an advocate for the Commonwealth.

Compl. at ¶ 248. This allegation alone is sufficient to deny prosecutorial immunity at this stage in the proceedings, but regardless, over twenty other factual allegations explicitly detail *how* and *why* Desiderio's specific misconduct involved in the Counts against him occurred in the investigatory phase of the case, well before he was acting in any quasi-judicial capacity. *Id.* at ¶¶ 141-172. Indeed, the essence of Mr. Wilson's claims against Desiderio are that before Wilson's arrest and before probable cause existed – or any shred of evidence implicated Mr. Wilson in the crimes – Desiderio coerced and fabricated a false statement from James White implicating Mr. Wilson during the investigation of the Anderson/Reynolds Murders, which was the only evidence leading to probable cause for an arrest, evidence that was deliberately withheld and suppressed. Because Desiderio's egregious misconduct, resulting in the wrongful arrest and eventual wrongful prosecution and conviction of Wilson, occurred plainly in Desiderio's investigative or administrative capacities, he cannot shield himself behind the armor of absolute immunity. Accordingly, Desiderio is not entitled to absolute immunity for his fabrication of evidence, his suppression of exculpatory information, or his fabrication and coercion of White's false confession implicating Wilson. Desiderio's Motion to Dismiss Claims I, II, and III should be denied.

IV.     **Defendant DA Abraham is Not Entitled to Absolute Immunity for her Supervisory Role and Her Administrative Conduct Here.**

As noted above, the Defendants misunderstand the nature of Plaintiffs' claims against them in this action. Former District Attorney Abraham is being sued by Plaintiffs for two basic functions: (1) her acquiescence of Desiderio's investigatory misconduct and/or her failure to supervise Desiderio's investigatory conduct (Counts I, II, III, VII, VIII, and IX) and (2) her policy and practice of failing to train, supervise, and discipline ADA Desiderio and other ADAs for their misconduct (Count IV). Defendant Abraham argues that Counts I, II, and III should be dismissed because "the Complaint does not present facts that indicate DA Abraham had any personal involvement in the alleged misconduct directed against Plaintiff or, in the alternative, because DA Abraham is entitled to absolute immunity." Abraham also argues Count VI should be dismissed because she is entitled to absolute immunity and that Counts VIII, and IX should be dismissed based on absolute immunity or because the Court should decline to exercise supplemental jurisdiction. (Motion, p. 20). For the reasons mentioned above and detailed further below, Defendant Abraham is not entitled to absolute immunity.

### A.  Defendant DA Abraham is Entitled Only to the Level of Immunity that Desiderio is Entitled.

"When a trial prosecutor is not absolutely immune from suit as a result of his engaging in administrative action which is not itself protected by absolute immunity…the prosecutor responsible for supervising and training that trial prosecutor is similarly not absolutely immune from suit for her conduct in sanctioning, supervising, and approving that trial prosecutor's action." *Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 296 (E.D. Pa. 2015). This is especially true when the subordinate prosecutor's conduct "involves no discretionary or advocative component and is unrelated to the trial." *Id.*

28

Here, Plaintiff has clearly alleged that ADA Desiderio is not entitled to absolute immunity for his conduct providing the basis for Counts I, II and III. *See supra Section III* above. Further, Plaintiffs have sufficiently pled – and Defendants do not dispute – that DA Abraham was the prosecutor directly responsible for supervising and training Desiderio. Compl. at ¶ 307. Likewise, as her subordinate assistant district attorney, Abraham sanctioned, supervised, and approved Desiderio's actions at all times relevant to this action. *Id.* at ¶ 242, 248; 263-264; 308. Accordingly, Abraham is only entitled to the level of immunity that ADA Desiderio has – in this case, none. Like Desiderio, Abraham is not entitled to absolute immunity for her supervision of Desiderio's investigatory conduct.

**B.** **Plaintiff Has Sufficiently Alleged Abraham's "Personal Involvement" in this Action.**

In an attempt to escape a strong supervisory liability claim, Abraham argues Plaintiff "presents no facts suggesting that DA Abraham had knowledge of or personal involvement in any decision to fabricate evidence against Plaintiff, to withhold or suppress exculpatory and impeachment evidence that would have shown Plaintiff was innocent of the Victims' murders, or to fabricate/coerce White's false confession against Plaintiff." (Motion, p. 22). In doing so, Abraham ignores clear § 1983 supervisory liability precedent as well as Plaintiff's specific allegations against Abraham.

As Defendant notes, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs," *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)), a supervisor in a § 1983 action can show personal involvement in three ways: "(1) participate in violating the plaintiff's rights; (2) direct others to violate them; or (3) as the person in charge, know of and acquiesce in the subordinate's unconstitutional conduct." *Korth v. Hoover,* 190 F. Supp. 3d 394,

403 (M.D. Pa. 2016). Further, some courts have held that "[m]ere knowledge and acquiescence in a subordinate's constitutional violations may also qualify as personal involvement," and that "[a]llegations that a supervisor tolerated past or ongoing misbehavior may suffice." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 587 (M.D. Pa. 2013) (internal quotations omitted). Regardless, "[a]ctual knowledge can be inferred from circumstances other than actual sight." *Festa v. Jordan*, 803 F. Supp. 2d 319, 325 (M.D. Pa. 2011) (internal quotations omitted). Likewise, "[a]cquiescence is found were a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so." Additionally, acquiescence can be found where the supervisor knows about the unconstitutional conduct and "facilitates it, approves it, condones it, or turns a blind eye to it." *Haberstick v. Nesbitt, et al.,* 1998 WL 472447, *4 (E.D.Pa.1998).

Additionally, because "the term 'personal involvement' is not universally defined in applicable case law," courts have held that "[p]olicy-making supervisors may be liable if they established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 588 (M.D. Pa. 2013) (internal quotations omitted). Further, a "supervisor's failure to employ a specific supervisory practice or procedure to correct a known unreasonable risk of constitutional harm also satisfies the personal involvement requirement." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 587-588 (M.D. Pa. 2013) (internal quotations omitted); *see also Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 291-297 (E.D. Pa. 2015) (holding that a Philadelphia District Attorney's actions "taken as part of her supervisory and administrative duties are entitled only to qualified, not absolute immunity.").

Here, Plaintiff alleges both that Abraham was "directly involved in the investigation of Wilson and directly supervised the specific investigative acts taken by…ADA Desiderio," compl.

at ¶ 307, and that Abraham established and maintained policies, practices, and customs of unconstitutional misconduct resulting in Wilson's wrongful conviction. Specifically, Plaintiffs alleged Abraham was deliberately indifferent to Desiderio's misconduct, violating her duty to supervise ADA Desiderio, and that Abraham had actual or constructive notice of her subordinate's misconduct. *Id.* at ¶ 308. Plaintiff also alleges that, because the bulk of information in this case came from one, coerced informant, ADA Desiderio and his supervisor at the OPDA, DA Abraham, knew or should have known White's statement was unreliable. *Id.* at ¶ 264. Regardless, Plaintiff alleges that DA Abraham, as supervisor, as well as the other detectives, used unreliable information to arrest and convict Wilson and clear stale cases that were over two years old. *Id.* Plaintiff additionally alleges that Abraham knew or should have known that the misconduct in Wilson's case was part of a pattern of misconduct described in Plaintiff's complaint, ¶¶ 240-248, that the entire investigation was unreliable, and that the arrest and prosecution of Wilson for these crimes was wrongful. *Id.* at ¶ 263. Additionally, Plaintiff alleges that the policies and practices maintained by DA Abraham include but are not limited to the suppression of exculpatory evidence (Compl. ¶¶ 222-233) and the fabrication and coercion of inculpatory evidence (*id.* at ¶¶ 244-251), which "caused Desiderio to deprive Wilson of his clearly established constitutional rights, including his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial." *Id.* at ¶ 306.

Accordingly, Plaintiff sufficiently alleges that Abraham, as Desiderio's supervisor, knew of Desiderio's misconduct, including the malicious prosecution, the fabrication of evidence, the coercion of White's confession, and the withholding of exculpatory evidence in the Wilson investigation, and that she acquiesced to such conduct by her deliberate indifference, her knowing

failure to stop such misconduct, and/or her tolerance of her subordinates' unconstitutional behavior. *Id.* at ¶¶ 242, 248.

### C. Abraham is Additionally Not Entitled to Absolute Immunity as Her Supervisory Conduct was Not Connected with the Conduct of a Trial.

Despite the personal involvement of DA Abraham in supervising the actions of Desiderio, Defendant argues that her "failure to adequately supervise, discipline or train ADA Desiderio which resulted in his fabricating inculpatory evidence, failing to disclose exculpatory evidence, coercing false testimony and causing Plaintiff to be prosecuted without probable cause," as well as "her alleged creation of policies which resulted in the alleged misconduct by prosecutors is protected by absolute immunity because they are directly connected with the conduct of a trial." (Motion, p. 25-26). This argument is unconvincing, as it once again ignores Plaintiff's allegations and clear legal authority to the contrary. Instead, as stated supra, in Section IV(A), DA Abraham is not entitled to absolute immunity for her supervisory liability because Desiderio is not entitled to absolute immunity for his underlying misconduct. Further, Abraham is liable for her failure to supervise, discipline or train ADA Desiderio and her creation of policies resulting in Wilson's wrongful conviction because they are administrative in nature.

The Third Circuit clearly articulated the distinction between a district attorney's prosecutorial and administrative/investigative functions for purposes of immunity in *Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir.1999). There, a wrongfully convicted plaintiff filed a § 1983 action against the City of Philadelphia, police officers, Defendant Lynn Abraham and unknown assistant district attorneys. *Id.* Carter claimed that the prosecutor defendants failed "as administrators to establish training, supervision and discipline policies which would have (a) prevented or discouraged Philadelphia police officers from procuring perjurious 'eyewitnesses'

and (b) alerted assistant district attorneys to the falsity of such information and prevented its introduction as evidence." *Id.* at 343. The district court dismissed the claims against the DA's office as immune under the Eleventh Amendment. *Id.* In holding that the prosecutors were not immune from suit, the Third Circuit observed that there is a "meaningful analytical distinction between a district attorney's prosecutorial and policy-making functions." *Id.* at 351. Citing other circuits who have addressed the issue, the court acknowledged the "obvious:" that "making and applying county-wide policy differs from carrying out state-wide policy," and that courts have "therefore, repeatedly differentiated between administrative and prosecutorial functions." *Id.* at 351. Thus, the *Carter* court held that prosecutors "serve as local policy makers when they manage or administer their own offices," and that the "district attorney's management of the office – in particular the decision not to supervise or train ADAs on *Brady* and perjury issues – constituted policymaking for the county, rather than the state." *Id.* at 352.

In addition to holding that Eleventh Amendment immunity did not apply, the Third Circuit stated that "the function complained of here is not prosecutorial, but administrative: it involves local policies relating to training, supervision and discipline, rather than decisions about whether and how to prosecute violations of state law. Therefore, even if a member of the Philadelphia DA's Office were deemed a state actor with respect to prosecutorial functions, they would nevertheless be a local policymaker with respect to the conduct at issue here." *Id.* at 352-353. Further, the court additionally ruled that "[l]iability under § 1983 will lie against supervisors whose conduct amounts to 'deliberate indifference' to the rights of persons with whom their subordinates will come into contact." *Id.* at 357. Indeed, the court held that a failure to train or supervise amounting to deliberate indifference only requires a showing that: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a

history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Harris*, 489 U.S. 378, 388 (1989) and *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)); *see also Keehn v. Troutmann*, No. CV 17-2109, 2019 WL 1429332, at *9 (E.D. Pa. Mar. 29, 2019).

The Third Circuit's reasoning in *Carter* applies with equal force here, as Plaintiff has alleged that DA Abraham failed to implement sufficient safeguards and adequately train or sufficiently supervise her agents, and instead, encouraged and condoned a pattern of improper conduct, not only with respect to the disclosure of exculpatory evidence but also with respect to fabricated and coerced statements made by suspects and witnesses like James White. Compl. at ¶¶ 222-233, 244-251, 303-309. Wilson alleges here that the "final policymaker" of the OPDA, DA Abraham, turned a blind eye, failed to supervise, and failed to train assistant district attorneys regarding the procurement and use of coerced and fabricated evidence and testimony while simultaneously declining to bar its use in future cases. *Id.* at ¶¶ 320. Her inaction, in essence, sanctioned this activity, which became the City and OPDA's "standard operating procedure" in these types of cases that eventually led to the violation of Wilson's constitutional rights. *Id.* at ¶¶ 222-233, 244-251, 303-309. Defendant Abraham was deliberately indifferent to the misconduct of Defendant Desiderio, particularly in her mismanagement of the policies and practices regarding fabrication of inculpatory evidence and the coercion and fabrication of a witness's confession, especially prior to an arrest. Indeed, claims for failure to train and supervise have been properly stated in terms of the personal involvement of Defendant Abraham over Defendant Desiderio's deprivations of Wilson's civil rights. *Id.*

In addition, Plaintiff Wilson alleges that Defendant ADA Desiderio acted with impunity in an environment in which he was not adequately supervised, disciplined, or trained by then-District

Attorney Lynne Abraham in this case and as a matter of practice. Compl. at ¶ 305. Defendant Abraham acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens like Wilson by failing to provide adequate training, supervision, and discipline of Defendant ADA Desiderio, and thereby caused Desiderio to deprive Wilson of his clearly established constitutional rights. Id. at ¶ 306. Had Defendant Abraham not provided grossly inadequate discipline, supervision and training of ADA Desiderio, he would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence and evidence of his own misconduct, coerced false testimony, or recklessly, intentionally, and/or maliciously caused Wilson to be arrested and prosecuted without probable cause. Id. at ¶ 307. Thus, DA Abraham is not entitled to absolute immunity for her failure to train, supervise, and discipline Desiderio's conduct providing the basis for Wilson's Counts I, II, and III.

Further, prosecutors in the OPDA – for which DA Abraham is the final policymaker – systematically failed to turn over evidence that would undermine the reliability of witnesses who had given false, coerced testimony under the threat of arrest or other consequences. Id. at ¶ 316; Est. of Tyler ex rel. Floyd v. Grossman, 108 F. Supp. 3d 279, 288-289 (E.D. Pa. 2015).  Indeed, Defendant Abraham – the final policymaker for the OPDA – had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, the unconstitutional investigatory practices of its prosecutors mentioned above and the charges that resulted which the OPDA used to improperly close cases such as Wilson's. Id. at ¶ 318. The egregious acts of Defendant ADA Desiderio were deliberately ignored by DA Abraham as she knew about the misconduct but either encouraged it or turned a blind eye to it. Id. at 320. DA Abraham knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to the use of false, fabricated or coerced testimony and perjury, false eyewitness reports, fabricated evidence,

false identifications, wrongful arrests, malicious prosecutions, and wrongful convictions – the exact outcome in this case. *Id.* at ¶ 320. These actions implicate both Desiderio's investigative functions of Desiderio (for which no absolute immunity applies) and administrative functions of Abraham, and hence none are cloaked by absolute immunity. *Carter,* 181 F.3d at 352-353. At this stage in the litigation, that is all that Plaintiff must allege, and he has done so with sufficient specificity to put the Defendants on notice of the claims against them. *See* Fed. R. Civ. P. 8(a). Accordingly, Defendant's Motion to Dismiss Counts I, II, III, and VII should be denied.

### D. <u>Defendant Abraham's Arguments are Unavailing</u>

To support her weak position, Abraham cites three cases in hopes that the court will grant her absolute immunity regardless of Plaintiff's well-pled allegations: *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009); *Quintana v. City of Philadelphia*, No. CV 17-996, 2017 WL 3116265, at *7 (E.D. Pa. July 21, 2017); and *Segers v. Williams*, 12 F. Supp. 3d 734 (E.D. Pa. 2014). However, all three cases involve conduct by a supervising district attorney that is "directly connected with the conduct of a trial," and, therefore, do not apply here, where the conduct at issue is either investigative or administrative in nature.

#### i. *Van De Kamp* is Inapplicable.

In *Van de Kamp,* a § 1983 plaintiff alleged the district attorney and deputy district attorney failed to institute proper systems for information-sharing and failed to adequately train or supervise subordinates on the proper means to share information about informants, resulting in a *Giglio* violation. *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). In *Van de Kamp*, the Plaintiff argued Defendants' conduct was administrative in nature, and, therefore, not immune from liability. *Id.* But the Court recognized that, although the policies and management functions at issue were administrative in nature, they were procedures "directly connected with the conduct of a trial." *Id.*

36

at 344. Therefore, because "[t]he management tasks at issue…concern[ed] how and when to make impeachment information available at a trial" they were "directly connected with the prosecutor's basic trial advocacy duties," and, therefore, protected by absolute immunity. *Id.* at 863.

That is not the case here, where Abraham's failure to train and supervise relates directly to the *pre-trial* fabrication of evidence and the coercion of confessions *prior to* obtaining probable cause. Further, in *Schneyder v. Smith*, a § 1983 plaintiff alleged that a Philadelphia District Attorney violated her Fourth Amendment rights "by failing to notify [a judge] or take any steps to have plaintiff released from custody knowing that she would not be needed as a witness in the underlying criminal case for several more months." *Id.* at 318. In analyzing the prosecutor's immunity, the Third Circuit addressed *Van de Kamp*'s holding, explaining that "*Van de Kamp* establishes subcategories within the 'administrative' class of official functions." 653 F.3d 313, 334 (3d Cir. 2011). The court then stated:

> One thing that *Van de Kamp* does not change is our characterization of the conduct in question as the nonperformance of a constitutional duty to advise the court of a significant change in the circumstances surrounding the detention of a material witness. We also continue to think that this duty is, broadly speaking, administrative rather than advocative. After *Van de Kamp*, we must ask the further question whether this is the sort of administrative duty the performance or nonperformance of which is protected by prosecutorial immunity. We hold that it is not.

*Id.* The court in *Schneyder* further held that "there was no advocative or discretionary dimension to [the prosecutor's] dereliction of her duty. She was the only person with knowledge of the relevant facts, and she was obligated to ensure that the court had information sufficient to monitor Schneyder's status." *Id.* The court held that "[i]t is true that this was not a paradigmatic, 'workplace hiring' type of administrative duty, but neither was it directly connected to the conduct of a trial," as it was *after* a continuance, and thus "it simply is not the prosecutor's prerogative to decide how long to keep a material witness detained." *Id.* The court ultimately held that "[a]s the sole

37

government official in possession of the relevant information, Smith had a duty of disclosure that was neither discretionary nor advocative, but was instead a purely administrative act not entitled to the shield of immunity, even after *Van de Kamp*." *Id.*

Additionally, the court in *Grossman* addressed the same prosecutorial immunity issue in *Schneyder* and *Van de Kamp*, holding that – as mentioned *supra* in Section IV(A):

> Under *Van de Kamp*, a supervising prosecutor is not liable for his actions relating to a particular trial when the trial prosecutor himself is absolutely immune from suit because both parties' actions are closely associated with the judicial process.

*Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 296 (E.D. Pa. 2015) (holding that because a prosecutor "engaged in administrative action not protected by absolutely immunity, Grossman's action in supervising that conduct is similarly unprotected.") Like *Schneyder,* the *Grossman* court based its decision on the fact that "[t]he conduct involved no discretion and no advocacy, and, as a result, is not entitled to absolute immunity." *Id.* The court denied Grossman, the supervising prosecutor, absolute immunity. *Id.* at 298. In addition, the court held that "sparce" allegations in plaintiff's complaint were sufficient at the motion to dismiss stage, because they alleged the defendants "acquiesced to the rejection" of evidence, and that their "inaction, in essence, sanctioned this activity," leading to the violation of the plaintiff's constitutional rights. *Id.*

As revealed in *Grossman*, the critical distinction between *Van de Kamp* and the case at bar is that the *Van de Kamp* claim "rests in necessary part upon a consequent error by an individual prosecutor ***in the midst of trial,***" *id.* at 346, while the claims against Abraham and Desiderio involve actions and conduct of prosecutors in the midst of a police investigation, prior to an arrest and prior to trial. Like the prosecutors in *Grossman,* Abraham acquiesced to the rejection of evidence proving Wilson was innocent, and Abraham, as well as other police supervisors, did

nothing to deal with the misconduct of Desiderio and the police on numerous occasions. Compl. at ¶¶ 242, 248.  Likewise, because Abraham's supervision of Desiderio's investigatory misconduct is only entitled to the same level of immunity as Desiderio himself, neither prosecutor is entitled to absolute immunity.

### ii.  *Quintana* is Inapplicable.

In the second case Defendants cite, *Quintana v. City of Philadelphia*, a § 1983 plaintiff alleged the Philadelphia district attorney's office and individual assistant district attorneys approved a probable cause affidavit, obtained an arrest warrant based on false evidence, failed to review evidence of alternate suspects, failed to investigate, failed to provide the defense with relevant discovery, and conspired to wrongfully convict the plaintiff and present false testimony to the court. No. CV 17-996, 2017 WL 3116265, at *7 (E.D. Pa. July 21, 2017). There, the court definitively found that "fabrication of evidence 'during the preliminary investigation of an unsolved crime' is not conduct protected by absolute immunity." *Id.* at *6 (citing *Buckley,* at 274). However, because some of the allegations of misconduct were "simply complaints about conduct 'intimately associated with the judicial phase of the criminal process,'" the district attorneys were entitled to absolute immunity for most of those actions. *Id.* at *7. Indeed, the court specifically held that because the underlying actions by the assistant district attorneys were prosecutorial in nature, the alleged failure to supervise or train subordinates which resulted in the alleged misconduct described above was also protected by absolute immunity. *Id.* at *8. Like *Van de Kamp*, the key difference between *Quintana* and the case at bar is that Desiderio's core misconduct was the fabrication of inculpatory evidence, suppression of exculpatory evidence, and fabrication and coercion of a false confession *prior to* any initiation or preparation of criminal proceedings and *prior* to any suspect being arrested or charged. Thus, Abraham's supervision of Desiderio and

acquiescence to his misconduct also were not prosecutorial in nature and she is not entitled to immunity.

### iii.   *Segers* is Inapplicable.

Finally, Defendant cites *Segers v. Williams*, 12 F. Supp. 3d 734 (E.D. Pa. 2014). There, a § 1983 plaintiff brought suit against several district attorneys alleging malicious prosecution, abuse of process, and due process violations *during the prosecution* of Segers for driving under the influence and possession of marijuana. *Id.* Specifically, the plaintiff alleged that the ADAs failed to "promptly convey the exculpatory test results to defense counsel. *Id.* at 739. In analyzing whether the conduct was absolutely immune from suit, the *Segers* court held that "[a]ctions relating to a prosecutor's handling and presentation of evidence are squarely within a prosecutor's advocacy function – and thus entitled to absolute immunity." *Id.* However, the court then noted that "the period during which prosecutors are most likely functioning [as advocates] ... is the time between indictment and dismissal, acquittal, or conviction.'" *Id.* at 738-739. But, the conduct at issue in *Segers* – like in *Quintana* and *Van de Kamp* – is distinguishable from the case at bar. Even if Desiderio's suppression of exculpatory evidence regarding White's false statement was blanketly covered under the guise of *Seger* (which it is not), Desiderio's pre-trial fabrication of evidence and coercion of the false statement of James White is purely investigative conduct, not within a district attorney's advocacy function.

### V.   Defendants Desiderio and Abraham are Not Immune from Liability on Plaintiff's State Law Claims and Supplemental Jurisdiction is proper.

Finally, this Court should deny Defendants' Motion to Dismiss Plaintiff's state law claims. Defendants argue their status as prosecutors protects them from liability for Plaintiff's state law claims, blanketly asserting Desiderio and Abraham are entitled to "*absolute* immunity." (*See*

Motion to Dismiss, pp. 17, 26) (emphasis added). But Defendants' assertion that they have complete and boundless immunity oversimplifies and misstates the law.

Under Pennsylvania state law, prosecutors are only immune from liability for "actions taken in the course of their official duties." *Brown v. Riazzi*, No. CV 17-708, 2018 WL 2435185, at *8, n. 13 (*citing Dunham v. McElynn*, 772 A.2d 68, 69-70 (Pa. 2001)). When the plaintiff's "complaint alleges specific conduct … that, if proven, would be outside the scope of his official duties as an ADA," the prosecutor not immune from suit. *Melchiorre v. Haileab*, 252 A.3d 697 (Pa. Commw. Ct.), *appeal denied*, 260 A.3d 76 (Pa. 2021); *see, e.g., Carter v. City of Philadelphia*, 181 F.3d 339, 342 (3d Cir. 1999) (Third Circuit reversed district court's dismissal of state and federal law claims against prosecutors and DA's Office holding they were not entitled to absolute immunity). Thus, Plaintiff's state law claims, like his claims under Section 1983, are not subject to a defense of prosecutorial immunity, because the Defendants' investigative and administrative misconduct in this case falls outside of the official duties of a prosecutor. *See, e.g.*, *Carter*, 181 F.3d at 342 (Third Circuit reversed district court's dismissal of state and federal law claims against prosecutors and DA's Office holding they were not entitled to absolute immunity).

In his Complaint, Plaintiff alleges Desiderio fabricated evidence prior to arrest and indictment, as a means to trump up fake charges against Mr. Wilson. Plaintiff further alleges Abraham oversaw and acquiesced to Desiderio's misconduct. As Plaintiff pleaded in his Complaint, neither the act of fabricating evidence nor the act of overseeing the fabrication of evidence falls within the scope of either prosecutor's official duties. In cases like this, where the Plaintiff has properly alleged the prosecutors exceeded their official duties, the Court should not dismiss the Complaint. "With no factual development through discovery, it is premature for [the] Court" to even "attempt to resolve the immunity question." *Melchiorre v. Haileab*, 252 A.3d 697

(Pa. Commw. Ct.), *appeal denied*, 260 A.3d 76 (Pa. 2021).  Plaintiff has pleaded more than sufficient facts to withstand dismissal.  Accordingly, the Court should deny Defendants' Motion to Dismiss Plaintiff's state law claims on the grounds of prosecutorial immunity.

The Court should also reject Defendants' urging to decline supplemental jurisdiction over Plaintiff's state law claims. It is this Court's custom to exercise supplemental jurisdiction when the Plaintiff has pleaded proper claims under Section 1983, as Mr. Wilson has done here. *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1091 (E.D. Pa. 1980) ("[I]n cases on our docket we have generally exercised our discretion in favor of retaining pendent state law claims in civil rights actions when, as here, such retention advanced judicial economy and convenience, and no unfairness to the litigants appears.").  Defendants' Motion to Dismiss should be denied on all grounds.

## <u>CONCLUSION</u>

Defendants Abraham and Desiderio are not entitled to absolute immunity or dismissal of any of Plaintiff's Counts, and Defendants Motion to Dismiss on these grounds should be denied.

Date:  December 6, 2021                    Respectfully submitted,

By: /s/ *Kimberly K. Winter*
       Michael J. Abrams (Admitted *Pro Hac Vice*)
       Kimberly K. Winter (Admitted *Pro Hac Vice*)
       Alana McMullin (Admitted *Pro Hac Vice*)
       LATHROP GPM LLP
       2345 Grand Boulevard, Suite 2200
       Kansas City, MO 64108
       Telephone: (816) 292-2000
       michael.abrams@lathropgpm.com
       kim.winter@lathropgpm.com
       alana.mcmullin@lathropgpm.com

       and

       Francesco P. Trapani
       KREHER & TRAPANI LLP
       Two Penn Center Plaza
       1500 John F. Kennedy Blvd., Suite 900
       Philadelphia, PA  19102
       Telephone: (215) 907-7289
       frank@krehertrapani.com

       ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2021, I caused a true and correct copy of the foregoing Plaintiff's Memorandum In Opposition To Defendants Former Assistant District Attorney David Desiderio and Former District Attorney Lynne Abraham's Motion To Dismiss Plaintiff's Complaint to be served via CM/ECF filing upon counsel for all parties.

       /s/ *Kimberly K. Winter*
       One of the Attorneys for Plaintiff

47678694