## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEOPHALIS (BINKY) WILSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 2:21-cv-02057-JMY |
| | ) | |
| **CITY OF PHILADELPHIA, PENNSYLVANIA; FORMER DISTRICT ATTORNEY LYNNE ABRAHAM; FORMER ASSISTANT DISTRICT ATTORNEY DAVID DESIDERIO, et al.** | ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS CITY OF PHILADELPHIA AND FRANK MARGERUM'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Plaintiff Theophalis (Binky) Wilson ("Wilson"), by and through his attorneys, hereby submits his response to Defendants City of Philadelphia (the "City") and Frank Margerum's Partial Motion to Dismiss.[1]

## INTRODUCTION

Theophalis Wilson spent over twenty-eight years wrongfully imprisoned for the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds (the "Anderson/Reynolds Murders"), crimes he did not commit. After spending decades fighting for his freedom, Mr. Wilson and his co-defendant's efforts finally proved that the only evidence linking Wilson to the crime – the statement of James White, the State's only alleged eyewitness – was fabricated and false. Indeed, White recanted his identification of Mr. Wilson under oath and confirmed that prosecutors and

---

[1] Plaintiff is filing a Notice of Voluntary Dismissal contemporaneously with this Opposition, voluntarily dismissing Count XI of his Complaint, Plaintiff's state law claim for Respondeat Superior.

police coerced and fed White a confession of the three homicides in order to implicate Mr. Wilson and his co-defendants in the crimes. In addition to proving Mr. Wilson had no involvement in the murders, White's recantation revealed Mr. Wilson's wrongful conviction was not an innocent mistake, but the result of startling misconduct on the part of ADA Desiderio and Philadelphia police officers. However, the misconduct in Mr. Wilson's case was not an isolated incident, but part of a long- standing pattern of investigative misconduct made possible by supervisors and policymakers in the Office of the Philadelphia District Attorney ("OPDA") and the Philadelphia Police Department ("PPD").

Mr. Wilson's conviction was overturned on January 21, 2020, after the OPDA filed a motion to vacate Mr. Wilson's convictions on behalf of the Commonwealth of Pennsylvania, the charges against him were dismissed, and he was finally released. The OPDA additionally filed Joint Stipulations of Fact of Petitioner Theophalis Wilson and Defendant Commonwealth of Pennsylvania, attached as Exhibit A to the Complaint, and an Answer in Wilson's Post- Conviction Relief, attached as Exhibit B to the Complaint, wherein, the OPDA admitted no evidence – apart from White's recanted testimony – connected Wilson to the crime, that Wilson's trial was unfair, and that it was "infected by serious prosecutorial misconduct."

This civil rights action ensued on May 4, 2021, seeking redress against the City of Philadelphia (the "City"), and individual police officers of the Philadelphia Police Department, including Defendant Frank Margerum, as well as former Assistant District Attorney Desiderio and his supervisor, former District Attorney Lynn Abraham. Mr. Wilson has asserted § 1983 claims against all police defendants, including Margerum, for malicious prosecution, fabrication of evidence, and intentional infliction of emotional distress, and a § 1983 *Monell* claim against the

City. Defendants here move to partially dismiss the claims in Plaintiff's Complaint, including all claims against Frank Margerum, arguing he is entitled to qualified immunity, and most claims against the City. However, Defendants misstate the law and ignore critical allegations showing Margerum's role in the investigation of the Anderson/Reynolds Murders and the City's policy, practice, and custom allowing misconduct in felony investigations, resulting in the wrongful conviction of Wilson. For the above reasons, which are examined in greater detail below, Defendants' Motion to Dismiss should be denied and the case should move on to the discovery phase.

<u>**COUNTER-STATEMENT OF FACTS**</u>

I.      **Mr. Wilson is innocent of the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds.**

      A.  **The Triple Homicide Investigation Lasts Over Two Years.**

In between the late-night hours of September 25, 1989 and early morning hours of September 26, 1989, brothers Kevin and Gavin Anderson, and their associate, Otis Reynolds, were murdered in Philadelphia. Compl. ¶ 3, 52-56, 69-70, 75-76. All three men were shot in the head, their bodies were found within a two-mile radius, and investigators concluded that their deaths happened only hours apart. *Id.* Police quickly concluded the three murders were related and likely committed by the same perpetrator(s). *Id.* at ¶ 3, 93. During the investigation of these murders, officers determined the victims were associated with the Jamaican Shower Posse, a drug gang in the midst of a feud with another gang (the Junior Black Mafia), over territory. *Id.* at ¶ 3-5, 89-90, 92. Although numerous eyewitness accounts, 911 calls, and statements from the victims' friends and family were provided to the officers, many of which connected the crimes to a well-known

3

enemy of the victims and a notorious drug dealer named Noel Grierson, also known as "Steplight," police arrested no suspects for two years. *Id.* at ¶ 6, 53-85, 94-140.

A few months after the Anderson/Reynolds Murders, 19-year old James White was arrested for two unrelated murders. *Id.* at ¶ 142-144. As a part of a plea deal with Defendant ADA Desiderio, White pled guilty to the two murders and implicated other individuals who allegedly participated in the crimes – including Chris Williams. *Id.* at ¶ 146. Police at the time suspected Williams of several murders and drug related activity and wanted him off the street. *Id.* at ¶ 146-147. Over a year later, a jailhouse informant in White's prison, falsely reported to ADA Desiderio that White was involved in another three murders of "Jamaicans." *Id.* at ¶ 153-154. Despite the fact that White knew nothing about the Anderson/Reynolds Murders – which he told police and ADA Desiderio numerous times – Desiderio, along with PPD officers, fed White descriptions of Kevin Anderson, Gavin Anderson, and Reynolds, as well as unknown facts about the murders, and fabricated and coerced White's confession, which eventually implicated Plaintiff. *Id.* at 155-167.

**B.  Mr. Wilson is wrongfully arrested and convicted.**

Although police and ADA Desiderio had White's alleged confession, including his implication of Wilson in the Anderson/Reynolds Murders, Wilson was not arrested for over three months after White's statement. *Id.* at ¶ 172. When interrogated by PPD officers and ADA Desiderio, Wilson refused to implicate Williams, stating he had no knowledge of any of the murders and could not testify falsely. *Id.* at 170-172. It was not until February 1992 – over two months later – that Wilson was finally arrested, solely on the basis of White's fabricated confession. *Id.* at ¶ 172-173. On August 6, 1993, Williams, Bennett, and Wilson were tried for the Anderson/Reynolds Murders as co-defendants. *Id.* at ¶ 177. Wilson and Williams were convicted

4

on August 6, 1993 and Wilson was sentenced to life in prison. *Id.* at ¶ 188. After White's incriminating statement and his testimony against Wilson, he pleaded guilty to all six murders, including the Anderson/Reynolds Murders on September 13, 1993. *Id.* at ¶ 190.

### C. Post-conviction withholding of exculpatory evidence.

In 2013, Wilson's co-defendant Chris Williams was granted an evidentiary hearing in a post-conviction proceeding. *Id.* at ¶ 192. There, White explicitly recanted his trial testimony, stating his statement about the Anderson/Reynolds Murders was false and fabricated, that White knew nothing about the triple homicide and that, to his knowledge, neither Williams nor Wilson had anything to do with the crimes. *Id.* White further testified that he was coerced by ADA Desiderio and Defendant PPD Officers to lie about the murders and testify against Williams and Wilson, information that was suppressed. *Id.* at ¶¶ 192, 196, 202. On December 18, 2019, the OPDA, on behalf of the Commonwealth of Pennsylvania, filed a motion to vacate Chris Williams' convictions, acknowledging that White – the only alleged eyewitness – testified falsely during trial and that the physical evidence demonstrated the falsity of his account of the murders. *Id.* at ¶ 210. On January 14, 2020, the Commonwealth filed a similar motion to vacate Wilson's convictions, the charges were dismissed, and he was finally released on January 21, 2020. *Id.* at ¶ 211.

The material, exculpatory information was known to police and prosecutors at the time of trial, but was withheld from Wilson and his co-defendants and fell into two categories: (1) evidence supporting alternate theories and suspects, and (2) evidence that undermined the theory of the crime presented at trial. *Id.* at ¶ 216. Further, the Commonwealth admits that "the withheld evidence detailed [above] was material and concedes that Brady was violated," *Id.* at ¶ 208; Ex. B, n.13, and that along with Defendant PPD Officers, it failed to disclose police activity sheets in

which officers omitted any reasoning for concluding several witness statements and 911 calls near the time and location of the murders were "unrelated" or "unfounded," and thus not disclosed. *Id.* at ¶ 217; Ex. B, ¶ 25.

### D.  The City's Practices, Policies, and Customs of Unconstitutional Conduct

The Philadelphia Police Department ("PPD") at all relevant times, had a custom and practice of permitting officers to engage in a wide variety of improper and unconstitutional investigative practices, including, but not limited to (i) discrediting witness statements, identifications, and key facts in order to suppress exculpatory information; (ii) obtaining identifications through manipulative and coercive means; (iii) providing information to eyewitnesses or indicating who they should identify; (iv) manipulating or coercing witnesses into making false or fabricated statements; (v) failing to document or disclose exculpatory evidence; (vi) failing to document or record witness statements and instead relying solely on an officer's claims about what the witness said; (vii) failing to gather or analyze critical physical evidence; and (viii) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices. These widespread customs, patterns and practices are evident from the multiple, repeated violations in this case and others. *Id.* at ¶¶ 239, 240-241.

Further, the PPD also maintained an unconstitutional policy, practice, and custom of suppressing exculpatory evidence found during felony investigations and failing to disclose that information in official police reports or other materials that would be turned over to the defense. *Id.* at ¶ 234. It was universally known within the PPD command structure and among officers that the DA's Office would not disclose "activity sheets" or similar internal investigative documents to the defense and/or to the prosecutor. Yet, the custom, policy, and practice of the PPD was to not

6

include the exculpatory information contained in activity sheets or other investigative documents within the official police report or to add the police activity sheets as an addendum to the official report. Thus, the PPD and its officers knowingly suppressed key exculpatory information from defendants. *Id.* at ¶ 235. Indeed, Wilson was not the only wrongfully incarcerated individual who was convicted based on the suppression of PPD activity sheets or logs concealing, among other things, inconsistences in witness statements, alternative suspects, and relevant 911 calls. *Id.* at ¶ 237; *see Dennis v. City of Philadelphia*, 379 F. Supp. 3d 420 (E.D. Pa. 2019). Nevertheless, the City of Philadelphia and the PPD, by and through their final policymakers, implemented the policies, practices and customs of not disclosing this exculpatory material evidence contained in police activity sheets in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Wilson's case. *Id.* at ¶ 238.

Additionally, the PPD maintained unconstitutional policies, customs, or patterns and practices of fabricating incriminating evidence and coercing false confessions, in violation of the Fifth and Fourteenth Amendments. *Id.* at ¶ 244. In particular, the PPD used unconstitutional techniques during the investigation phase of a case to coerce inculpatory statements or confessions from suspects and witnesses by giving those suspects and witnesses details about the crime that the police knew (or believed) to be true, including: making false promises, including the promise that a suspect would be given lenient treatment or favorable sentencing; making false and improper threats, including threats to use statements made in prior plea negotiations to seek the death penalty; the use or threat of physical violence; making improper assertions of guilt, including confrontation with false inculpatory evidence; and providing false assurances that the suspect

would benefit from making an inculpatory statement that included, but minimized the suspect's own involvement. These techniques attempt to make false and coerced statements seem credible and reliable. *Id.* at ¶ 245. These policies, practices, and customs were well-known to the City and resulted in similar violations committed by the PPD, *d.* at ¶¶ 242, 248, which illustrate the departments as a whole, and as a matter of custom, practice, and policy, disregarded their obligations to refrain from coercing and fabricating false evidence to close cases. *Id.* at ¶ 246.

Also, the PPD had policies, practices or customs of arresting, charging, and interrogating purported witnesses in criminal investigations without legal cause and with the intent to coerce and/or fabricate statements from these persons, under threat of punishment or material benefit. *Id.* at ¶ 249. These interrogations were conducted without voluntary consent and without the benefit of advice of counsel. *Id.* The unconstitutional policies, practices, and customs directly caused the incarceration and conviction of Wilson for the Anderson/Reynolds Murders due to the deliberate indifference of the PPD, City of Philadelphia, and the DA's Office, and were the moving force behind his wrongful conviction on January 6, 1993. *Id.* at ¶¶ 251, 243.

In addition to unconstitutional customs and policies, the PPD failed to implement adequate policies, training, procedures, and guidelines to: (1) protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions, (2) require exculpatory information to be recorded in a format that would be disclosed to the prosecution and the defense after a suspect was arrested and charged, and (3) not discredit reliable, trustworthy, and consistent exculpatory information as "unfounded" or "irrelevant" and suppress that evidence from the defense. *Id.* at ¶¶ 259, 254, 242, 248. Although their misconduct was open and notorious, the Officers suffered no significant discipline or repercussions and continued their pattern and practice of misconduct in future cases.

*Id.* at ¶ 255. The PPD, through its encouragement, ratification, silent acquiescing, and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of Wilson and other individuals in the community. *Id.* at ¶¶ 261-262.

The multiple red flags in the investigation of the Anderson/Reynolds Murders, including, without limitation, the failure to conduct basic investigatory steps, the absence of proper documentation of investigatory steps, the absence of inculpatory information other than one dubious and unsupported eyewitness account from a self-professed murderer, the failure to gather or analyze any physical evidence, and the failure to develop any evidence of motive did or should have alerted superiors that this case was part of the pattern of misconduct described above, that the entire investigation was unreliable, and that the arrest and prosecution of Wilson for these crimes was wrongful. *Id.* at ¶ 263. Likewise, because the bulk of information in this case came from one informant who had been coerced – and who had already falsely implicated other individuals in crimes he later confessed to – supervisors, other detectives at the PPD, ADA Desiderio, and the DA's Office knew or should have known that White's statement was unreliable. *Id.* at ¶ 264. But supervisors and other detectives nonetheless used the information to arrest and convict Wilson and clear tough cases. *Id.* at ¶ 264. PPD, through its continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to Wilson, and other wrongfully accused individuals' constitutional rights. *Id.* at ¶ 265. As a predictable and foreseeable result of those failures to act, Wilson was wrongly convicted and incarcerated after an unconstitutional and unfair trial based on suppressed exculpatory information and a false

9

confession, fabricated and coerced by Defendant PPD Officers and ADA Desiderio, in violation of the United States and Pennsylvania Constitutions. *Id.* at ¶ 265.

## LEGAL ARGUMENTS

### I.    Motion to Dismiss Standard of Review.

Under Rule 12(b)(6), the Defendants bear the burden of demonstrating that Plaintiff has failed to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6); *Hedges v United States*, 404 F.3d 744, 750 (3d Cir. 2005). In reviewing a motion to dismiss, the Court will "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from therefrom, [viewing] them in the light most favorable to plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007); *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). The pleading requirements of the Federal Rules are clear and unequivocal. As the Third Circuit recently reiterated, "[t]he Rules demand 'only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Connelly v. Lane Constr. Corp.,* 809 F.3d 780, 786 (3d Cir. 2016) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); see also Fed. R. Civ. P. 8(a). A court considering a motion to dismiss conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). First, the court "must accept all of the complaint's well-pleaded facts as true," *id.* at 210, including "all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant," *Foglia v. Renal Ventures Mgmt.*, LLC, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (quotations and citations omitted). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"

Fowler, 578 F.3d at 211 (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). This plausibility analysis is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* But "the plausibility standard does not impose a heightened pleading requirement" or require a plaintiff to "plead 'specific facts' beyond those necessary to state a valid claim." *Schuchardt v. President of the United States*, 839 F.3d 336, 347–48 (3d Cir. 2016). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

## II.     The Allegations Against Margerum Are Sufficient to Proceed to Discovery.

### A.  Margerum was Personally Involved in the Anderson/Reynolds Investigation.

Although a defendant in a civil rights action must have personal involvement in the alleged wrongs," *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)), "personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.*

Interestingly, in his Motion, Defendant Margerum alleges that "only two (2) paragraphs of Plaintiff's three hundred and thirty-four (334) paragraph complaint contain any factual allegations regarding actions by retired Detective Margerum. And those allegations are simply that Defendant Margerum collected and shared information that other individuals requested during their initial investigation." (Motion, p. 8) (*citing* Compl. ¶ 105, 130). Regardless of Defendant's attempt to downplay the actions of Defendant Margerum, Plaintiff has sufficiently alleged Margerum's participation and personal involvement in the unconstitutional investigation resulting in Wilson's wrongful conviction. Compl. at ¶¶ 105, 128-130, 240(c), 300, 301(b), 301(c).

Indeed, Defendant Margerum ignores several allegations directly relating to Margerum's investigative conduct, wherein "inferences can be drawn based on the current allegations, that Detective [Margerum was] personally involved in the alleged conspiracy to frame" Wilson for the

11

Anderson/Reynolds Murders. *Id; Wright v. City of Philadelphia,* 229 F. Supp. 3d 322, 338 (E.D. Pa. 2017). In *Wright,* this court also held that the Complaint's "tendency to create sub-groups of defendants…is not a basis for this Court to dismiss for failure to state a claim." *Id.* Indeed, Plaintiff refers to Defendants Harris, Ansel, Cimino, Hasara, Miller, Rodden, Santiago, Schol, Jastrzembski, Dougherty, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint as "PPD Officers" throughout its Complaint (in contrast to "PPD Supervisors") a term that is used in over 33 different paragraphs to describe the investigators' misconduct, including that of Defendant Margerum. *See generally* Compl. The court in *Wright* held that although a § 1983 plaintiff "will ultimately have to prove that each individual defendant violated his constitutional rights to survive summary judgment or succeed at trial, at this stage of the case, before the completion of discovery, it is sufficient for a plaintiff to identify a sub-group of defendants as responsible for particular, stated constitutional wrongs." *Wright,* 229 F. Supp. 3d at 339; *see Burgess v. Baltimore Police Dep't*, No. 15-834, 2016 WL 795975, at *10 (D. Md. Mar. 1, 2016) (complaint survived a motion to dismiss utilizing the term "Officer Defendants" where the plaintiff could not identify the specific officers responsible for each alleged constitutional violation because discovery had not been completed); *see also Mincy v. McConnell,* No. 09-236, 2010 WL 3092681, at *3–*4 (W.D. Pa. July 15, 2010) (allowing a complaint to survive a motion to dismiss where the complaint alleged violations by a defined subgroup without specifically naming individual defendants).

The *Wright* court further held that "[t]he Complaint's allegations provide more than enough detail to give Detectives Baker, Dusak, and Wyatt notice of the nature and basis of the claims against them." *Id.* In fact, the *Wright* court held that "with regard to Detective Dusak, Mr. Wright alleges that Detective Dusak, as the lead investigator, was responsible for overseeing the

investigation and gathering the evidence obtained by other officers. This allegation is sufficient to draw the reasonable inference that Detective Dusak had actual knowledge of, or acquiesced in, the misconduct detailed throughout the Complaint." *Id.* The court thus held that "the Complaint contains sufficient factual allegations to "allow[ ] the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Id.* at 338-339.

Similarly, Plaintiff alleges here that the PPD Officers, including Margerum "directly participated in the investigation of the Anderson/Reynolds Murders by gathering evidence, obtaining witness statements, responding to and examining the crime scenes, and creating and documenting investigative reports and activity sheets." *Id.* at ¶ 50. The Complaint further alleges that because police were aware of the Victims' crimes, reckless and violent behavior and gang associations, the day after the Anderson/Reynolds Murders, Defendants requested Detective Margerum check with federal authorities on possible warrants for Steplight – ***the main and only suspect in the Anderson/Reynolds Murders*** – and his associates, including possible indictments that could serve as the basis for an arrest or search warrant. *Id.* at ¶ 105. Then, Detective Rodden contacted Detective Margerum at the Violent Offenders Traffickers Unit, and requested background information on the names provided by Anthony Eglam, the father of the Anderson brothers regarding potential suspects. *Id.* at ¶ 130. Detective Rodden also requested any known activities of the Victims in the New York area from Margerum, information that was never disclosed. *Id.*

Next, Plaintiff's complaint alleges that Defendant Officers, including Margerum, "deliberately failed to investigate multiple leads – suppressing material exculpatory evidence – disregarded credible witness statements, reported critical 911 calls as 'unfounded,' dismissed

connections to likely suspects, and suppressed material, exculpatory evidence of the PPD's 'prime suspect' Steplight." *Id.* at ¶ 240(c). The Complaint further alleges that the Defendant Officers, including Margerum, "acting within the scope of their employment and under color of state law, agreed among themselves and with others, including the coerced witness James White and the prosecutor of Wilson's case, ADA Desiderio, to act in concert in order to deprive Wilson of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency." *Id.* at ¶ 300.

Additionally, Defendant Officers, including Margerum, "worked in concert with ADA Desiderio to suppress evidence of alternative suspects and evidence that would have contradicted and impeached White's perjury." *Id.* at ¶ 301(b). The incorrect, false, and fabricated testimony of White was either intentional or caused by the deliberate indifference of the officers with knowledge that such testimony was false. *Id.* Further, the Defendant Officers, including Margerum, "as well as members of PPD's Jamaican Task Force worked in concert to deliberately fail to investigate multiple leads, disregard credible witness statements, dismiss connections to likely suspects, and suppress material, exculpatory evidence of the PPD's 'prime suspect' Steplight." *Id.* at ¶ 301(c).

These allegations are more than sufficient to demonstrate that Defendant Margerum, as the Philadelphia police officer tasked with gathering and collecting information on the PPD's ***only suspect in a triple homicide***, was personally involved in the unconstitutional investigative misconduct and conspiracy between Philadelphia police officers to wrongfully convict Wilson – an innocent man – of crimes he did not commit. Apart from ignoring several of Plaintiff's

14

allegations, Defendant also argues that because such actions were taken "during the first investigation" they did not lead to the identification or prosecution of Plaintiff for murder. (Motion, p. 8) This conjecture is unfounded and ignores the burden Defendant bears to dismiss claims at this stage based on "insufficiency," taking all allegations as true *in the light most favorable to the non-movant,* Plaintiff Wilson. *Foglia v. Renal Ventures Mgmt*., LLC, 754 F.3d 153, 154 n.1 (3d Cir. 2014)**.** Here, Plaintiff has sufficiently pled Margerum's conduct "deprived Wilson of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency." *Id.* at ¶ 300. Accordingly, Margerum's motion to dismiss based on a lack of personal involvement or insufficient allegations, should be dismissed.

### B.  Margerum is Not a Supervisor.

Further unavailing is Defendants attempt to argue that Margerum's specific acts encompassing the suppression of exculpatory evidence and the fabrication of inculpatory evidence are akin to a supervisory claim wherein "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference." (Motion, p. 9). Of course, Margerum is not being sued by Plaintiff under a supervisory liability theory and is instead being sued for his own conduct resulting in violations of Wilson's constitutional rights, as well as Margerum's failure to intervene and his conspiracy to wrongfully convict Wilson, as Plaintiff actually alleges in the Complaint. Compl. at ¶¶ 105, 128-130, 240(c), 300, 301(b), 301(c). Indeed, even if Margerum may not have committed the *most egregious aspects* of the misconduct alleged by Plaintiff, that does not mean that Margerum should be dismissed as a Defendant, especially in light of Plaintiff's

15

well-pled allegations sufficiently showing Margerum was personally involved in the investigation of the key suspect in the Anderson/Reynolds Murders – information never disclosed to Wilson. Likewise, Defendant's argument that such allegations are "sparse" does not support dismissal. (Motion, p. 6); *Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 298 (E.D. Pa. 2015) (holding that "sparce [sic]" allegations in plaintiff's complaint were sufficient at the motion to dismiss stage).

It also bears noting that Defendant Margerum does not argue that Plaintiff did not sufficiently plead Margerum's participation in Plaintiff's state law claims but only notes that "to be held liable for an intentional tort, an actor must have engaged in the alleged tortious conduct." (Motion, p. 9). As mentioned above, Margerum's conduct and participation in the investigation of the Anderson/Reynolds Murders is clear and must be taken as true for purposes of a motion to dismiss. Additionally, Defendant's attempt to dismiss Plaintiff's intentional infliction of emotional distress claim as untimely is unsupported by any legal authority and is instead contrary to established law. *Gilbert v. Feld*, 788 F. Supp. 854, 857 (E.D. Pa. 1992) (holding that a Pennsylvania IIED claim, alleged in conjunction with § 1983 wrongful arrest claim, was not time-barred).  Even if the two-year statute of limitations applied to Plaintiff's state law claim, such a claim did not accrue until Wilson's conviction was vacated in January of 2020. This is especially true in the context of a § 1983 wrongful conviction action, wherein the victim of such intentional conduct was imprisoned for decades and prevented from filing a civil suit for his wrongful conviction. *See Wright v. City of Philadelphia,* 229 F. Supp. 3d 322, 334 (E.D. Pa. 2017) (finding

16

plaintiff's § 1983 wrongful conviction claims did not accrue until his conviction was vacated).[2]

Thus, the Pennsylvania two-year statute of limitations did not accrue until plaintiff had a complete

and present cause of action, i.e. when his conviction was overturned and he was able to file suit

and obtain relief. *Id.* Accordingly, Plaintiffs' state law claims against Defendant Margerum are

timely.

For these reasons, Defendant Margerum's motion to dismiss should be denied.

### III.    Defendant Margerum is Not Entitled to Qualified Immunity.

This Court should also reject Defendant Margerum's argument that he is entitled to

qualified immunity (in part) on Counts I, II, and III of Plaintiff's Complaint for the claims of

malicious prosecution (under the Fourteenth Amendment), withholding of exculpatory evidence,

constitutionally inadequate investigation, and failure to intervene. "The defense of qualified

immunity can support the grant of a Rule 12(b)(6) motion only when the complaint itself

establishes the circumstances required for a finding of qualified immunity. *Gilbert v. Feld*, 788 F.

Supp. 854, 861 (E.D. Pa. 1992) (finding the qualified immunity analysis "is inappropriate raised

---

[2] Even assuming for the sake of argument that the two-year statute of limitations accrued in the 1990s when the unconstitutional conduct first took place (it did not), the doctrine of equitable tolling or the discovery rule should apply here, as the same unconstitutional conduct giving rise to the IIED ("intentional infliction of emotional distress") claim, resulted in Wilson's decades of wrongful incarceration. *Benard v. Washington Cty.,* 465 F. Supp. 2d 461, 471 (W.D. Pa. 2006) ("Sufficiently inequitable circumstances have been found where a plaintiff received inadequate notice of her right to sue, where a motion for appointment of counsel was pending when the deadline accrued, or where the court has misled the plaintiff into believing that she had met all filing requirements…. Equitable tolling may also apply when the defendant has actively misled the plaintiff; when the plaintiff in some extraordinary way was prevented from asserting her rights; or when the plaintiff timely asserted her rights in the wrong forum.") (internal quotations omitted); *see also Lake v. Arnold,* 232 F.3d 360, 367 (3d Cir. 2000) ("Pennsylvania common law does, however, allow some 'breathing room,'… in that it recognizes the discovery rule, which tolls the statute of limitations until a plaintiff actually discovers the harm caused by an earlier inflicted but latent injury.")

on a motion to dismiss" as "Plaintiff's complaint does not set forth facts establishing qualified immunity.") Further, in the Third Circuit, the "burden of persuasion…[is] on the party asserting the affirmative defense of qualified immunity." *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014); *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir.2010) ("The burden of establishing entitlement to qualified immunity is on [the defendant-movant].") Thus, Defendant Margerum must show that "reasonable officers could not have known that their conduct constituted such a violation [of constitutional rights] when they engaged in it." *Halsey,* 750 F.3d at 288.

As the Third Circuit has recognized, "[t]he established-right prong of a qualified immunity defense does not demand that there had been a precise preview of the applicable legal analysis underlying the defense; rather, 'what is required is that government officials have 'fair and clear warning' that their conduct is unlawful.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014) (*Devereaux,* 263 F.3d at 1075 (quoting *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997)). Stated differently, a case specifically holding that a certain act is constitutionally violative is not required when the officer in question had sufficient notice that his actions violated the constitution. The Supreme Court placed an even finer point on the doctrine of qualified immunity in its recent 2020 decision, *Taylor v. Riojas*, when it held that a case with similar facts is not required when **"no reasonable ... officer could have concluded"** their conduct was permissible under the Constitution. *Taylor v. Riojas*, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020) (emphasis added). If a reasonable officer would know his actions offended the Constitution, he is not entitled to qualified immunity. *Id.*

Here, Plaintiff clearly alleges in his complaint that Defendant Margerum knew his conduct was unreasonable and unconstitutional, and that "no reasonable officer in 1989-1993 would have

believed this conduct was lawful." Compl. at ¶¶ 276, 284, 293, 297. These allegations are sufficient to bar qualified immunity at this stage in the litigation, as Plaintiff's complaint does not set forth facts establishing qualified immunity and, instead, alleges the opposite. Defendant's conclusions that the above-mentioned rights were not clearly established through case law is unavailing and his partial motion to dismiss on this issue should be denied.

### A. Malicious Prosecution.

Defendant Margerum argues he is entitled to qualified immunity for malicious prosecution claims made under the Fourteenth Amendment because the law on this issue is "unsettled." However, Margerum's analysis – and the case law he cites in support – ignores or misinterprets Third Circuit law holding specifically that "[i]f the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) (reversing grant of qualified immunity on summary judgment for officers on plaintiff's malicious prosecution claim). Accordingly, at this stage in the litigation, qualified immunity should not be granted as to Plaintiff's Fourteenth Amendment malicious prosecution claim, which should proceed to discovery.

Regardless, Plaintiff's complaint clearly alleges malicious prosecution under *both* the *Fourth* and Fourteenth Amendments. Compl. at ¶¶ 270-277. Because Defendant Margerum does not seek qualified immunity for the *Fourth* Amendment claim of malicious prosecution, as he cannot, Plaintiff's Count I for malicious prosecution must proceed to discovery. (Motion, p. 7-8); *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 380 (E.D. Pa. 2018) (holding that "a Fourth Amendment right against malicious prosecution is clearly established")

### B.  Withholding of Exculpatory Evidence.

Margerum asserts there was no clearly established duty for police to turn over exculpatory evidence at the time of the conduct at issue, between 1989-1993. As mentioned above, the United States Supreme Court and the Third Circuit have held that if a reasonable officer would know his actions offended the Constitution, he is not entitled to qualified immunity, even if the exact situation at issue is not addressed in case law. *Taylor*, 141 S. Ct. at 53; *Halsey*, 750 F.3d at 295. According to Plaintiff's allegations, Defendant Margerum, among other things, withheld exculpatory evidence relating to the PPD's main suspect, evidence which would have exonerated Plaintiff. Compl. at ¶¶ 105, 128-130, 240(c), 300, 301(b), 301(c). Additionally, Plaintiff has further alleged that Defendant Margerum knew his conduct was constitutionally prohibited. Compl. at ¶¶ 276, 284, 293, 297. Accordingly, such allegations are sufficient at this stage to overcome Margerum's request for qualified immunity.  Plaintiff's Complaint sets forth allegations that any reasonable police officer would understand to be a constitutional violation. Thus, Plaintiff is not required to cite a specific case, under the same circumstances, in which a clearly established right was recognized.

However, even if Plaintiff were required to cite a case holding the conduct at issue here violated a "clearly established" constitutional right, such a requirement would be satisfied.  In *Halsey v. Pfeiffer*, the Third Circuit recognized that, as early as 1985, "[r]easonable officers should have known that … they could not withhold exculpatory evidence from a defendant." *Halsey v. Pfeiffer*, 750 F.3d 273, 296 (3d Cir. 2014).[3]  Likewise, this court in *Wright v. City of Philadelphia,*

---

[3] Margerum cites *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371 (E.D. Pa. 2018) for the opposite proposition, stating that the *Brady* disclosure obligations of "police officers" were "not clearly established until 2005" when the Third Circuit decided *Gibson v. Superintendent of New*

denied Philadelphia police officers' motions to dismiss after finding they were alleged to have

been personally involved in "knowingly eliciting or coercing fabricated witness testimony and"

then "**concealing that misconduct from prosecutors and Mr. Wright**," during a 1991 homicide

investigation. *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 338 (E.D. Pa. 2017). Moreover,

as of the date of the conduct in question, from 1989-1993, nearly every circuit had recognized the

constitutional duty of police officers to disclose exculpatory evidence. *See Drumgold v. Callahan*,

707 F.3d 28, 43 (1st Cir. 2013) ("There can be no doubt that," as of 1989, "the law was firmly

settled … that a law enforcement officer may not deliberately suppress material evidence that is

favorable to a defendant."); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992)

(recognizing police had duty to disclose exculpatory evidence); *Geter v. Fortenberry*, 849 F.2d

1550, 1559-1561 (5th Cir. 1988) (police officer who deliberately concealed exculpatory material

violated clearly established federal law); *Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir.

2009) (As of 1990, police had clearly established duty to disclose exculpatory evidence); *Steidl v.

Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (As of 1987, "all of the police officers involved in this

case, had ample notice that the knowing suppression of exculpatory material that was in the files

at the time of the trial violated the defendant's constitutional rights."); *Atkins v. Cty. of Riverside*,

151 F. App'x 501, 507 (9th Cir. 2005) ([A]s for the *Brady* claim, a police officer in 1988 should

have been aware of his obligation to not withhold exculpatory evidence.); *Pierce v. Gilchrist*, 359

F.3d 1279, 1299 (10th Cir. 2004) (As of 1986, forensic chemist employed by police department

---

*Jersey Dep't of Law & Public Safety – Division of Police*, 411 F.3d 427, 443 (3d Cir. 2005).
(Margerum, p. 10). The holding in *Thomas*, however, is not binding on this Court, and it is clearly
contradicted by the Third Circuit's decision in *Halsey*, decided four years earlier. 750 F.3d 273,
295 (3d Cir. 2014).

had clearly established duty to disclose exculpatory evidence.); *McMillian v. Johnson*, 88 F.3d 1554, 1568 (11th Cir.), *opinion amended on reh'g*, 101 F.3d 1363 (11th Cir. 1996)(as of 1987 and 1988, law was clearly established that police officers could not conceal exculpatory or impeachment evidence.))

Margerum had more than sufficient notice of his duty to disclose exculpatory evidence. As the Supreme Court held in *Wilson v. Layne*, if **"a consensus of cases of persuasive authority" existed at the time "such that a reasonable officer could not have believed that his actions were lawful**", the law is clearly established for the purposes of qualified immunity. 526 U.S. 603, 617 (1999) (emphasis added). *Wilson v. Layne* recognizes a stark reality: namely, that it would be absurd for the Constitution to prohibit police officers in Boston, New York, Chicago – and all other jurisdictions across the country – from suppressing exculpatory evidence, while simultaneously permitting the same conduct in Philadelphia and the rest of the Third Circuit.  The overwhelming majority of persuasive authority clearly established Margerum's alleged conduct of suppressing exculpatory evidence was prohibited under the Constitution at the time. In addition, the Third Circuit's decision in *Halsey*, *supra*, establishes that such a duty existed as early as 1985. As a result, "**no reasonable ... officer could have concluded"** Margerum's conduct was permissible under the Constitution. *Taylor v. Riojas*, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020) (emphasis added).

## C. Failure to Intervene

A police officer's failure to intervene in the midst of a constitutional violation has been recognized as a cause of action numerous times in the Third Circuit. *See Smith v. Mensinger,* 293 F.3d 641, 650 (3d Cir. 2002); *Garbacik v. Janson*, 111 F. App'x 91, **3 (3d Cir. 2004) (holding

"the duty to intervene on the part of nonsupervisory employees was clearly established at the time of the incident in this case.") Further, the case cited by Defendant, *Ekwunife v. City of Philadelphia,* is distinguishable, as it deals with a prosecutor's failure to intervene to correct false information in an affidavit, not a police officer's failure to intervene in an ongoing conspiracy to convict an innocent man. *Ekwunife v. City of Philadelphia*, 245 F. Supp. 3d 660, 673 (E.D. Pa. 2017), aff'd, 756 F. App'x 165 (3d Cir. 2018) Indeed, the court in *Ekwunife* specifically noted that the Plaintiff in that case had not even alleged the former ADA was aware of the allegedly false information and thus did not have a reasonable opportunity to intervene, whereas here, Plaintiff alleges in detail that the Defendants, including Defendant Margerum, knew of the blatant and ongoing deprivation of Wilson's constitutional rights and did nothing to intervene or prevent it. Compl. at ¶¶ 295-302.

Also, despite Defendant's argument to the contrary, this court has repeatedly denied police officer's motions to dismiss a failure to intervene claim in similar circumstances to the case at bar, and should do so here. *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 339 (E.D. Pa. 2017) (in wrongful conviction case, court denied officer's motion to dismiss the failure to intervene claim); *Cash v. Wetzel,* 8 F. Supp. 3d 644, 662 (E.D. Pa. 2014) (denying officer's motions to dismiss failure to intervene claims, including a failure to intervene when another defendant "destroyed plaintiff's legal materials," a failure to intervene to "stop the conspiracy to deny plaintiff's access to courts," and a failure to intervene while plaintiff was being retaliated against by failing to intervene in each other's withholding of mitigation evidence) .

At this stage of the litigation, Plaintiff has sufficiently alleged the Defendants, including Defendant Margerum, failed to intervene in the constitutional violations of Wilson alleged in

Counts I, II, and III and knew such conduct was unlawful at the time. Compl. at ¶¶ 295-298.

Accordingly, Plaintiff's failure to intervene claim should proceed to discovery.

### D. Constitutionally Inadequate Investigation

Defendant Margerum next argues that the Third Circuit has not recognized a cause of action

arising out of an allegedly deficient investigation and thus he is entitled to qualified immunity for

a part of Count II alleging a constitutionally inadequate investigation. (Motion, p. 11-12) However,

as Defendant admits, this court in *Wright v. City of Philadelphia* stated that:

> It certainly remains to be seen whether there is an independent cause of action under the Fourteenth Amendment for Count 2's claim for 'failing to conduct a constitutionally adequate investigation,' and the Court will not affirmatively recognize one here at this time. However, to the extent this claim stands for the more general proposition that the **Defendants' unconstitutional conduct throughout their investigation interfered with Mr. Wright's right to a fair trial, then this claim would also be timely pursuant to *Heck's* deferred accrual rule.** *See Benckini v. Upper Saucon Twp.*, No. 07-3580, 2008 WL 2050825, at *11 (E.D. Pa. May 13, 2008) (finding that *Heck* bars § 1983 claims alleging a general interference with the right to a fair trial); *Rosato v. N.Y. Cty. District Attorney's Office*, No. 09-3742, 2009 WL 4790849, at *2, *4 (S.D.N.Y. Dec. 14, 2009) (finding that *Heck* barred a plaintiff's § 1983 claims premised on "the alleged unconstitutionality of defendants' investigation and prosecution").

*Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 332, n.3 (E.D. Pa. 2017). Accordingly, even

if a "constitutionally inadequate investigation" is not a standalone cause of action, Margerum is

not entitled to qualified immunity for his conduct in the unconstitutional investigation of the

Anderson/Reynolds Murders, as such conduct directly interfered with Plaintiff's right to a fair trial,

as detailed at length in Count II. Further, the court in *Outlaw* specifically held that "even without

this 'failure to investigate' component to Count II, the Defendant Detectives' alleged conduct

remains at issue in Outlaw's other claims…For example, the investigation-related allegations are

captured in Outlaw's malicious prosecution claim (Count I) which asserts the Detective

Defendants prosecuted Outlaw knowing full well no probable cause existed." *Id.* at *7.

Accordingly, Count II of Plaintiff's Complaint here should not be dismissed, even in part, on this basis and instead Count II should proceed to discovery.

In conclusion, Margerum is not entitled to qualified immunity for any of the above conduct, and certainly not for those causes of action Margerum did not mention in his Motion (Count I malicious prosecution under the Fourth Amendment, Count II fabrication of evidence, and Count III fabrication and coercion of witness statements). Margerum's motion to dismiss should be denied.

**IV.   Plaintiff's Claims against Defendant City of Philadelphia should proceed.**

   **A.  Request for Leave to Add Defendant Lynn Abraham as a *Monell* Defendant.**

Defendant first states that Plaintiff's claims against the City incorrectly attribute municipal liability to the City where actions are attributable to the District Attorney's Office. Binding case law on this issue is somewhat "murky" as Defendants admit in their Motion. Indeed, in *Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 288-289 (E.D. Pa. 2015), the court held that a § 1983 Plaintiff could *not* sue the Philadelphia District Attorney's Office under § 1983. *Id.* (citing 53 Pa. Stat. § 16257). The court rejected the application of *Sourovelis* v. *City of Philadelphia,* 103 F. Supp. 3d. 694, 710 (E.D. Pa. 2015) (holding that the Bucks County District Attorney's Office is subject to suit under § 1983) as Defendant suggests here, and instead held that all claims against the District Attorney's Office were dismissed with prejudice as it "is not a separate legal entity for purposes of Section 1983." *Id.* at 288-289. However, if the court finds that Plaintiff's *Monell* claims for unconstitutional policies and practices of the OPDA are attributable to either the Philadelphia District Attorney's Office or Defendant Lynn Abraham (then-District Attorney), and <u>not</u> the City of Philadelphia, Plaintiff requests leave to amend his Complaint to hold the proper party responsible for those claims under *Monell*.

25

**B.  Plaintiff Properly Relied on the Conviction Integrity Unit's Admissions.**

Next, Defendants allege that Plaintiff "incorrectly" relies upon the admissions made by the Conviction Integrity Unit in Plaintiff's post-conviction litigation, arguing that the statements are not "admissions" and are "not binding." (Motion, p. 13). Nothing in the local rules of this court or the federal rules of civil procedure prohibit Plaintiff's attachment of Exhibits A and B to his Complaint. In fact, this court has previously ruled in a similar § 1983 action that "to decide a Rule 12(b)(6) motion to dismiss, the Court may look only to the facts alleged in the complaint *and its attachments*." *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 329 (E.D. Pa. 2017) (emphasis added). Further, in *Simpson v. Ferry*, 202 F. Supp. 3d 444, 449 (E.D. Pa. 2016), this court held that "several reasons support consideration of the DOJ Report at the motion to dismiss stage." *Id.* Ultimately, the court considered the relevant portions of the DOJ Report (pertaining to the issues alleged in the Complaint) because it was "attached as an exhibit," because it was "arguably … a public record, and because the "Third Circuit has acknowledged that, in reviewing a 12(b)(6) motion, 'document[s] integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'" *Id.* (*quoting In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir.1997)); *see also Ravert v. Monroe Cty.,* No. 4:20-CV-0889, 2021 WL 1017372, at *3 (M.D. Pa. Mar. 17, 2021) ("In reviewing a motion to dismiss, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents.") (internal quotations omitted).

Here, the Joint Stipulations of Fact of Plaintiff Wilson and Defendant Commonwealth of Pennsylvania and the Commonwealth's Answer in Wilson's post-conviction proceeding were

attached as Exhibits to Plaintiff's Complaint, were filed in a judicial proceeding and are thus public records, and are explicitly relied upon in Plaintiff's Complaint. *See* ¶¶ 212-214, 217-219, 222, 223, 230, 290, 291, 321. The statements made by the Commonwealth in these documents are clearly relevant to Wilson's claims in this proceeding, especially regarding the City's *Monell* claim and in how the unconstitutional conduct of officers, prosecutors, and the City resulted in the wrongful conviction of Wilson. Further, Defendants do not contest the authenticity of the statements made in these documents, but instead argue that such statements are not "judicial admissions." (Motion, p. 13). Regardless, at the motion to dismiss stage, all of Plaintiff's allegations, including that such statements contained in Exhibit A and B are "admissions" by the Commonwealth, and must be taken as true.

### C.  Plaintiff has Sufficiently Alleged *Monell* Liability Against the City.

In a § 1983 action against a municipality, "[a] plaintiff can demonstrate municipal responsibility by establishing that 'the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.'" *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 336 (E.D. Pa. 2017) (*citing Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). The Third Circuit has described *Monell* liability as follows:

> A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law.

*Id.* (*citing McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009)). However, even on summary judgment, "a plaintiff need not specifically identify a responsible policymaker if the

plaintiff has demonstrated a custom that is so permanent and well settled as to have the force of law, such that the custom can be ascribed to municipal policymakers." *Id.* "Accordingly, a plaintiff can survive a motion to dismiss a *Monell* claim without alleging conduct by a specific municipal policymaker by pleading facts that allow a court to infer that he or she sustained a constitutional injury as a result of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (internal quotations omitted).

Additionally, in the Third Circuit, a § 1983 claim against a municipality may proceed in two ways: "either (1) 'that an unconstitutional policy or custom of the municipality led to his or her injuries,' or (2) 'that [his or her injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice.'" *Lawson v. City of Philadelphia*, No. CV 17-4228, 2020 WL 93941, at *3 (E.D. Pa. Jan. 8, 2020) (*citing Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). "For claims 'predicated on a failure or inadequacy,' the plaintiff must demonstrate that the failure or inadequacy amounts 'to deliberate indifference on the part of the municipality.'" *Id.* "A plaintiff may demonstrate deliberate indifference for a failure to train, supervise, or discipline claim by showing that '(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Id.*

Plaintiff's 334-paragraph complaint alleges in detail a striking, years-long pattern of investigative abuses by the City of Philadelphia and its police department, including the: (1) use of coercive techniques to obtain confessions, such as threats of violence, false promises, and the

use of prolonged interrogations; (2) fabrication of incriminating statements, and providing witnesses with details of crimes only the perpetrator or police could know; (3) fabrication of inculpatory evidence; (4) withholding of exculpatory evidence; (5) failure to adequately discipline officers or prosecutors who engaged in unconstitutional conduct; (6) failure to adequately train and supervise officers, ignoring systematic misconduct and abuse of civilians' rights; (7) failure to discipline officers or prosecutors who failed to report the unconstitutional conduct of fellow colleagues,; and (8) the failure to train officers and prosecutors on *Brady* evidence and/or PCRA procedures. Compl. at ¶¶ 222-265, 314-317. Plaintiff further alleges that these unconstitutional customs, practices, and policies were in place during the relevant time period and were the moving force behind Wilson's wrongful conviction. *Id.*

Further, Plaintiff alleges that the Defendant City of Philadelphia was at all times relevant to this action: (1) responsible for the polices, practices, and customs of the PPD, *compl*. at ¶ 311-313; (2) employed all of the individual Defendant PPD Officers during the relevant time period; *id.*, and (3) was aware of, yet showed deliberate indifference to, the unconstitutional misconduct, causing Wilson's wrongful conviction. *Id.* at ¶¶ 314-322.

### D. Defendant's Argument that Plaintiff Must Prove Each Basis for *Monell* Liability Was a "Clearly Established" Right is Unavailing.

Defendant does not dispute the sufficiency of Plaintiff's *Monell* claim or Plaintiff's supporting allegations, but instead argues that "theories of liability expressed in Counts I-VI" implicated in Plaintiff's *Monell* claim – including malicious prosecution, withholding of evidence, failure to conduct a constitutionally adequate investigation, and failure to intervene – should be dismissed, as "Plaintiff cannot sue the City for violations of rights that were not clearly established at the time of the events at issue." (Motion, p. 14-15). In making this claim, the City argues that

29

distinguishable out-of-circuit case law should apply and that only some, *but not all*,[4] of Count VII (Plaintiff's *Monell* claim) should be dismissed.

Despite Defendants argument to the contrary, whether a right was "clearly established" is a question relevant only to a qualified immunity defense by *an individual defendant*. (*See* Motion, pp. 7-13) In its Motion, the City confuses Plaintiff's *Monell* claim – which is based on a "policy" or "custom" of the City under *Monell v. Dept. of Social Servs. of New York,* 436 U.S. 658, 692 (1978) with Plaintiff's § 1983 claims (Counts I-VI) against individual officers. Indeed, as the City is aware, municipalities are not entitled to qualified or absolute immunity from § 1983 claims, and thus the "clearly established" requirement is inapplicable to *Monell* claims. *See Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980) (holding that municipalities are not entitled to immunity under § 1983, even when their officers are immune). This basic concept is supported by decades of United States and Third Circuit precedent and is highlighted by the City's failure to cite a single binding case to advance its novel argument. Accordingly, the argument that a municipality can escape liability for valid *Monell* claim via the qualified immunity standard has not been accepted in this Circuit, and should not be accepted here.

In *Wright v. City of Philadelphia,* a § 1983 plaintiff alleged he was wrongfully convicted for a 1991 rape and murder after DNA evidence conclusively excluded him as the source of the biological evidence found at the scene. 229 F. Supp. 3d 322, 325 (E.D. Pa. 2017). After Wright's conviction was vacated and he was acquitted upon retrial, he sued the City of Philadelphia and

---

[4] Although Defendant admits Plaintiff's *Monell* Claim (Count VII) is one "omnibus contention of municipal liability," the City appears to request a novel dismissal of *some but not all* of Count VII, as the City does not move for dismissal of Plaintiff's *Monell* claim relating to fabrication of evidence and coercion of witness statements. (*See generally* Motion, pp. 13-16).

individual police officers for malicious prosecution, violations of his Fifth Amendment right against self-incrimination, failure to intervene, supervisory liability, and *Monell* liability. *Id.* In his Complaint, Wright alleged that at least eight specific customs were maintained by the City during the time of his arrest and prosecution which led to his wrongful conviction, including: "(i) using coercive techniques to obtain confessions, such as threats of violence, false promises, and the use of prolonged interrogations; (ii) fabricating incriminating statements from witnesses, by, for example … providing witnesses with details of the crime only the perpetrator or police could know; (iii) fabricating inculpatory evidence; (iv) withholding exculpatory evidence; (v) failing to adequately discipline officers who engaged in unconstitutional conduct; (vi) failing to adequately train and supervise officers; (vii) ignoring systematic police misconduct and abuse of civilians' rights; and (viii) failing to discipline officers who failed to report the unconstitutional conduct of fellow officers." *Id.* at 336-337. The court noted that Wright's complaint set forth "at least eight separate instances in the years immediately before and after the investigation into Mr. Wright in which officers from the Philadelphia Police Department, including some of the same officers named in this case, engaged in the type of misconduct that is alleged to have occurred here." *Id.* at 337. The court held that after taking the allegations as true for purposes of the motion to dismiss, the Court inferred that "the unconstitutional practices of the Philadelphia Police Department caused Mr. Wright's injuries and were sufficiently widespread as to be ascribed to municipal policymakers," and denied the City's motion to dismiss the *Monell* claim. *Id.*

The *Wright* case is almost identical to the case at bar. Like Wright, Plaintiff here alleges that the City of Philadelphia maintained policies, practices, and customs of misconduct directly resulting in Wilson's wrongful conviction, including, but not limited to customs of: "(i)

discrediting witness statements, identifications, and key facts in order to suppress exculpatory information; (ii) obtaining identifications through manipulative and coercive means; (iii) providing information to eyewitness or indicating whom they should identify; (iv) manipulating or coercing witnesses into making false or fabricated statements; (v) failing to document or disclose exculpatory evidence; (vi) failing to document or record witness statements and instead relying solely on an officer's claims about what the witness said; (vii) failing to gather or analyze critical physical evidence; and (viii) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices." Compl. at ¶ 239. Also like *Wright*, Plaintiff here alleges seven other detailed "instances" wherein the Philadelphia Police Department's unconstitutional policies, customs or practices wrongfully convicted individuals in the same or similar manner as Wilson, including circumstances where Philadelphia officers – several of whom are Defendants in this action – fabricated evidence, withheld exculpatory evidence, and coerced witness statements, leading to judicial recognitions of the City's violation of the defendant's constitutional rights. *Id.* at ¶¶ 242, 248.

Unlike *Wright,* the case cited by the City, *Szabla* v. *City of Brooklyn Park,* 486 F.3d 385 (8th Cir. 2007), does not address numerous constitutional customs, policies, or practices resulting in a § 1983 plaintiff's wrongful conviction. Instead, in *Szabla,* a § 1983 plaintiff sued the City of Brooklyn Park, Minnesota and individual police officers for excessive force after being bitten by a police canine with no warning while sleeping in a park. *Id.* In its analysis of the individual defendants' qualified immunity, the court held that the "right" to a warning before being bitten by a police canine was not "clearly established." *Id.* at 389. Although the court acknowledged that municipalities were not entitled to immunity from liability under § 1983, it nonetheless held that

municipal policymakers could not exhibit "*deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Id.* at 392-393 (emphasis in original). However, and what Defendants omit from their Motion, is that the court clearly limited its holding to the fact "Brooklyn Park's written policy concerning the use of dogs is lawful on its face," and where "official policy is lawful on its face and does not compel unconstitutional action by an employee of the municipality" this clearly established analysis does not apply. *Id.* at 390, 394. Instead, where "municipality was liable … because a particular municipal action *itself* violated federal law," a plaintiff need only "establish a constitutional violation," and in fact, "no evidence is needed other than a statement of the municipal policy and its exercise." *Id.* at 390 (emphasis in original). Further, the court specifically distinguished its holding from the case at bar, stating "[t]he separate doctrine providing for municipal liability in a case of widespread unconstitutional practices that constitute a 'custom or usage with the force of law' is not at issue in this case." *Id.* at 392, n.3.[5]

Accordingly, *Szabla* itself states that it would not apply to the case at bar, where widespread unconstitutional practices are alleged and where various polices, customs, and practices implicating numerous different constitutional injuries coincide are unconstitutional on their face. *Compl.* at ¶¶ 234-251, 315-321.[6] Thus, *Szabla* is inapplicable here, *even if* it was binding on this

---

[5] The inapplicability of Defendant's cited cases is also shown by the distinguishable constitutional violations and claims at issue in each case – none of which is similar to the claims at hand. *See Szabla* v. *City of Brooklyn Park,* 486 F.3d 385 (8th Cir. 2007) (failure to warn citizen about police canine bite); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) (failure to treat mental health of pretrial detainee leading to death); *Bustillos v. El Paso Cty. Hosp. Dist.*, 891 F.3d 214 (5th Cir. 2018) (body searches by medical personnel at the direction of border patrol).

[6] The fact that Plaintiff *also* alleges that the City failed to train, supervise, and discipline problem officers for their unconstitutional conduct, which continuously resulted in constitutional violations such as Wilson's, *id.* at ¶¶ 252-265, was not addressed in the cases Defendant cites, and is thus not grounds for dismissal of Plaintiff's well-pled claims that meet the criteria under *Monell* criteria. *See Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

court, **which it is not.** Further, the *Szabla* plaintiff did not allege seven other similar instances of the City's unconstitutional customs nor did he allege that the Commonwealth itself admitted that the misconduct "may also be attributable in part to institutional failures…." *Id.* at ¶¶ 242, 248, 321; Ex. B, p. 25. Regardless, the *Szabla* and *Arrington-Bey* cases were determined on summary judgment and *not* at the motion to dismiss stage.

As Plaintiff has undoubtedly asserted sufficient allegations giving rise to a *Monell* claim at this stage of the case, the City's Motion to Dismiss Count VII should be denied.

## CONCLUSION

Defendant Margerum is not entitled to qualified immunity or dismissal of any of Plaintiff's Counts against Margerum and the City of Philadelphia is not entitled to dismissal of the well-pled *Monell* claim against it. Accordingly, Defendants' Motion to Dismiss on these grounds should be denied.

Date:  December 10, 2021                    Respectfully submitted,

                                            By:/s/ *Kimberly K. Winter*
                                                Michael J. Abrams (Admitted *Pro Hac Vice*)
                                                Kimberly K. Winter (Admitted *Pro Hac Vice*)
                                                Alana McMullin (Admitted *Pro Hac Vice*)
                                                LATHROP GPM LLP
                                                2345 Grand Boulevard, Suite 2200
                                                Kansas City, MO 64108
                                                Telephone: (816) 292-2000
                                                michael.abrams@lathropgpm.com
                                                kim.winter@lathropgpm.com
                                                alana.mcmullin@lathropgpm.com

                                                and

                                                Francesco P. Trapani
                                                KREHER & TRAPANI LLP
                                                Two Penn Center Plaza
                                                1500 John F. Kennedy Blvd., Suite 900
                                                Philadelphia, PA  19102
                                                Telephone: (215) 907-7289
                                                frank@krehertrapani.com

                                                ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2021, I caused a true and correct copy of the foregoing Plaintiff's Memorandum In Opposition To Defendants City Of Philadelphia And Frank Margerum's Motion To Dismiss Plaintiff's Complaint to be served via CM/ECF filing upon counsel for all parties.

                                            /s/ *Kimberly K. Winter*
                                            One of the Attorneys for Plaintiff

47703836