## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEOPHALIS (BINKY) WILSON** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF PHILADELPHIA,** | ) | Case No. 2:21-cv-02057-JMY |
| **PENNSYLVANIA; PHILADELPHIA** | ) | |
| **POLICE DEPARTMENT; FORMER** | ) | |
| **DISTRICT ATTORNEY LYNNE** | ) | |
| **ABRAHAM** *individually*; **FORMER** | ) | |
| **ASSISTANT DISTRICT ATTORNEY** | ) | |
| **DAVID DESIDERIO** *individually*; | ) | |
| **KAREN ANSEL, AS PERSONAL** | ) | |
| **REPRESENTATIVE OF THE ESTATE** | ) | |
| **OF FRANCES ANSEL; JOHN DELLA** | ) | |
| **ROCCA, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF MICHAEL BURKE; JOHN DELLA** | ) | |
| **ROCCA, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF JOHN CIMINO; JOHN DELLA** | ) | |
| **ROCCA, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF FRANK MILLER; JAMES** | ) | |
| **RODDEN, AS PERSONAL** | ) | |
| **REPRESENTATIVE OF THE ESTATE** | ) | |
| **OF GREGORY RODDEN; MANUEL** | ) | |
| **SANTIAGO; JESSIE R. SCHOL, AS** | ) | |
| **PERSONAL REPRESENTATIVE OF** | ) | |
| **THE ESTATE OF WILLIAM SCHOL;** | ) | |
| **KENNETH RUSSELL, AS PERSONAL** | ) | |
| **REPRESENTATIVE OF THE ESTATE** | ) | |
| **OF RALEIGH WITCHER; RICHARD** | ) | |
| **HARRIS; FRANK JASTRZEMBSKI;** | ) | |
| **JOHN DELLA ROCCA, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF JOSEPH HASARA; RAYMOND** | ) | |
| **DOUGHERTY** *OR* **JOHN DELLA** | ) | |
| **ROCCA, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF RAYMOND DOUGHERTY; JOHN** | ) | |
| **DELLA ROCCA, AS SPECIAL** | ) | |

**ADMINISTRATOR OF THE ESTATE OF ARTHUR DURRANT; JOHN DELLA ROCCA, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF JAMES MORTON; JOHN DELLA ROCCA, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF PATRICK FARRELL; KEVIN HOLLINSHEAD; LUDMILLA PERMINT AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CHARLES PERMINT; JOHN GRIER; FRANK MARGERUM; JOHN DOE OFFICERS 1–10; ROGER ROE SUPERVISORS 1–10, all in their individual capacities.**

**Defendants.**

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Theophalis (Binky) Wilson ("Wilson"), by and through his attorneys, Lathrop GPM LLP, and Kreher & Trapani, alleges:

## INTRODUCTION

1. This matter concerns an extraordinary injustice. Theophalis Wilson spent over twenty-eight years wrongfully imprisoned for the shooting deaths of Kevin Anderson, Gavin Anderson, and Otis Reynolds (referred to herein as the "Anderson/Reynolds Murders"), crimes he did not commit.

2. Wilson's wrongful conviction and continued wrongful incarceration were directly caused by the misconduct of law enforcement officers from the City of Philadelphia Police Department and prosecutors from the Philadelphia District Attorney's Office (collectively "Defendants"). As a result of Defendants' misconduct, including fabrication of inculpatory evidence, suppression of exculpatory evidence, and coercion of false testimony, Wilson spent

almost three decades – his entire adult life – behind bars, sustaining distinct, compensable bodily and emotional injuries from which he is unlikely to ever recover.

3.      In between the late-night hours of September 25, 1989 and early morning hours of September 26, 1989, Kevin Anderson, Gavin Anderson, and Otis Reynolds (collectively referred to herein as the "Victims") were murdered in North Philadelphia. Kevin and Gavin Anderson were brothers (referred to as the "Anderson Brothers") and close associates of Otis Reynolds ("Reynolds"). The Victims were all shot in the head or face, their bodies were found within a two-mile radius, and their deaths were only hours apart. The Philadelphia Police Department ("PPD") Officers investigating the three murders quickly concluded they were related and likely committed by the same perpetrator(s).

4.      Despite numerous eyewitness accounts and 911 calls relating to the murders, no witness ever connected Wilson, who was innocent, to any of the Victims or their deaths, and no physical or forensic evidence implicated Wilson. Instead, PPD Officers were given a wealth of statements from friends and family members of the Victims indicating that the murders were likely committed by a well-known enemy and former business associate of the Victims, a notorious drug dealer named Noel Grierson, also known as "Steplight."

5.      Evidence in the PPD's possession indicated that Steplight and the Victims were associated with a notorious gang, the Jamaican Shower Posse, which was feuding with another gang, the Junior Black Mafia in the North Philadelphia area. In addition, police knew that only weeks before the Anderson/Reynolds Murders, Steplight and the Victims were engaged in shootouts and disputes over drug territory.

6.      Despite eyewitness accounts, forensic and ballistic evidence, and knowledge of the Victims' gang relations and motivated enemies, the PPD arrested no suspects for over two years.

7.     At the time of the investigation, an informant and self-professed murderer, James White ("White") was serving 10-20 years in prison for two unrelated murders he confessed to committing. As part of a plea deal with Defendant Assistant District Attorney ("ADA") David Desiderio ("Desiderio" or "ADA Desiderio"), White implicated himself and others in those crimes, including Chris Williams ("Williams") and Rick Bennett ("Bennett").

8.     In 1991 – two years after the Anderson/Reynolds Murders – an informant incarcerated with White reported to ADA Desiderio that White admitted to the Anderson/Reynolds Murders while in prison, but that White withheld this information when making his original plea deal.

9.     Based on this tip, ADA Desiderio revoked White's plea deal, threatened to use his previous statements against him, and promised to seek the death penalty unless White again implicated Williams, this time in the Anderson/Reynolds Murders. To sweeten the deal, ADA Desiderio promised to assist White in getting a pardon after serving only 15 years of his sentence, a part of the plea deal that was never disclosed. These threats and promises coerced White to falsely plead guilty to the Anderson/Reynolds Murders and sign a new deal with Desiderio.

10.    Because White had no actual knowledge of the Anderson/Reynolds Murders, as White had repeatedly stated, the ADA Desiderio and PPD Detectives fed White relevant information (private facts only the police or prosecutor can know) about the crimes, fabricated a narrative of the shootings based off White's prior confessions in other cases, and showed him photographs of the Victims in order for his story to appear credible.

11.    As a part of his coerced plea deal, on November 4, 1991 – two years after the shootings – White made his first and only statement to police about the Anderson/Reynolds Murders, implicating himself, Williams, Bennett, and individuals named "Steve," "Opie," and

"Binky" in a robbery gone wrong. White detailed a planned robbery of the three Victims wherein Williams – with only Bennett as a witness – killed one Victim for failing to give Williams more money, and then later – in the presence of White and Bennett – killed the other two Victims in a moving van, after which their bodies were thrown onto the street. "Binky," however, was not present for the murders, but instead allegedly followed White, Bennett, and Williams in another vehicle.

12.    A week later, White allegedly identified "Binky" from a group of 21 photographs as Plaintiff Wilson. This was and remains the only evidence linking Wilson to the Anderson/Reynolds Murders.

13.    A month later, Wilson voluntarily went to the PPD and Philadelphia District Attorney's Office ("DA's Office"), upon request, to speak with PPD Detectives and ADA Desiderio. Once there, Defendants threatened Wilson with prosecution if Wilson did not implicate Williams in the crimes White had falsely confessed to. Wilson informed Defendants he did not know White, and had no knowledge of any murders, including the Anderson/Reynolds Murders. ADA Desiderio told Wilson that even though Desiderio knew Wilson did not commit the crimes, Wilson would be prosecuted if he did not cooperate in implicating Williams. Although no new information surfaced after this interview, Wilson was subsequently arrested months later in February 1992.

14.    Even a cursory investigation by Defendants would have quickly eliminated Wilson as a possible suspect, as evidence in the PPD's possession instead pointed to the Victims' well-known enemy, "Steplight." Indeed, it was later revealed in post-conviction proceedings that the PPD and DA's Office withheld tens of thousands of documents, including police activity sheets that revealed (1) an extensive investigation into the PPD's "prime suspect" in the triple homicide,

Steplight, (2) witness statements describing the Victims' involvement in drug running, selling drugs, and robbing drug dealers, as well as their association with the Jamaican Shower Posse, (3) numerous witness statements and 911 calls that contradicted the Commonwealth's version of events at trial, and (4) critical impeachment information relating to White and other testifying witness's perjury at Wilson and William's trial.

15.     Because the exculpatory information above was not disclosed to Wilson or his co-defendants Williams and Bennett, they were jointly tried for all three murders. Williams and Wilson were convicted of murder, among other charges, and while Williams was sentenced to death, 17-year-old Wilson was sentenced to life in prison. Bennett was acquitted.

16.     Over the next two decades, Wilson and his co-defendant Williams continuously sought to prove their innocence. At a post-conviction hearing for Williams in 2013, White – the sole testifying eyewitness at trial– recanted his false identifications of Williams and Wilson, confirming that he told prosecutors and police *before* trial that he had nothing to do with the Anderson/Reynolds Murders and that he was coerced by ADA Desiderio and PPD Officers into fabricating a story in exchange for taking the death penalty off the table and for a promise that White would be released from prison after 15 years.  Like the exculpatory police activity sheets, this information was never disclosed to the defense or elicited at trial.

17.     Wilson was only incarcerated because individual Defendants fabricated evidence – including the false and coerced statement of White – withheld critical exculpatory and impeachment evidence showing Wilson's innocence, and conspired to prosecute him without probable cause. The Commonwealth of Pennsylvania agrees, stating in 2020 that Wilson's conviction was a "manifest injustice," and admitting that police and prosecutor misconduct caused such injustice. In fact, the DA's Office requested a new trial on Wilson's behalf. Once granted, the charges were dismissed

and Wilson was finally freed on January 21, 2020, after spending 28 years in prison for crimes he did not commit.

18.     However, Wilson was not the only Pennsylvania citizen affected by the PPD and DA's unconstitutional fabrication of testimony and suppression of exculpatory activity sheets, witness statements, and impeachment evidence. Indeed, the suppression of this type of exculpatory material evidence and fabrication of inculpatory evidence was a direct result of Defendants' custom, policy, and practice – as of 1992 – to not disclose or alert the defense to the existence of fabricated evidence or the police activity sheets containing material exculpatory information. As a result of Defendants' customs, policies, and practices, exculpatory activity sheets and information were not relayed to Wilson's defense team, and fabricated, false testimony was used against him in violation of the Defendants' constitutional rights.

19.     Complementing these systemic failures by the PPD was the custom, policy and practice of the DA's Office at the time to deliberately avoid seeking exculpatory evidence and to coerce and fabricate statements from informants and/or witnesses in order to close cases. As a result, Wilson's defense team never learned that White's statements about the Anderson/Reynolds Murders – the only evidence against Wilson – were fabricated and false.

20.     As a direct result of the Defendants' unconstitutional misconduct, Wilson was wrongfully arrested and convicted of a triple homicide, spent 28 years in prison, and suffered injuries and damages as a result beginning in 1992 and which continue to date.

## JURISDICTION AND VENUE

21.     This action is brought under 42 U.S.C. § 1983 and state law to redress the deprivation under color of law of Wilson's rights as secured by the United States Constitution.

22.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Wilson's federal constitutional and civil rights.

23.     This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

24.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in the Eastern District of Pennsylvania, and a substantial part of the events giving rise to the claims asserted herein occurred within this district.

## THE PARTIES

25.     Plaintiff **THEOPHALIS WILSON** is a resident of the Commonwealth of Pennsylvania. He currently resides in Philadelphia, Pennsylvania. Wilson was wrongfully convicted and incarcerated by the Commonwealth of Pennsylvania from his arrest in 1992 until he was exonerated in 2020.

26.     Defendant **CITY OF PHILADELPHIA** is a political subdivision of the Commonwealth of Pennsylvania and a municipal corporation, which was at all relevant times the employer of individual Defendant PPD Officers and Supervisors, District Attorney Lynne Abraham and ADA Desiderio. It is authorized to sue or be sued in its own name. The City of Philadelphia is and was at all times relevant to this complaint responsible for the policies, practice, and customs of the PPD and the DA's Office.

27.     Defendant **JOHN DELLA ROCCA** is the Special Administrator of the **ESTATE OF MICHAEL BURKE** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of

Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was a sergeant in the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

28.     Defendant **KENNETH RUSSELL** is the Personal Representative of the **ESTATE OF RALEIGH WITCHER** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was a sergeant in the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

29.     Defendant **JOHN DELLA ROCCA**, is Special Administrator of the **ESTATE OF ARTHUR DURRANT** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was a lieutenant in the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

30.     Defendant **FRANK JASTRZEMBSKI** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

31.    Defendant **JOHN DELLA ROCCA** is Special Administrator of the **ESTATE OF JAMES MORTON** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

32.    Defendant **MANUEL SANTIAGO** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

33.    Defendant **KAREN ANSEL** is the Personal Representative of the **ESTATE OF FRANCES ANSEL** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

34.    Defendant **JOHN DELLA ROCCA** is the Special Administrator of the **ESTATE OF JOHN CIMINO** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to

statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

35.     Upon information and belief, Defendant **JOHN DELLA ROCCA** will be the Special Administrator of the **ESTATE OF FRANK MILLER** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

36.     Defendant **JAMES RODDEN** is the Personal Representative of the **ESTATE OF GREGORY RODDEN** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

37.     Defendant **JESSIE R. SCHOL** is the Personal Representative of the **ESTATE OF WILLIAM SCHOL** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract

and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

38. Defendant **RICHARD HARRIS** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

39. Defendant **JOHN DELLA ROCCA** is the Special Administrator of the **ESTATE OF JOSEPH HASARA** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

40. Defendant **RAYMOND DOUGHERTY** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity. Plaintiff has yet to determine whether Raymond Dougherty is deceased. An estate has been opened for Raymond Dougherty and John Della Rocco has been named as the Special Administrator of the Estate of

Raymond Dougherty, however, plaintiff has yet to determine whether this is the correct Raymond Dougherty. Plaintiff will continue to update this information.

41.     Defendant **KEVIN HOLLINSHEAD** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

42.     Upon information and belief, Defendant **JOHN DELLA ROCCA** will be the Special Administrator of the **ESTATE OF PATRICK FARRELL** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

43.     Defendant **LUDMILLA PERMINT** is the Personal Representative of the **ESTATE OF CHARLES PERMINT** who was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

44.     Defendant **JOHN GRIER** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

45.     Defendant **FRANK MARGERUM** was, at all times relevant to this complaint, a duly appointed and active officer of the PPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. Upon information and belief, he is entitled to indemnification under statute and by contract and was assigned as a detective with the Homicide Unit at the time of this investigation. He is sued in his individual capacity.

46.     Defendants **JOHN DOE OFFICERS 1–10** were, at all times relevant to this complaint, duly appointed and active officers of the PPD acting within the scope of their employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia, Pennsylvania, as well as the State of Pennsylvania. Upon information and belief, they are entitled to indemnification under statute and by contract. They are sued in their individual capacities.

47.     Defendants **ROGER ROE SUPERVISORS 1–10** were, at all times relevant to this complaint, duly appointed and active supervising officers of the PPD acting within the scope of their employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia, Pennsylvania, as well as the State of Pennsylvania.

Upon information and belief, they are entitled to indemnification under statute and by contract. They are sued in their individual capacities.

48.     Defendant **DAVID DESIDERIO** was, at all times relevant to this complaint, duly appointed and active assistant district attorney of the DA's Office, acting within the scope of their employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the DA's Office and the City and State of Pennsylvania. Upon information and belief, they are entitled to indemnification under statute and by contract. He is sued in his individual capacity.

49.     Defendant **FORMER DISTRICT ATTORNEY LYNNE ABRAHAM** was, at all times relevant to this complaint, duly elected and active supervising attorney of the DA's Office and Defendant Assistant District Attorney David Desiderio, who was acting within the scope of her employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the DA's Office as well as the City and State of Pennsylvania. Upon information and belief, she is entitled to indemnification under statute and by contract. She is sued in her individual capacity.

## FACTS

### The Anderson/Reynolds Murders

50.     Defendants Harris, Ansel, Cimino, Hasara, Miller, Rodden, Santiago, Schol, Jastrzembski, Dougherty, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint (sometimes collectively referred to herein as "PPD Officers") directly participated in the investigation of the Anderson/Reynolds Murders by gathering evidence, obtaining witness statements, responding to and examining the crime scenes, and creating and documenting investigative reports and activity sheets.

51.     Defendants Witcher, Burke, and Durrant, (collectively "PPD Supervisors") were assigned to supervise the Anderson/Reynolds Murder investigation and it was their responsibility to oversee the investigation, including all evidence gathered and statements obtained by various officers, and to give direction and guidance to uniformed officers and detectives on scene.

*Otis Reynolds*

52.     Otis Reynolds, a 5'11, 250-pound Black male, was found shot to death at 1235 W. College Avenue in Philadelphia, Pennsylvania on September 25, 1989.

53.     Reynolds' body was first discovered lying in the street by Denise Washington ("Washington") at 10:45pm, as she was walking her baby in a stroller. Thinking Reynolds was drunk, she crossed the street to avoid him and walked home. Forty-five minutes later, Washington went outside again and found the man still lying there. She got closer, noticed blood, and knocked on her neighbors' doors until one agreed to call the police. Police arrived on scene at 11:38pm.

54.     Reynolds was found lying on his back with two gunshot wounds to the face, and an upper spinal cord contusion. The medical examiner, Dr. Paul Hoyer, reported that Reynolds' body was soaked in blood, and his clothing was wet. Otis was pronounced dead at 1:01am on September 26, 1989, but the hour of injury on his medical report states only "Late P.M."

55.     Although Reynolds' fingerprints were on file with the PPD, they enlisted the help of the NYPD Identification Unit to identify Reynolds.

*Kevin Anderson*

56.     At 12:31pm on September 26, 1989 – an hour and a half after Reynolds' body was found – Lisa Perry ("Perry") reported a man with a gun to police near her home at 3102 West Berks Street in Philadelphia. Perry reported that a Black male knocked on her door at 11:50pm,

less than an hour earlier. She noticed that his companion, who was sitting in a car in front of her house, had a gun.

57.     One minute after Perry's 911 call, dispatch instructed all cars to standby for a report of a Black male on the highway with a gun. Officers Hollinshead and Farrell responded.

58.     Thirteen minutes after Perry's 911 call, a nearby gas station employee working on 33rd and Columbia called 911 to report that someone had knocked on his window and asked him to call police because he had witnessed a man being shot on 32nd and Berks Street, one block away from where Perry reported a man with a gun.

59.     One minute later, police officers instructed dispatch that the report of a person with a gun at 3102 Berks Street was unfounded.

60.     Two minutes after that, dispatch again called in a report of an individual with a gun and a shooting at 32nd and Berks Street. Officers agreed to "ride back around there." Dispatch cautioned the officers to be careful as they had a call for that location earlier. The officers responded, "[t]he last time we were out there…there was nobody there. We just left there."

61.     One minute later, the police again told dispatch the call regarding a shooting in the area was unfounded.

62.     Neither the gas station employee nor the eyewitness to the shooting were ever interviewed by law enforcement or those interviews were suppressed.

63.     Two hours later, at 3:06am, Cornelius Williams called 911 to report that on his way to work, he walked by a dead body lying "on the school side of the street" at 32nd and Berks Street.

64.     Officers canvassed the Berks Street area and spoke to a local resident who reported having witnessed a white Lincoln driving erratically in the area nearly every night between 10:00pm and 11:00pm.

65.     In the days before their deaths, the three Victims were reportedly seen in a vehicle matching that description. Officers dismissed this connection.

66.     Seven minutes after Cornelius Williams' 911 call, officers *again* told dispatch to report the call in that area unfounded.

67.     Three hours later, at 6:45am, another resident of the 3200 block of Berks Street called 911 to report a male lying in the street.

68.     This was confirmed by another resident's 911 call reporting the same thing at 7:32am.

69.     At 8:55am, police finally discovered Kevin Anderson's body 20 feet west of 32nd and Berks Street, one and a half miles away from Reynolds' body – which was found just hours before. A crack vial with white substance was found near Kevin Anderson's body.

70.     Kevin Anderson was a 19-year-old Black male, 5'4'' and 140 pounds. The Philadelphia medical examiner, Joseph P. Aloisi pronounced Kevin Anderson dead from a gunshot wound to the back of the head at close range, and noted one superficial gunshot wound to the scalp on the left temple. Rigor was fully developed in the jaw and partial rigor was noted in the other joints. Under his clothing, Kevin Anderson wore green swim trunks.

71.     At 6:45pm, Perry, the original 911 caller, was interviewed by Detective Morton. She explained the incident in more detail, indicating that after a knock at her apartment door, she heard a man she knew as "Fred" yell "Stop, Monk, don't do that, man." When Perry looked outside again, she saw Fred's white Thunderbird parked outside with a Black male in the passenger seat pointing a silver handgun out the window toward Perry's house. Perry noted that Fred normally drove a 1989 white Lincoln 4-door – the same car the Victims were reportedly sighted in before their deaths and the same car other residents reportedly observed in the area that night.

72.     After talking with police, Perry saw men she knew as "Gary" and "Snow" in a green car parked in front of 3401 West Berks Street stripping the car. Perry called 911 as Gary and Snow were known to rob people and steal cars in the area. Officers Hollinshead and Farrell were dispatched. When they arrived to talk to Perry, the men stripping the car ran. After police left, Gary and Snow returned and drove the green car away. Police never followed up on this lead.

73.     Instead of investigating, Detective Morton reported that the incidents Perry told police about the night of the shootings were "unrelated" to the murder of Kevin Anderson. No reason was given for this conclusion.

74.     On September 27, 1989 Detective Schol interviewed Officer Hollinshead, the patrol officer who responded to the initial Berks Street 911 calls. Officer Hollinshead stated that after the first two calls, he "drove by" 32nd and Berks with Officer Farrell, but did not see Kevin Anderson's body lying there until hours later that morning, after several additional 911 calls.

*Gavin Anderson*

75.     At 8:36am on September 26, 1989 – thirty minutes before Kevin Anderson's body was discovered –Gavin Anderson was found dead in the 2400 block of West Glenwood Avenue, just a mile from Kevin Anderson's body.

76.     Gavin Anderson had two gunshot wounds to the front of his right ear and was found bleeding from the back of his head. He was found lying on his back with his legs bent and up in the air. His right leg was leaned against a white Cadillac, while his left leg was leaning against a bush. A shell casing was found near the body.

77.     Like his brother, Gavin was found wearing swim trunks under his clothing.

78.     Gavin Anderson had no identification on his person, but had three or four slips of paper containing telephone numbers in his pockets.

79.     While officers were processing the scene, Kerry Simmons ("Simmons"), a resident of the area where Gavin Anderson was found, approached officers and told Detective Dougherty that at 6:00 am that morning, he drove by the scene and saw the victim arguing with a 6'1'' Black male wearing a black jacket and jeans. Simmons saw the assailant making a motion as if he was going to hit the victim, but when the assailant noticed Simmons, he stopped and put his arm around the victim.

80.     Simmons told police he saw the two men walk together up the hill to where the victim's body would later be found. Simmons also informed police that he recognized the assailant as someone he had seen around the neighborhood and the nearby high-rise apartments numerous times.

81.     In a later interview at 10:10 am by Detective Dougherty, Simmons gave a consistent account of the incident, a detailed description of the assailant, and indicated he had seen this man five or six times before. Simmons confirmed he would be able to recognize the assailant if he saw him again.

82.     Gavin Anderson's death certificate does not declare a specific time of death, instead stating only "Early A.M." However, for reasons not stated in the reports, police apparently believed Gavin Anderson's time of death was between midnight and 3:00am, not 6:00am, as would be consistent with Simmons' statement to police.

83.     Because of this unfounded assumption regarding Gavin's time of death, Detective Jastrzembski conducted a second interview of Simmons at 6:50pm that same night, finding Simmons' recollection remained consistent, leading police to disregard his statement. Further, Simmons again noted that he recognized the assailant as a "crackhead" from his neighborhood, at

22nd and Diamond, the Diamond Street Projects, and insisted that if shown a photo, he would recognize him.

84.      Upon arrival at the scene, police documented the names of witnesses, including Francis Jarrett, a 42-year-old Black woman who was near the scene when police arrived, and lived at 2446 West Glenwood Avenue. In a later interview with Simmons, he identified the assailant in Gavin Anderson's murder as David Jarrett. However, police never questioned Ms. Jarrett about the identification of a man with the same last name in the area of the murder, nor do any meaningful investigation into this critical lead.

85.      On the day of the murder, police also interviewed Evonne Lackey ("Lackey"), who stated that at 11:00pm the night before the murder – on September 25 – she was walking through the playground a block from where Gavin Anderson was found when she heard four gunshots and saw a man lying down in the area. Lackey told police that she could recognize the victim if shown a picture, as she knew most of the people in the neighborhood.

86.      There is no indication that law enforcement followed up with Lackey or showed her a photograph of Gavin Anderson, yet, Detective Permint concluded in his report that Lackey "didn't know the deceased."

87.      Detective Permint then either deliberately or recklessly misidentified Lackey's location at the time – 2400 Glenwood – where she heard the gunshots (the playground a block from the shooting) as Simmons' work address (six blocks further from the location where the shooting occurred), permitting police to again conclude another credible witness report was "unrelated."

88.      Nonetheless, police surveyed the neighborhood and reported several more residents that heard multiple gunshots in the early morning hours at about 3:00am.

**Police Quickly Determined the Murders were Related and That the Victims were Involved
in Illicit Activity and Gang Feuds**

89.     Detectives Santiago and Dougherty interviewed Sherrie Young ("Young"), whose number was found in Gavin Anderson's pocket at the time of death. Young told police the Anderson Brothers and Reynolds were friends, were living together, and were all involved in the same criminal enterprise.

90.     PPD Officers and Supervisors knew that all three Victims were associates and/or members of the Jamaican Shower Posse (sometimes referred to herein as the "Posse"), a drug trafficking organization that originated in Kingston, Jamaica, where Reynolds was born. Young Jamaican men would migrate to the U.S. to work as drug sellers and transporters for the Posse, particularly between Texas, Philadelphia, Florida, and New York. In cities where the Posse took hold, record high murder rates followed. In 1988 alone, the federal government linked the Posse to 525 murders. The gang reportedly earned its name because its members, who typically carried Uzis, were known for showering their enemies with bullets. Often the bodies of victims killed by the Posse were left in public places.

91.     In the 1980s, the Posse began to infiltrate Philadelphia. The organization successfully established cocaine networks in the West, Southwest, North and Germantown sections of the city, areas that had long been controlled by the Junior Black Mafia ("JBM"), a drug trafficking organization. Violent confrontations between the Posse and the JBM continued to escalate throughout the late '80s. In September 1988, a DEA agent interviewed by the Philadelphia Daily News warned that law enforcement was unprepared for the Posse, stating that when the Posse "move[s] into the territory of established drug traffickers, they offer the opposition two choices: do business with them or get out."

48139649v1                                                22

92.     In addition to their association with the Posse, PPD Officers and Supervisors knew the Victims were known in the North Philadelphia area as the "stick-up boys." Their nickname originated with their reputation for violent and brutal robberies of known drug houses and drug dealers at gunpoint, typically with Uzis, for cash and narcotics which often ended in shootouts. The "stick-up boys" were also heavily involved in drug trafficking from Texas to New York. This well-known nickname was discarded by police.

93.     Because of the Victims' close association, joint illicit activity, the purported timing and manner of their death, and location of discovery, PPD Officers treated the murders as connected.

### Police Identify a "Prime Suspect," Steplight

94.     On September 26, 1989, the day the Anderson Brothers' bodies were discovered, witnesses confirmed the Victims were involved in drug trafficking and brutal robberies in the Philadelphia area, and told police that many of the robberies were connected to a well-established North and West Philadelphia drug dealer named "Steplight."

95.     Steplight, aka Noel Grierson, aka Noel Black Jr., was a notorious drug dealer in Philadelphia, who owned at least six stores throughout the north and west Philadelphia areas. Steplight has a criminal history including arrests for robbery, possession of drugs, illegal firearms and was a known enemy of the Anderson Brothers and Reynolds. In fact, Steplight was engaged in a conflict with them over territory just months before their deaths.

96.     Reynolds ran a store at 4229 Germantown Ave. in Philadelphia, Pennsylvania, a front for drugs. Periodically, Reynolds, along with the Anderson Brothers, would leave Philadelphia for New York and temporarily leave the store in Steplight's hands. When they returned after one such trip, Steplight was unwilling to relinquish control of the store.

97.     In the summer of 1989, just months before the murders, Reynolds hired Bruce Williams ("Bruce") to work at the Germantown store. Bruce witnessed Steplight and his associates meet with Reynolds and exchange money, which ended in a shootout between the two. Bruce also told police Steplight owed Reynolds money.

98.     Additionally, during the summer of 1989, Steplight physically assaulted the Victims and robbed them of a large amount of narcotics.

99.     Three weeks before their murders, the Anderson Brothers and Reynolds violently robbed Steplight's drug house at 5029 N. 11th Street in Philadelphia (the "5029 N. 11th St. Robbery"). The Anderson Brothers and Reynolds threatened occupants with Uzis and forced them to lie face down on the floor. They assaulted and beat the drug house occupants, and fired shots into the ceiling as they left with about $3,000 worth of drugs.

100.    On September 27, 1989, the day after the murders, police served a warrant on the 5029 North 11th Street drug house, bringing in thirteen of its occupants to conduct interviews about the homicides. Six of the occupants told police they had been present during the robbery and identified the Anderson Brothers and Reynolds as the assailants.

101.    Anthony Elam ("Elam"), one of the robbery victims, told police he saw Reynolds stab and beat a man at the intersection of Lindley and Windrim Streets, the location of one of Steplight's stores.

102.    Miriam Clarke and Darnell Nalley, also victims of the robbery, told police that the Anderson Brothers and Reynolds robbed another one of Steplight's stores a week after the 5029 North 11th St. Robbery, and that they had also committed robberies at several locations in Steplight's territory, including 5139 Hutchinson Street, the corners of 11th and Loudon, 15th and Lindley, Lindley

and Windrim, and 5049 N. 8th Street, and at 8th and Lindley just two weeks before the 5029 N. 11th St. Robbery.

103.     Sharon Williams, who was pregnant with Gavin Anderson's child at the time of his murder, informed police she had met the Anderson Brothers and Reynolds through Steplight. Sharon Williams last saw the Victims on Saturday, September 23, when they were driven to her house in a white 4-door Lincoln with tinted windows. That same day, Sharon Williams ran into Steplight on the street, and he had asked her where Reynolds was.

104.     In addition, the weekend before they were murdered, the Anderson Brothers and Reynolds had an altercation with Stefan Nixon, who was supposedly selling bad drugs. When Nixon came out of Steplight's store at 11th and Lindley, the Victims beat Nixon and began shooting at him. The weekend before that, the Anderson Brothers and Reynolds were in a shootout with other young drug dealers near the same location. On that same night, the Anderson Brothers and Reynolds got into another shootout with a different 18-year-old.

105.     Because police were aware of the Victims' crimes, reckless and violent behavior and gang associations, the day after the Anderson/Reynolds Murders, Defendants requested Detective Margerum check with federal authorities on possible warrants for Steplight and his associates, including possible indictments that could serve as the basis for an arrest or search warrant.

106.     Police received further confirmation of the Victims' involvement in the Jamaican Shower Posse and Junior Black Mafia's war over territory on October 10th, 1989, when Anthony Thigpen ("Thigpen") was arrested. Thigpen told police that he had information about the "three Jamaicans" who were killed in Philadelphia. PPD was alerted and Detective Morton and Lieutenant Durrant traveled to interview him.

107.     Thigpen told police that Emmanuel Mason ("Mason"), a top member of JBM, visited a Jamaican Shower Posse store on Woodland between 55th and 56th Street to warn the Jamaicans not to sell drugs in that neighborhood unless they got those drugs from the JBM. Disregarding Mason's warning, the Anderson Brothers and Reynolds started working protection for the Woodland store and planned a trip to Texas to get drugs to sell back in Philadelphia.

108.     Mason was assaulted in September of 1989, just days before the Victims were killed.

109.     Thigpen told PPD Officers that a man named "Q" (aka Derrick Steplight, not to be confused with Noel Grierson, the primary suspect, whose nickname was "Steplight") drove a grey 2-door Lincoln, was recently released from prison, and said he was going to take care of the Jamaicans. Thigpen told police that the Victims were killed in retaliation for Mason's beating and because the Victims had started working as protection for a Jamaican drug store on JBM territory, in defiance of a warning by the JBM. Thigpen told police the Victims were killed elsewhere and dumped in North Philadelphia. After their bodies were found, Thigpen heard Derrick Steplight say, "We got some of them Jamaicans and we are going to get the rest of them." This new suspect and critical, exculpatory information was withheld by Defendants until 2019.

110.     Thigpen's tip was given to Officer John Grier, whose confidential informant confirmed "Q" was selling drugs and firearms only two blocks from where JBM warned the Anderson Brothers and Reynolds not to sell drugs. This information was never disclosed.

111.     With knowledge of the Anderson Brothers' and Reynolds' involvement with the Jamaican Shower Posse, the PPD convened a multi-unit investigation into the triple homicide, including requesting assistance from the Jamaican Task Force and the Violent Traffickers Task Force, from which a detective was assigned specifically to investigate Noel Grierson, aka Steplight. Police

also requested background intelligence from the Violent Traffickers Task Force on several addresses connected to Steplight. The information gathered on Steplight from these task forces has never been disclosed to this day.

112.     On October 18, 1989 police visited Steplight's store on 4933 Old York Road. The employee there at the time, Michael Sultan, claimed the store was owned by someone other than Steplight and that he knew nothing of the Anderson/Reynolds Murders.

113.     Detectives then visited Steplight's store at 4229 Germantown Avenue. Employee Raymond Bowen also claimed the store was owned by someone other than Steplight. While there, detectives accidentally knocked over a box behind the counter containing marijuana. They arrested Bowen for possession of drugs and interviewed him, but Bowen denied knowing anything.

114.     On October 21, 1989, police, including Officers Miller, Witcher, and Rodden, identified Steplight as "the prime suspect" in the Anderson/Reynolds Murders.

115.     On October 22, 1989, police logged extensive research into Steplight's drug houses, known locations, addresses, businesses, criminal history, and associates.

116.     On November 27, 1989, Sharon Williams assisted police by identifying nine associates of Steplight in a "Violent Trafficker's Photo Book" provided by the Violent Traffickers Task Force: Wayne Walker, Clivis Anderson, Marvel Grierson, Clinton Morris, Collimore Easy, Lindan Benschop, Anthony Burante, Patrick Bennett, and David Abraham. Police withheld these identifications from Sharon Williams' interview record.

117.     Collimore "Sherlock" Easy ("Easy") was identified by police as having knowledge of and/or participating in the Anderson/Reynolds Murders. Easy was arrested on November 27, 1989, for possession of crack, and was interviewed by Detective Rodden. However, Easy denied knowing Steplight or the Victims. In addition, Easy could provide no alibi for the night of the murders.

Nonetheless, according to the police reports and activity sheets, law enforcement conducted no further investigation into Easy as a suspect.

118.     Incredibly, despite the numerous witness statements and informant tips that Steplight was responsible for the Anderson/Reynolds Murders, Defendant PPD Officers never interviewed Steplight.

119.     Although police visited two stores they knew to be operated by Steplight and conducted interviews with employees, the Commonwealth withheld all records pertaining to one of the employees and, though it disclosed the interview of the other employee, failed to disclose any mention of Steplight's connection to the store or that employee.

120.     Steplight's status as a "prime suspect" in the Anderson/Reynolds Murders was withheld by police and prosecutors until 2019.

**Police Identify Other Possible Suspects, but Fail to Follow Up on Any Leads.**

121.     Witnesses and friends of the Victims, such as Joanna Williams, Norma Mercado, and Seanette Honeyblue, told police repeatedly that the three Victims had numerous conflicts with individuals resulting in gunfire, and that at the time of their murders, the Victims were afraid for their lives because they thought someone wanted to kill them.

122.     Norma Mercado, Reynolds' then-girlfriend, told police she was walking with Reynolds back from a store when he warned her that if he said, "duck" she had better do so because there were people out there who wanted to take his head off because he had robbed them.

123.     Joanna Williams told police that the first night she met Reynolds he told her that he "was in danger, that someone was looking to shoot him" and that three weeks before their deaths, Gavin Anderson came to Joanna Williams' house with a fresh bullet wound in his leg, having been

shot with a 9-millimeter gun. Indeed, whenever a car drove by, the Victims would get nervous and uptight because someone wanted them dead.

124.    Seanette Honeyblue, Gavin Anderson's girlfriend, further corroborated that Gavin Anderson had been shot just a few weeks before his murder and that the Victims had shot at least three people in the gunfire.

125.    In addition, the week before his murder, Kevin Anderson was seen running from a drug house on Kershaw Street, chased by men accusing him of stealing money.

126.    Police were also told that the Anderson Brothers and Reynolds were selling drugs and transporting mass quantities of cocaine and marijuana from other states to be sold in North Philadelphia, an area already dominated by the Jamaican Shower Posse and the JBM, who were, at that time, embroiled in a violent feud with one another over territory.

127.    A central hub for the Anderson Brothers and Reynolds' criminal activity was a Jamaican restaurant called Prime Time. The Victims used the restaurant to traffic drugs from out of state and bring drugs back to Philadelphia. Likewise, the Victims repeatedly asked women to help them transport drugs across state lines, which often involved their employment at Prime Time.

128.    Eglam Anderson ("Eglam"), the Anderson Brothers' father, told police, including Officers Durrant and Rodden, that he called Prime Time the night of September 25, 1989 to return Kevin Anderson's phone call from earlier that day. A man on the phone told Eglam the boys were upstairs.

129.    Eglam also told police Reynolds had robbed a man named Ken, whose brother, Dwight Taylor, was now looking for Reynolds. Likewise, a friend of the Victims, Donna Steele, also told police that a man named Dwight called her very soon after the Anderson Brothers were

found by police to inform her of their murders and asked whether the Victims had been doing anything that could have caused it. Police never interviewed or questioned Dwight.

130.    Detective Rodden contacted Detective Margerum at the Violent Offenders Traffickers Unit, and requested background information on the names provided by Eglam. Detective Rodden also requested any known activities of the Victims in the New York area. This information was never disclosed.

131.    Shortly before their murders, the Anderson Brothers and Reynolds had planned a trip to Texas to trade in drugs and arms – even after being warned by the JBM not to.  A business card from a gun shop in Dallas, Texas was found in Reynolds' personal effects recovered after his death and the ATF later confirmed this shop was, at the time, under joint local-federal investigation.

132.    Further, law enforcement made no record memorializing the chain of custody for Reynolds' personal belongings, which included immigration papers, a Texas identification card, a social security card, several business cards, a phone bill, and a small handwritten phone book. These belongings were ultimately provided to police by Sharon Williams, but how she came to be in possession of these items was not clear.

133.    On September 26, 1989, Sharon Williams told police that a Jamaican man came to her house and informed her that the Anderson Brothers and Reynolds were dead. She then ran outside to the corner of 10th and Duncannon, where a woman handed her all of Reynolds' belongings. Sharon Williams went back into her house and called Kevin Anderson's sister, who told Sharon Williams she had spoken to Kevin Anderson on the phone the day before (September 25, 1989) and that day (September 26, 1989).

134.    On October 10ᵗʰ, 1989, police interviewed Joyce Gillis ("Gillis"), who said she had

been introduced to the Victims by Kevin Hicks ("Hicks"). Gillis told police the Victims were at her

house the day before they were killed and that she found Reynolds' personal effects under her couch.

When she saw on television they had been murdered, she gave those belongings to Hicks.

135.     Hicks was a former employee of Steplight, and had numerous charges for violent and

drug related crimes. Hicks had close personal ties to Steplight and was one of the last people to be

seen with the Anderson Brothers and Steplight before they were murdered. Hicks admitted that he

met the three Victims through Steplight, and that, at the time, they were working for the Jamaican

store at Lindley and Windrim and they were looking for drug sellers. Hicks also admitted that he sold

marijuana for the Victims for a short time.

136.    Police interviewed Hicks, who confirmed Gillis's version of events regarding

Reynolds' personal effects and that he gave the effects to his niece, Sharon Williams. Additionally,

Hicks told police he had last seen Reynolds and Kevin Anderson at Warnock and Duncannon, at 9pm

on the Thursday night before Reynolds was found dead (September 21, 1989).

137.    However, Anthony Elam, a victim of the 5029 N. 11ᵗʰ Street robbery, told police that

the Victims robbed everybody but Hicks, who used to work for them as a drug seller. Anthony said

he last saw Hicks with the three decedents on the day they were killed (September 25, 1989) at 4am.

The four were standing together at Warnock & Duncannon. This contradicted Hicks' report of having

only seen the Victims four days before they were killed, not the day of, but at the same location.

138.    Additionally, a phone bill belonging to the phone number for Hicks was found in

Reynolds' personal effects and showed numerous calls to Reynolds' beeper number. No mention of

this is found in the police reports. Police disregarded the inconsistent and contradicting stories of

Sharon Williams and Hicks as to how the victim's belongings ended up in Hicks' possession, and the stories of Hicks and Elam regarding when Hicks may have last seen the Victims alive.

139.    All credible leads, contradictory evidence, and conflicting witness statements were ignored by police until seven months later, when Hicks' records were requested from the FBI. However, there is no evidence that police deemed Hicks a suspect.

140.    Despite several suspects and leads, police did not arrest or charge anyone with the Anderson/Reynolds Murders for over two years.

### Defendants Coerced and Fabricated a False Identification and Confession from James White, a Known Informant

141.    No evidence connecting Plaintiff Wilson to the Anderson/Reynolds Murders existed. Wilson's name was never mentioned by police or witnesses and he was never interviewed as a suspect or person of interest. Instead, Wilson only became involved in the case after informant White confessed to the triple homicide *two years after* the murders and implicated Wilson and others in the crime.

142.    Upon information and belief, White, a 19-year-old with only an 11th grade education, was first arrested on December 9, 1989 by Detective Raymond Dougherty for the unrelated murder of Michael Haynesworth, who was killed on November 21, 1989.

143.    Not long after that, White was additionally charged with the murder of 19-year-old Marron Genrette, who was shot on June 25, 1989.

144.    After White's arrest for the Haynesworth murder, his attorney negotiated a deal with the Assistant District Attorney for the Commonwealth handling the cases, ADA Desiderio. The deal required White to plead guilty to the murders of Haynesworth and Genrette and identify anyone who participated in the crimes. In return, White would receive two consecutive prison sentences of 5-10 years for a total sentence of 10-20 years.

145.    In accordance with that agreement, White made numerous, albeit contradictory, statements implicating himself and others in those and other crimes.

146.    On the day of his arrest, December 9, 1989, White implicated himself, his girlfriend Rasheeda, Chris Williams ("Williams"), and Troy Coulston ("Coulston") in the Haynesworth murder. In his statement, White eluded to other crimes that Coulston and Williams also committed.

147.    Upon information and belief, police suspected that Williams, then 30 years old, was the head of a drug gang that robbed other drug dealers and murdered anyone in its way.  Accordingly, police wanted Williams off the street. White would later admit that Williams was, in actuality, little more than a small-time drug dealer. Nonetheless, based on White's statement Coulston and Williams were arrested.

148.    One year and five months later, on May 3, 1991 at 11:25am, White – in conjunction with his plea agreement – was questioned by Detective Joseph Hasara ("Hasara") and Detective Harris regarding other crimes potentially committed by Williams and Coulston.

149.    In his May 3, 1991 statement, White admitted that his first confession from December 1989 was false. Further, White added several details to the murder, including a beating that occurred prior to the killing, and mentioned additional crimes that Williams allegedly told White about.

150.    A few hours later, at 2:20pm, Detectives Harris and Hasara again interviewed White, this time about the shooting death of Genrette, for which White had already been charged. In his statement, White again implicated himself, Williams, Rick Bennett (Chris William's brother), and Terrence Smith in the murder of Genrette.

151.    Just a few hours later, at 4:15pm, Detective Hasara interviewed James White – for the third time that day – about the shooting death of William Graham, a cab driver. Although White had not been charged with the murder of Graham, he again implicated himself and Williams in a murder,

stating that Williams pulled the trigger and shot Graham in the back of the head because he wanted a cab to use during robberies of drug dealers.

152.    As part of his ongoing plea deal with ADA Desiderio, White was given immunity from prosecution in the Graham case, and was never arrested or charged for his part in it.

153.    Over four months later, on September 30, 1991, Craig Vaughn ("Vaughn") – an inmate in White's prison – contacted ADA Desiderio stating that White told Vaughn of his plea deal for the Genrette and Haynesworth murders, and that White later confessed to Vaughn that he was also involved in a triple homicide of three Jamaicans that White did not disclose to the ADA.

154.    White did not make these statements to Vaughn, but instead told him that when White went to the DA's office, the detectives and prosecutor questioned White about unsolved cases, including the death of three young black Jamaican males from New York who were found dead in the streets of North Philadelphia. White told Vaughn he was asked by police to "jog his memory" as to whether Williams was involved in these murders, like the other murders White was a part of, but White told police he had no knowledge of these crimes.

155.    Based solely on Vaughn's statement to ADA Desiderio, Desiderio rescinded White's plea agreement for the previous murders and additionally charged White with the Anderson/Reynolds Murders.

156.    White was not informed of the cancellation of his plea deal until after White was charged in prison with the Anderson/Reynolds Murders by Detective Ansel. White and Desiderio spoke on the phone after White's arrest, without White's attorney, wherein Desiderio informed him there was no longer any plea deal for his previous crimes and that White had only one choice: to plead guilty to the Anderson/Reynolds Murders. White told Desiderio he did not commit and had no involvement in the Anderson/Reynolds Murders, after which ADA Desiderio threatened to charge

White will all six murders, use White's previously made incriminating statements against him (including those for which he had immunity), and to seek the death penalty for White.

157.    White was transported from the jail to the Philadelphia Police Department for questioning. Detective Ansel attempted to interrogate White in the police car, but White continued to tell detectives he did not commit the murders for which he was now arrested. Additionally, after White was charged with the Anderson/Reynolds Murders, he was transported to the District Attorney's Office numerous times to speak with ADA Desiderio about a new plea deal. Detective Harris and other PPD Officers were present at these meetings.

158.    Desiderio, without White's attorney present, then coerced White into making a new plea deal: White would plead guilty to all six murders in return for his testimony against Williams – and others whom White said were involved – and in return White would receive a life sentence. However, Desiderio promised White that although the plea agreement called for life in prison, White would receive a pardon after he served 15 years because Desiderio would guarantee a hearing and put a letter in White's prison file to be seen by the Pardon Board. Desiderio and White met – with and without White's attorney present – in connection with this plea agreement. In fact, Desiderio arranged for White's mother and other family members to be present at some of these meetings, and eat together while discussing White's deal. Also in these meetings and prior to any trial, Desiderio instructed White not to reveal that Desiderio promised White he would be pardoned after 15 years, which was not memorialized in the plea agreement, in order "to protect the integrity of the deal" at trial.

159.    Detective Harris, who personally knew and went to high school with White's mother, Sheryl Richardson, gave White advice relating to the plea deal, telling him to take it, and to file for an application of pardon in 12 years, not 15.

160.     Although White had no knowledge of the Anderson/Reynolds' Murders, because of ADA Desiderio's threats of the death penalty and promises of an early release, White agreed to lie. Desiderio, along with detectives, then fed White descriptions of the Victims and the murders, showing White photographs of the crime scene and the Victims' body positions at the time of death, so that he could identify them. Although Desiderio knew White was not involved in the Anderson/Reynolds Murders, Desiderio told White that he did not believe what Craig Vaughn told him about the murders and that no one else would either. Desiderio told White if he wanted to keep the new plea deal, White needed to come up with a more plausible story. When White reminded Desiderio he did not know how the murders occurred, Desiderio concocted a confession based off White's statement in the Hainsworth case, explaining to White that he must implicate himself as well or no one would believe White's testimony.

161.     After White and Desiderio fabricated how the murders took place, White gave his first formal statement about the Anderson/Reynolds' Murders on November 4, 1991 at 11:58am to Detectives Cimino and Ansel. There, White repeated the fabricated confession, implicating himself and Williams – as he had done three times before – and also named Rick Bennett, "Steve," "Binky," and "Opie" as those involved in the Anderson/Reynolds Murders that had allegedly occurred *over two years prior*.

162.     White told police that he stole a van at Williams' request, so that they could rob unsuspecting "drug boys," (the Anderson Brothers and Reynolds) when they came to Williams to buy AK-47s. White said that when the men arrived to buy the guns, White, Williams and Bennett forced the Victims to give them their money at gunpoint. Williams wanted more than the $2,400 the Victims had, so one of the Victims agreed to take Williams to get more money. According to White, when Williams returned 30 minutes later, he had $24,000, and told Bennett that he blew the guy's head off.

Williams demanded more money from the other two Victims and forced them into the van where White, Williams, and Bennett interrogated them about money. White said the others, "Opie," "Binky" and Steve" were driving in another car as back up. When the Victims denied having more money, Williams shot the smaller Victim two or three times in the face and threw him from the back of the moving vehicle onto the street. When the last Victim would not give up the money, White said, Williams shot him twice, and threw him out of the van as well.

163.    Despite White's incredible account of the Anderson/Reynolds' Murders, law enforcement never recovered the van White allegedly stole in which the Victims were allegedly shot and never recovered any murder weapon(s). In White's statement, there was no mention of the meetings and phone calls with ADA Desiderio, the threats he made to White, or the promise that White would be released early. Despite their knowledge of that White's confession was false and coerced, at no time did White, ADA Desiderio, or the police officers disclose that the information contained in White's statement was fabricated and false.

164.    Notably, Plaintiff Wilson's name was never mentioned by White and his descriptions of the other individuals involved were that of 22 to 30-year-old men. Wilson was 17 at the time.

165.    Later that day, on November 4, 1991 at 2:10pm, Detective Cimino again interviewed White. Detective Cimino asked White about the Graham murder, wherein White again admitted that his last statement on the matter was false. White changed his story, instead telling police that Bennett, not Williams, killed Graham. He stated that Williams had told White and Bennett to kill a cab driver so he could have a cab to rob others, but that he did not pull the trigger.

166.    On November 13, 1991 at 12:30 p.m., Detective Cimino again interviewed White regarding the Graham murder. During that interview, White changed his account of that murder for a third time, telling police that it was actually White, himself, who killed Graham, with the help of

James McArthur. White told police he killed Graham because Williams told him to kill an innocent person to prove his loyalty. White then said he sold the gun he used to Terrence Smith.

167.    Later in the afternoon of November 13, 1991, at 3:45pm, White was again interviewed, this time by Detective Ansel.  At that time, White was apparently questioned about twenty-one photographs. During that interview, White allegedly identified a photo of Plaintiff Wilson as "Binky" and Joseph Lee as "Opie". This was the first time that Theophalis Wilson was identified by White, and the first and only time Wilson's name was connected with the Anderson/Reynolds Murders.

**Desiderio Attempts to Coerce Wilson into Testifying Against Williams**

168.    Although police had possession of White's confession implicating Wilson and Williams in November of 1991, Wilson was not immediately arrested.

169.    Instead, like White, Desiderio and PPD Officers attempted to make a deal with Wilson by coercing him to falsely testify against Chris Williams.

170.    On December 19, 1991, police requested that Wilson voluntarily come to the PPD's Homicide Unit to speak with PPD Detectives about the murders White had previously confessed to. Wilson did so, and once there, PPD Officers told Wilson that they only wanted Chris Williams and that if Wilson cooperated, he would not be charged with any crimes. Wilson refused to implicate Williams, stating he had no knowledge of any of the murders and could not testify falsely. Afterward, police took Wilson home.

171.    The next day, Wilson's presence was again requested by Defendants, this time at the DA's Office. There, and in the presence of PPD Officers, including but not limited to Defendant Cimino, ADA Desiderio threatened Wilson with prosecution if he did not implicate Williams in the crimes White had already confessed to. Wilson was also informed that White had

implicated Wilson in the Anderson/Reynolds Murders. Regardless, Wilson told Desiderio and police he did not know White, and had no knowledge of the Anderson/Reynolds Murders. ADA Desiderio told Wilson he knew Wilson did not commit those crimes, but that he would be prosecuted if he did not cooperate. After this encounter Wilson again went home.

172.     Although White had implicated Wilson in November of 1991, and no further evidence was discovered, Wilson was not arrested until February of 1992.

**Arrests and Convictions Based on White's Fabricated Confessions**

173.     On December 9, 1991, based heavily on White's testimony, Williams and Coulston were tried for the murder of Genrette, which ADA Desiderio prosecuted. Both men were acquitted.

174.     On January 10, 1992, Bennett was tried for the murder of Genrette, which ADA Desiderio prosecuted. Bennett was found not guilty. Having failed to convict Williams and Coulston for the murder of Genrette, Desiderio next prosecuted them for the murder of Michael Haynesworth, again, with White as his primary witness. The two were convicted on January 2, 1992.

175.     On July 3, 1993 Bennett was tried for the murder of Graham, which ended in a hung jury.

176.     Despite White's changing accounts, Williams was tried for the murder of Graham. He was found not guilty. The unsuccessful prosecution of Williams and Bennet for Graham came after Desiderio unsuccessfully prosecuted two wholly unrelated individuals in 1990.

177.     However, based solely on the testimony of White, on August 6, 1993, Williams, Bennett, and Plaintiff Wilson were tried for the Anderson/Reynolds Murders as co-defendants.

**The Trial was Infected with Fabricated and Perjured Testimony and Material Exculpatory Evidence was Suppressed**

178.     At trial, White testified against Williams, Bennett and Wilson, admitting that he killed – and pleaded guilty to killing – six people within a ten-month timeframe: William Graham in

February 1989, Marron Genrette in June 1989, Gavin Anderson, Kevin Anderson, and Otis Reynolds in September of 1989, and Michael Haynesworth in November of 1989.

179.    Although White pleaded guilty to these murders, he admitted to lying in multiple statements and receiving a plea deal from the District Attorney's Office regardless of his inconsistencies. However, Desiderio coached White to lie to the jury, by having White testify that he intended to spend life in prison for his crimes, when Desiderio had actually promised White he would be pardoned in 15 years in exchange for his testimony against the Wilson, Bennett, and Williams. This perjury was never corrected or brought to the attention of the court or the defense by Desiderio.

180.    Additionally, White testified that it was Williams and Bennett who killed the Anderson brothers and Reynolds, and that his and Wilson's involvement in the Anderson/Reynolds Murders was limited.

181.    Additionally, Craig Vaughn testified against White, stating that while in prison, White confessed to committing the Anderson/Reynolds Murders with "Chris" in Philadelphia. Vaughn specifically testified that White never mentioned the name "Binky" or Theophalis Wilson, and that he would have remembered that.

182.    Likewise, Detectives Schol, Miller, and Rodden testified to finding the three Victims in the early morning hours of September 26th, 1989 and described the three Victims' crime scenes.

183.    However, at trial, law enforcement was unable to explain why the van the Victims were allegedly shot inside was never recovered or why they never recovered a murder weapon. Likewise, White failed to disclose, and ADA Desiderio failed to elicit details regarding White's meetings with ADA Desiderio, Desiderio's threats to White, or the promise that White would be released early – a condition not reflected in White's plea agreement. At no time during trial did White, ADA Desiderio, or the police officers disclose that White's testimony was fabricated and false.

184.     On cross-examination, Dr. Paul Hoyer, one of the medical examiners, established there were no scrapes or bruises on Reynolds or Gavin Anderson, while Dr. Hygow Park, testified that there were no injuries other than gunshot wounds on Kevin Anderson.

185.     Dr. Hoyer also testified that whether a person would sustain additional injuries, such as scrapes, bruises, abrasions, or contusions from a fall after a shooting would depend on the surface upon which the person fell, the speed of travel and whether the surface was wet or dry. The absence of such injuries in the Victims, he said, meant only that the body "did not fall against a hard surface with a lot of force."

186.     David Lee[1], a federal informant, also testified for the prosecution that he had been a straw purchaser of weapons for Williams, one of which was a nine-millimeter pistol that police seized from Williams at the time of his arrest. He further testified that he bought nine-millimeter guns for Wilson in 1990, almost a year after the Anderson/Reynolds Murders took place. Then, Lee swore he had no guarantee of lenient treatment for his testimony and that he had no agreement with Desiderio, the prosecutor.

187.     In addition, Alan Jackson testified regarding the bullet fragments taken from Kevin Anderson and Otis Reynolds were consistent with a nine-millimeter gun, but that two different types of guns were used to fire the various bullets.

188.     Although no physical evidence tied Wilson to the Anderson/Reynolds Murders, a jury convicted Williams and Wilson of first-degree murder, robbery, conspiracy, possession of an instrument of crime, and violating the state corrupt organization act on August 6, 1993. Both Williams

---

[1] At trial, the Commonwealth incorrectly referred to Lee as Wilson's uncle. In fact, Lee was not related to Wilson; Lee's brother married to Wilson's maternal grandmother.

and Wilson endured a death penalty hearing, resulting in Williams being sentenced to death, while Wilson – who was 17 years old at the time of the crime – was sentenced to life in prison.

189.    Bennett was acquitted of any involvement in the Anderson/Reynolds Murders.

190.    On September 13, 1993, after testifying against Williams and Wilson, White pleaded guilty to all six murders – Haynesworth, Genrette, Graham, and the Anderson/Reynolds Murders.

### Wilson And Williams' Fight to Prove Their Innocence Leads to the Discovery of Critical, Exculpatory Evidence Suppressed by Defendants

191.    Both Wilson and Williams unceasingly maintained their innocence in the Anderson/ Reynolds Murders.

192.    In 2013, Williams was granted a new trial following an evidentiary hearing. During the hearing, White explicitly recanted his trial testimony, stating his testimony about the Anderson/Reynolds Murders was false and fabricated, that White knew nothing about the triple homicide and that, to his knowledge, Williams, Bennett, and Wilson had nothing to do with the Anderson/Reynolds Murders. White further testified that he was coerced by ADA Desiderio and Defendant PPD Officers to lie about the murders and testify against Williams and Wilson in exchange for a guaranteed pardon hearing after serving 15 years. White also described further unethical behavior by ADA Desiderio, including buying White and his family numerous meals, meeting with White while his attorney was not present, and using deceptive threats and promises to coerce White into pleading guilty to six murders.

193.    White further denied stealing the van allegedly involved in the crime, which he gave inconsistent accounts of to police, and testified that police never even questioned him about the details of how or when he allegedly stole it.

194.    White testified that in 2005 he realized Desiderio was not going to provide assistance in getting his sentence and conviction commuted or pardoned after he had served 15 years, as

Desiderio had promised. White learned that an ADA has no influence over the parole or pardon board. White also discovered that Desiderio lied to him about Desiderio's "promise" to attend a guaranteed hearing for White's pardon in exchange for White's testimony against Williams and Wilson, as an ADA representative is required to be at the hearing. Additionally, White learned that although Desiderio threatened to use White's previous statements against him when seeking the death penalty, prior statements made in relation to a plea deal cannot be used against someone in connection with those charges.

195.    When White learned that Desiderio's threats – the reason White testified falsely – were empty and worthless, White filed for post-conviction relief alleging his innocence in the Anderson/Reynolds Murders to which he had pleaded guilty and stating that his guilty pleas were based on an unconstitutional deal with Desiderio.

196.    White further testified that police officers and prosecutors knew that he had no knowledge of or involvement in the Anderson/Reynolds Murders *before* he made his statement regarding the crimes. When White informed Desiderio that he did not know who committed the murders, Desiderio told White to lie and to use to the same concepts from the Haynesworth case in his statement about the Anderson/Reynolds Murders so the story would be convincing.

197.    Supporting White's recantation, Robert Tressell ("Tressell"), chief criminal investigator for the Cobb County, Georgia District Attorney's Office and an expert in blood pattern and spatter analysis, testified that the location of Gavin Anderson's body was inconsistent with being pushed from a moving van. The blood evidence was also inconsistent with White's description. Blood had pooled in the creases of Anderson's ear and had the body been thrown, there would have been evidence of blood projection away from the ear. Tressell also testified that Kevin Anderson's clothing

showed that blood had begun to soak in and the blood flow patterns were consistent with being shot and falling right in the place where he was found.

198.     Tressell also noted that the bullet removed from Kevin Anderson's body did not match the nine-millimeter gun seized from Williams.

199.     Likewise, Dr. Charles Wetli, former chief medical examiner for Suffolk County, New York, testified that based on a review of the autopsy, the trial transcripts and the crime scene reports, there was no evidence that any of the Victims were thrown from a moving vehicle. He also said there was no evidence that any of the Victims were shot directly in the face as White claimed.

200.     On December 30, 2013, Court of Common Pleas Judge William Manfredi granted Williams a new trial due to ineffective assistance of counsel, because William's trial attorney, Lee Mandell, failed to retain a medical expert to confront the prosecution's evidence, and failed to cross-examine the prosecution's medical examiners to draw out the inconsistencies in the evidence. In July 2016, the Pennsylvania Supreme Court upheld William's new trial ruling.

201.     Meanwhile, Plaintiff Wilson was also attempting to overturn his conviction. In 2017, Wilson's case was remanded back to the trial court for resentencing after the U.S. Supreme Court ruled that it was unconstitutional to sentence juveniles to mandatory life sentences in *Miller v. Alabama*. As part of that proceeding, on April 28, 2017, the Philadelphia DA's Office turned over a redacted copy of the Philadelphia Police Department's Homicide Investigation files ("Homicide Files").

202.     After review of the documents, it became clear that the Homicide Files provided to Wilson contained exculpatory information that had not previously been disclosed. Accordingly, Wilson filed an amended Post-Conviction Relief Act ("PCRA") petition adding *Brady* claims to his pleadings.

203.    Also in 2017, more than a quarter of a century after Wilson was arrested and convicted, the Philadelphia County District Attorney's Conviction Integrity Unit ("CIU") began a comprehensive review of Wilson's case, upon request by Wilson's *pro bono* counsel.

204.    As a part of the CIU's review, on February 15, 2019, the CIU provided Wilson a copy of DA's Office's prosecution file ("Prosecution File")—more than 42,500 pages of documents.

205.    During review of the Prosecution File, it became apparent to both Wilson's counsel and the CIU that a wealth of additional material and exculpatory evidence had not previously been disclosed to Wilson or his co-defendants, similar to the Homicide File. Because of this, the DA's Office joined in Wilson's request to proceed to a *Miller* (holding it is unconstitutional for a minor to be sentenced to life in prison) resentencing, which was denied because of a Philadelphia Court of Common Pleas policy requiring petitioners to exhaust all guilt/innocence claims and forgo claims of actual innocence prior to resentencing.

206.    In September of 2019, Wilson supplemented his petition for an *en banc* review of the court's *Miller* resentencing denial with three new *Brady* claims: (1) the prosecutors and police withheld material, exculpatory evidence in the form of contemporaneous investigation documents related to two of the homicide scenes, refuting the testimony of White, undermining reliability in Wilson's verdict and warranting relief, (2) the prosecutors and police withheld material, exculpatory evidence of the "prime suspect," (3) the prosecutors and police suppressed material and exculpatory contemporaneous investigation records that credibly inculpated alternative suspects, and evidenced a growing war between the decedents, other Jamaican drug dealers, and the Junior Black Mafia, and (4) the prosecutor and police withheld material documentation of the

aggravating witness David Lee's involvement in two prior murders as well as his ongoing relationship with law enforcement as a confidential informant.

207.    The material, exculpatory information was known to police and prosecutors at the time of trial, but was withheld from Wilson and his co-defendants. Specifically, the withheld material fell into two categories: (1) evidence supporting alternate theories and suspects, and (2) evidence that undermined the theory of the crime presented at trial. In sum, the following additional exculpatory evidence would have been available at Wilson's trial had it not been suppressed by the Defendants:

- A police activity sheet identifying Steplight as the "prime suspect" in the Anderson/Reynolds Murders and a memorandum identifying David Jarrett as an eye witness.

- Statements and police activity sheets describing a far-reaching investigation into Steplight, a Jamaican drug dealer who was suspected by police of orchestrating the three Anderson/Reynolds murders. This included police activity sheets containing records of searches into Steplight's properties, witness interviews of his known associates, and various businesses suspected of being fronts for drug-dealing. These documents paint a compelling picture of a drug kingpin who engaged in a shootout with the Victims in the weeks prior to their murders.

- Photographs of Otis Reynolds' personal effects, including his identification and immigration papers, as well as a personal phone book, cards, and handwritten notes which indicated close ties to known members of the Jamaican Shower Posse, which had been turned over to Steplight's associate, Kevin Hicks.

- Witness interviews that disclosed the Victims, after the shootout with Steplight, continued to violently and brutally rob and shoot individuals in and around Steplight's properties.

- A report of a 911 call made at 12:41am on the morning of September 26, 1989, one block from where Kevin Anderson was found, in which the caller, a gas station employee, reported that someone had just knocked on the window of the gas station and asked him to call police because a man had been shot at 32nd and Berks Street.

- A statement from the Anderson Brothers' father, Eglam, that his daughter got a call from one of the brothers at 6:00pm on September 25th, 1989 – after the time that White said the murders had occurred. In addition, the father said that Reynolds had an argument with someone named Ken who was looking for him around the time of the murders, claiming that Reynolds had robbed him.

- A statement of Evonne Lackey, who said that at 11:00pm on September 25, 1989, she heard four shots a block from where one of the Victims was found. This also was several hours after White said the murders occurred.

- Homicide activity reports and records that said the Anderson Brothers were involved in drug running and trafficking, selling drugs, and robbing drug dealers, as well as their association

and general practice of brutal drug house robberies indicating they were members of or associated with the Jamaican Shower Posse gang, and that they were in active conflict with a rival gang, the Junior Black Mafia. This contradicted the Anderson Brothers' sister, who at trial portrayed them as a high school student and an HVAC trainee with no criminal backgrounds.

- Confidential informant interviews corroborating Thigpen's statement that the Anderson Brothers and Reynolds were involved in the beating of a high-ranking Junior Black Mafia member, Mason, and that the Victims were in an ongoing feud between the two gangs centered on a store the Victims used as a base of operations. Also, activity sheets from a related investigation indicating this same store was the site of an ongoing, violent turf war between the Jamaican Shower Posse and the Junior Black Mafia.

- Reports showing that David Lee, who testified at trial that he sold guns to Williams, had previously provided prosecution testimony in two other murders and was implicated in both homicides. This could have been used to impeach Lee's testimony and cast doubt on the fact that he was "squeaky clean" and faced possible prison time since he had not been prosecuted in the past. One of those prior prosecutions was handled by ADA Desiderio and the other by former ADA McMahon, Wilson's trial defense lawyer. Desiderio and McMahon never disclosed this information.

- Multiple reports and notes of correspondence between ADA Desiderio and White and White's mother suggesting that the prosecutor would help White get released from prison early, corroborating White's recantation testimony from 2013.

- A statement from a witness who said he saw Gavin Anderson struggling with someone just before he was shot. The witness later identified that person, by name, as someone who was frequently seen in the neighborhood where the shooting occurred. This exculpatory identification cast reasonable doubt on the defendant's guilt.

- Activity sheets relating to Collimore Sherlock Easy, who was alleged to have had involvement or been responsible for the murders of the Jamaicans, and who is identified in the Violent Traffickers Photo book as an associate of Steplight.

208.    A review of the suppressed evidence painted a clear and comprehensive picture that supported Steplight's involvement in the Anderson/Reynolds Murders and exculpated Wilson. The Commonwealth agrees and urged that Wilson was entitled to relief on his *Brady* claims. Indeed, the Commonwealth admits that "the withheld evidence detailed [above] was material and concedes that *Brady* was violated."[2] Ex. B, n.13

---

[2] A true and correct copy of the Commonwealth's Answer in Wilson's post-conviction proceeding is attached to this Complaint as **Exhibit B**.

209.    All of the withheld witness accounts and police investigative reports mentioned, *supra,* in ¶ 207, undercut or contradict White's trial testimony that the Victims were killed inside a van, early in the night on September 25th, thrown from the moving vehicle after being shot, and that they were murdered in a seemingly random robbery by Williams for money.

210.    On December 18, 2019, the CIU, on behalf of the Commonwealth of Pennsylvania, filed a motion to vacate Williams' convictions, acknowledging that White – the only eyewitness – testified falsely during trial and that the physical evidence demonstrated the falsity of his account of the murders. The motion was granted on December 23, 2019 and the charges against Williams were dismissed.

211.    On January 14, 2020, the Commonwealth filed a similar motion to vacate Wilson's convictions, the charges were dismissed, and he was released on January 21, 2020.

**Wilson's Conviction is Overturned on the Basis of Undisclosed Exculpatory Evidence**

212.    During Wilson's post-conviction proceedings, Joint Stipulations of Fact of Petitioner Theophalis Wilson and Respondent Commonwealth of Pennsylvania were filed, in which the Commonwealth of Pennsylvania agreed that stipulations were a "declaration that the fact agreed upon is proven." A true and correct copy of the Joint Stipulations are attached to this Complaint as **Exhibit A**. *See* Ex. A, General Stipulations, n. 1.

213.    The Court of Common Pleas and the Pennsylvania Supreme Court determined that the primary evidence of Williams' guilt – the testimony of White – was thoroughly discredited by expert forensic testimony. In Wilson's post-conviction proceeding, the Commonwealth stipulated to these findings of fact as it relates to Wilson's conviction. *See generally* Ex. A, ¶ General Stipulations.

214.    The Commonwealth admits that at trial "James White provided critical inculpatory testimony against the defendants . . . [and t]here was no forensic evidence connecting Williams or Wilson to the crime." Ex. A, ¶ 7.

215.     In addition, the Commonwealth admits that at the time of Wilson's trial, David Lee – a witness who testified against him – was an informant who had already cooperated with the Commonwealth and was implicated in at least one murder. In fact, David Lee had testified in two murder cases – Rice and Brown – which were prosecuted by ADA David Desiderio, the ADA who prosecuted Wilson, and former-ADA McMahon, Wilson's trial attorney. At no time did ADA Desiderio or former-ADA McMahon disclose their knowledge of Lee's involvement as a co-conspirator and informant in two prior murder cases. ADA Desiderio was also aware of an ATF investigation into Lee for federal firearms violations when Lee testified in Wilson's trial that he had "never even had a parking ticket" and was "squeaky clean." This impeaching information was never disclosed.

216.     In fact, ADA Bridget Kirn falsely represented to Wilson and Williams' counsel during post-conviction proceedings, after Williams received a new trial, that "David Lee was not involved in the investigation into the murder of David Rice" and that the Rice case "did not involve David Lee at all."

217.     The Commonwealth further admits that it, along with Defendant PPD Officers, failed to disclose police activity sheets in which officers omitted any reasoning for concluding several witness statements and 911 calls near the time and location of the murders were "unrelated" or "unfounded," and thus not disclosed.  Ex. B, ¶ 25.

218.     The Commonwealth broadly, and in no uncertain terms, acknowledged that "a plethora of *Brady* information (material, exculpatory evidence) was not disclosed to the defense at the time of the original trial," that "the record establishes that [Wilson's] constitutional rights have been violated," that "the Commonwealth's failure to disclose the evidence discussed above violated Wilson's right to due process as set forth in *Brady v. Maryland*…" and that "Wilson alleges (and the

Commonwealth concedes) that evidence described in Wilson's *Brady* claims was suppressed. If that evidence had been disclosed as the Pennsylvania and United States constitutions require, the outcome of his case would have been different…as the suppression violated his right to due process under both the Pennsylvania and United States Constitutions…as there is a reasonable probability that he would have been acquitted if his evidence had been made available at the time of trial." Ex. B.

219.     Indeed, the Commonwealth "concedes that Wilson was entitled to relief in light of newly discovered exculpatory evidence and due to violations of his right to due process under the Pennsylvania Constitution and the United States Constitution." Ex. B, ¶ 6.

220.     Further, during the hearing in which Wilson's charges were dismissed, the Commonwealth's CIU Attorney stated, "[i]t is time for Mr. Wilson to be allowed to go home—that he go home a free man, and that he go home with an apology. No words can express what we put these people through—what we put Mr. Wilson through; what we put his family through."

221.     Additionally, the Commonwealth "concedes that, but for an exceptionally unfair trial, it is 'more likely than not any reasonable juror would have reasonable doubt' and acquit him…. Wilson's conviction and sentence, like Williams' now vacated conviction and capital sentence, represent a gross miscarriage of justice."

### The District Attorney's Office Maintained Unconstitutional Policies, Customs, and Practices Regarding the Suppression of Exculpatory Evidence in Violation of *Brady v. Maryland*

222.     It is undeniable that Defendant Desiderio violated *Brady v. Maryland* in Wilson's case, a point conceded by the Commonwealth on several occasions in court. *See supra,* ¶ 212-221. In fact, on January 13, 2020, the Commonwealth filed its Answer in Wilson's Post-Conviction Relief proceeding, wherein the Commonwealth admits, "Wilson's trial was infected by serious prosecutorial misconduct, *Brady* violations, a critical witness who supplied false testimony, and ineffective

assistance of counsel. As a result, he was wrongfully convicted of three homicides and sentenced to an unconstitutional mandatory life sentence." Ex. B, ¶ 1.

223.     Defendant DA's Office further admitted that in Wilson's case, "the Commonwealth's suppression extends beyond *Brady's* blameless standard. Several of the violations in this case appear purposeful at worse or reckless at best." Ex. B, ¶ 85. Indeed, the Commonwealth concedes that the prosecutorial misconduct alleged herein was "intentional, knowing or reckless." Ex. B, n.1

224.     The failure to disclose exculpatory evidence in Wilson's case was not an isolated incident and was instead the result of customs, policies, and practices of the DA's Office prior to and at the time of the unlawful investigation into the murder of the Anderson brothers and Reynolds. The DA's Office, by and through its final policymakers, maintained an official policy, custom, or practice of suppressing exculpatory material in violation of Wilson and others' constitutional rights.

225.     By official policy, practice, or custom, the DA's Office would fail to seek out any exculpatory information that was not affirmatively provided to them by the PPD and deliberately withheld police "activity sheets," witness statements, 911 calls, informant impeachment information, and other exculpatory material from defendants charged with a crime. Official written reports created by the PPD would be produced to the prosecutor and included in the prosecutor's file given to the defense. By contrast, internal "activity sheets" and the exculpatory information contained therein were stored within the Homicide and Prosecution Files and were not produced to anyone outside the PPD and DA's Office – specifically, these documents would not be produced to the defense.

226.     Similarly, prosecutors would not customarily contact PPD detectives to seek out any information not affirmatively contained in the Detective's written report provided to the prosecutor. Thus, for example, prosecutors would not customarily obtain any witness statements or suspect identifications taken during the investigation (such as, here, any written statement taken from Evonne

Lackey) or any other daily activity report created by the investigating officers during the investigation, but would instead rely on the final written report typically created only after an arrest, which in Wilson's case was two years after the crime was committed.

227.    As a result of this unconstitutional policy and practice, such exculpatory information was documented only in the internal PPD files – documents which by official policy, practice and custom were never produced to the defense.

228.    A limited pre-Complaint investigation has identified numerous similar violations as well as other relevant evidence indicating that the DA's Office — as a matter of custom, practice, and policy — encouraged prosecutors to avoid *Brady* obligations wherever possible.

229.    Former District Attorney Lynne Abraham, known reputationally as "American's deadliest DA," was at all relevant times the chief policymaker in the DA's Office, and espoused a fundamentally incorrect and unconstitutional interpretation of *Brady's* requirements. Indeed, an Assistant District Attorney, ADA Shver, admitted at a post-conviction hearing for Williams' that "in older cases, we [the Commonwealth] did not pass all activity sheets as a matter of course," at the time of the Anderson/Reynolds Murders. The Commonwealth has stipulated to this fact in two related proceedings.

230.    Further, at the time of Wilson's arrest, the Philadelphia DA's Office had no open file discovery; that is, every discovery request was within the discretion of the ADA. Moreover, ADAs faced significant pressure because the District Attorney expected that any case that was screened and accepted should result in a conviction. This policy created a "win at all costs" mentality among the ADAs in the DA's Office.  Moreover, prosecutors in the DA's Office weren't attuned or informed about their constitutional and ethical disclosure responsibilities. Additionally, the DA's Office perpetuated these violations by implementing a policy wherein ADA's did not review underlying DA

files in evaluating and responding to post-conviction claims of constitutional violations. *See* Ex. B, at 29, n. 18.

231.    The need for exculpatory witness statements, suspect identifications, impeachment evidence, and prime suspect material to be recorded in a written report so that it would be produced to the defense was both obvious and well known before 1992. Indeed, prosecutors knew that police noted critical exculpatory information regarding investigations, witness statements, and identifications in various formats, including activity sheets, but never sought out, requested, or required that such information be transferred to formal reports or other material disclosed to the defense.

232.    Nevertheless, the City of Pennsylvania and the DA's Office, by and through its final policymakers, implemented the policy, practice and custom of not disclosing exculpatory material evidence contained in police activity sheets in deliberate indifference to the substantial likelihood that these customs, practices and policies would result in constitutional violations like those that occurred in Wilson's case.

233.    These policies, customs and practices of the City of Pennsylvania DA's Office were the moving force behind the suppression of exculpatory alternative suspect identifications, witness statements regarding the Anderson/Reynolds Murders, and impeachment information regarding White's coerced confession, the only evidence against Wilson at trial. This directly caused Wilson's wrongful conviction on January 6, 1993.

### The PPD Maintained a Policy, Custom, or Practice of Unconstitutional Misconduct in Felony Investigations Including Suppressing Exculpatory Evidence, Fabricating Evidence, and Other Improper and Unreliable Investigative Practices

234.    For years, dating back decades before Wilson's arrest and conviction, Defendant City of Philadelphia and the Philadelphia Police Department maintained an unconstitutional policy, practice, and custom of suppressing exculpatory evidence found during felony investigations and

failing to disclose that information in official police reports or other materials that would be turned over to the defense. These unconstitutional practices were in effect prior to and long after the unlawful investigation, prosecution, and incarceration of Wilson.

235.   It was universally known within the PPD command structure and among officers that the DA's Office would not disclose "activity sheets" or similar internal investigative documents to the defense and/or to the prosecutor. Yet, the custom, policy, and practice of the PPD was to *not* include the exculpatory information contained in activity sheets or other investigative documents within the official police report or to add the police activity sheets as an addendum to the official report. Thus, the PPD and its officers knowingly suppressed key exculpatory information from defendants. This operating procedure was either directly commanded by the final policymakers for the PPD and City of Philadelphia or, in the alternative, was known to those policymakers who permitted it to continue in deliberate indifference to the likelihood it would result in violations of the constitutional rights of suspects like Wilson.

236.   The need for exculpatory witness statements, suspect identifications, impeachment evidence, and prime suspect material to be disclosed in a written report so that it would be produced to the defense was both obvious and well known before 1992. Indeed, the information existed, and was noted by police in various informal formats, including activity sheets, but was never transferred or added to formal police reports or disclosed in testimony or any other manner to the defense.

237.   Indeed, Wilson was not the only wrongfully incarcerated individual who was convicted based on the suppression of PPD activity sheets or logs concealing, among other things, inconsistences in witness statements, alternative suspects, and relevant 911 calls. *See Dennis v. City of Philadelphia,* 379 F. Supp. 3d 420 (E.D. Pa. 2019).

238.     Nevertheless, the City of Philadelphia and the PPD, by and through their final policymakers, implemented the policies, practices and customs of not disclosing this exculpatory material evidence contained in police activity sheets in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Wilson's case.

239.     PPD also had a custom and practice of permitting officers to engage in a wide variety of similarly improper and unreliable investigative practices, including, but not limited to (i) discrediting witness statements, identifications, and key facts in order to suppress exculpatory information; (ii) obtaining identifications through manipulative and coercive means; (iii) providing information to eyewitness or indicating whom they should identify; (iv) manipulating or coercing witnesses into making false or fabricated statements; (v) failing to document or disclose exculpatory evidence; (vi) failing to document or record witness statements and instead relying solely on an officer's claims about what the witness said; (vii) failing to gather or analyze critical physical evidence; and (viii) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices. These widespread customs, patterns and practices are evident from the multiple, repeated violations in this case and others.

240.     In Wilson's case, PPD Officers repeatedly failed to disclose to the prosecution or defense their involvement in the fabrication of White's testimony, their reckless and/or intentionally deficient and unreliable investigation into the Anderson/Reynolds Murders, or that the information ADA Desiderio presented to the court was obtained through coercion via the practices described throughout this pleading. More specifically:

   a.     Defendant Officers Harris, Ansel, Cimino, and Hasara worked with ADA Desiderio in the investigation into the Anderson/Reynolds Murders to compel fabricated eyewitness testimony from James White to falsely implicate Wilson and others and failed to document and disclose material exculpatory evidence to the defense,

including, without limitation, the fact that White's account was false, that White's statement was based on coercion and threats of death, that White's statement was also based on improper and unlawful promises made to benefit White that were not contained in the plea agreement disclosed to Wilson, and that the details of White's account originated with investigators and ADA Desiderio, not White;

b.      Defendant Officers Miller, Rodden, and Witcher, actively suppressed evidence of alternative suspects, including an extensive investigation into Steplight, Steplight's status in the Anderson/Reynolds investigation as the "prime suspect," and other evidence that would have exculpated Wilson and/or contradicted the Commonwealth's case at trial and impeached White's statements regarding the seemingly random robbery turned killing.

c.      Defendant Officers Rodden, Santiago, Schol, Jastrzembski, Dougherty, Durrant, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint deliberately failed to investigate multiple leads – suppressing material exculpatory evidence – disregarded credible witness statements, reported critical 911 calls as "unfounded," dismissed connections to likely suspects, and suppressed material, exculpatory evidence of the PPD's "prime suspect" Steplight.

241.    These constitutional violations caused Wilson's wrongful conviction and resulted directly from the PPD's custom, pattern, and practice of failing to disclose or dismissing as "unfounded" or "unrelated" material exculpatory evidence, including the failure to disclose the coercion of the only eye-witness' testimony in the case against Wilson and the fact that the information provided by White was false, fabricated, and unreliable.

242.    Wilson was not the only suspect deprived of exculpatory information at trial as a result of the PPD's unconstitutional customs, practices, and policies. For example:

a.      **Anthony Wright** (CP-51-CR-1131582-1991) Wright was convicted of the rape and murder of Louise Talley, a 77-year-old woman, found stabbed to death in her North Philadelphia home in October of 1991. Wright was 20 years old at the time, and within 24 hours of the murder was coerced into signing a confession by **Defendant Detective Santiago**. In the coerced confession, Wright stated he was wearing certain clothes on the night he killed the victim, and Defendant **Detective Jastrzembski** and other PPD officers allegedly recovered those exact clothes, soaked in the victim's blood, in Wright's bedroom under his mattress. Wright was sentenced to life in prison. During post-conviction proceedings, the DNA from the victim was tested and the sperm found inside matched Ronnie Byrd, a convicted felon. Further, the bloody clothes Jastrzembski claimed to have seized from Wright's bedroom did not have Wright's DNA on them, and instead only had the victim's DNA. Trace evidence made it clear that *the victim,* not Wright was wearing them and that Jastrzembski had fabricated and planted evidence.

b.   **Jimmy Dennis** – In 1992, James Dennis was convicted of killing Chedell Williams, high school student, in North Philadelphia. The investigation was led by **Detectives Jastrzembski and Santiago**. Detectives Jastrzembski and Santiago used improper photo arrays to suggest Dennis as the murderer. Additionally, Detective Jastrzembski fabricated the existence of certain clothing matching the clothing of the shooter allegedly found at Dennis's **residence**, but at trial, testified it had since disappeared from police headquarters. Dennis was arrested for the murder in November of 1991. Officers also concealed evidence (a welfare receipt) that would have supported Dennis' alibi at the time of the murder, and coerced false testimony from Charles Thompson, a witness. Dennis's conviction was later overturned by the U.S. Court of Appeals in 2016 based on multiple *Brady* violations. District Judge Anita Brody ruled that the PPD "covered up evidence" that "pointed away" from Dennis' guilt, suppressed key witness statements, and conducted sham suspect lineups.

c.   **Donald Ray Adams** (CP 51-CR-0743812-1991) Adams was arrested and convicted for the murders of Darryl Patterson and Thomas Winn, which occurred in 1990. PPD Detectives investigated the matter in 1991 after no **suspects** were arrested. PPD Detectives obtained a coerced and false statement from alleged witness, Donna Benjamin, implicating Mr. Adams in the crime, despite contradictory accounts of the physical descriptions of the assailant. Based on this statement and Donna's later testimony, Adams was convicted. Strikingly similar to the case at hand, in 2007, the Court of Common Pleas granted post-conviction relief based on Donna's recanted testimony that detectives threatened her with incarceration, promised her open criminal charges would be dismissed, and offered her financial and other support for testifying against Adams. Further, other evidence pointed toward another "Don Ray" who lived nearby the victims, fit the description, and who had an ongoing dispute with the victims. Donna later admitted it was "Don Ray" not Donald Ray that was the assailant. After a retrial, Adams was acquitted of all charges.

243.   The unconstitutional policies, customs and practices of the City of Philadelphia and the PPD described herein were the moving force behind the suppression of the exculpatory suspect identifications, statements regarding the murders, and impeachment information in Wilson's case, and thus of his wrongful conviction on January 6, 1993. Accordingly, the Defendants failure to conduct a constitutionally adequate investigation and their unconstitutional conduct throughout the investigation into Wilson and the Anderson/Reynolds Murders interfered with Wilson's right to a fair trial.

**Defendants PPD and DA's Office Maintained Unconstitutional Policies and Practices Regarding Coercing Confessions**

244.    Prior to and at the time of the unlawful investigation into the Anderson/Reynolds Murders, Defendants PPD and the DA's Office, by and through their final policymakers, maintained policies, customs, or patterns and practices of fabricating incriminating evidence and coercing false confessions, in violation of the Fifth and Fourteenth Amendments.

245.    In particular, the PPD and DA's Office used unconstitutional techniques during the investigation phase of a case to coerce inculpatory statements or confessions from suspects and witnesses by giving those suspects and witnesses details about the crime that the police knew (or believed) to be true, including: making false promises, including the promise that a suspect will be given lenient treatment or favorable sentencing; making false and improper threats, including threats to use statements made in prior plea negotiations to seek the death penalty; the use or threat of physical violence; making improper assertions of guilt, including confrontation with false inculpatory evidence; and providing false assurances so the suspect will benefit from making an inculpatory statement minimizing the suspect's own involvement. These techniques attempt to make false and coerced statements seem credible and reliable.

246.    Upon information and belief, these policies, practices, and customs were well-known to the DA's Office and the City of Philadelphia and its policymakers, began long-before Wilson's arrest and continued long-after Wilson's conviction. These policies, practices, and customs have resulted in similar violations committed by the DA's Office and PPD, which illustrate the departments as a whole, and as a matter of custom, practice, and policy, disregarded their obligations to refrain from coercing and fabricating false evidence to close cases.

247.    At all relevant times Defendant DA's Office's policy, custom, and practice of unconstitutionally coercing and fabricating witness and suspect statements to close cases was not

conducted in a prosecutorial or judicial role, but as an investigative function normally performed by a detective or police officer. Indeed, the unconstitutional acts described herein – namely the coercion and falsification of James White's statement inculpating Wilson in the Anderson/Reynolds Murders – was conducted *before Wilson was arrested, charged, or even mentioned as a suspect.* Instead, to further the investigation of the Anderson/Reynolds Murders, for which there was no arrests in over two years, ADA Desiderio, in conjunction with Defendant PPD Officers, used unconstitutional techniques to coerce, falsify, and threaten James White into confessing and implicating Wilson *before any prosecution or judicial proceeding began.* Thus, in an attempt to find a suspect to arrest for the Anderson/Reynolds Murders, ADA Desiderio, in concert with the PPD Officers, acted as an investigator and not as an advocate for the Commonwealth.

248.    In addition to the DA's Office and the PPD's unconstitutional policies, customs, and practices found in ¶ 240-242 above, Defendants' policy of coercing and falsifying witness or suspect statements to inculpate wrongfully convicted individuals is further illustrated by the unconstitutional incidents below, which occurred during the relevant period.

    a.    **Percy St. George** (CP-51-CR-1012571-1993). Percy was charged with capital murder on the basis of a sole witness in 1993. **Defendant Detective Santiago** obtained the statement from Inmon Goggans, who – because warrants were out for his arrest – represented himself to be David Glenn, a friend of his. Before trial, PPD officers picked up the actual David Glenn and took him to the station, where Detective Santiago coerced him into signing a new, false statement that he witnessed the crime and identified St. George from a photo array. Since it was Goggans, and not Glenn, who actually witnessed the crime, Glenn later testified to Det. Santiago's misconduct and recanted the statement. Further, **Defendant Detective Jastrzembski** encouraged the victim's sister to misidentify David Glenn as Goggans, in an attempt to make Detective Santiago's coerced statement by Glenn reliable. St. George moved for a hearing to bar prosecution based on due process violations and Detectives Santiago and Jastrzembski announced their intent to assert their 5th amendment rights. Shortly afterward, St. George's charges were dismissed.

b.    **<u>Malcolm Medley</u>** – In 1988, Malcolm Medley was convicted in the Court of Common Pleas of aggravated assault, carrying firearms on public streets or public property, criminal conspiracy, and possessing instruments of crime. In 1987, Medley and Alford were found in possession of a car potentially involved in a shooting, handcuffed, and immediately taken to the police station. **Defendant Detective Francis Anel** took a statement from Alford, while Medley was locked in the waiting area until Detective Denham took his statement, wherein no Miranda warnings were ever given. The Supreme Court held that "the conduct of the police officers placed [Medley] in a situation in which he could have reasonably believed that his freedom of movement was restricted… Indeed, it would be difficult to imagine a situation more likely to produce a belief that one's freedom of movement is restricted than that of being frisked, handcuffed, and transported to a police station." *See Commonwealth v. Medley,* 531 Pa. 279 (1992).

c.    **<u>Tramayne Blacknall</u>** (CP-51-CR-0802721-1999) Blacknall was found guilty of the 1998 murder of Rashawn Calhoun on August 2, 2001, and acquitted of the murder of Eric Baskerville. Mr. Baskerville allegedly had fired shots in Blacknall's direction in September of 1998, but struck Herb Bryant in the ankle. At least one witness, Steven Driver, alleged he provided a statement implicating Blacknall because police, specifically **Defendant Officer Rodden**, threatened to charge him and his brother (another witness, Clinton Driver) for the murders. Driver testified Blacknall was not involved in the shooting. Blacknall was granted a new trial on July 13, 2012, on the basis of newly discovered evidence, including alibi testimony and testimony that Clinton Driver confessed to committing the crime.

d.    **<u>Donald Ray Adams</u>** (CP 51-CR-0743812-1991) Adams was arrested and convicted for the murders of Darryl Patterson and Thomas Winn, which occurred in 1990. PPD Detectives investigated the matter in 1991 after no suspects were arrested. PPD Detectives obtained a coerced and false statement from alleged witness, Donna Benjamin, implicating Mr. Adams in the crime, despite contradictory accounts of the physical descriptions of the assailant. Based on this statement and Donna's later testimony, Adams was convicted. Strikingly similar to the case at hand, in 2007, the Court of Common Pleas granted post-conviction relief based on Donna's recanted testimony that detectives threatened her with incarceration, promised her open criminal charges would be dismissed, and offered her financial and other support for testifying against Adams. Further, other evidence pointed toward another "Don Ray" who lived nearby the victims, fit the description, and who had an ongoing dispute with the victims. Donna later admitted it was "Don Ray" not Donald Ray that was the assailant. After a retrial, Adams was acquitted of all charges.

e.    **<u>Andrew Swainson</u>** (CP-51-CR-0431331-1988) Andrew Swainson was convicted of murder in 1989 based on a single eyewitness, Paul Presley. Presley was originally the PPD's suspect arrested for the shooting moments afterward, covered in blood and running from the scene. **Defendant Detective Santiago** obtained a statement from Presley implicating himself. The prosecution dropped all charges a few weeks later after Presley told police that Detective Santiago coerced the statement with threats of being charged for a separate drug crime, that he had not

seen Swainson at the time of the shooting and only knew what he looked like because Santiago showed him Swainson's picture. Instead of a proper photo array, Presley explained all seven photos shown to him by Detective Santiago were of Swainson. Presley was charged for the crime under a different name and the criminal case was never disclosed to the defense. *See Commonwealth v. Kareem Miller,* CP-51-CR-1024751).

249.    During the investigation and prosecution of Wilson for the Anderson/Reynolds Murders, the PPD and DA's Office had policies, practices or customs of arresting, charging, and interrogating purported witnesses in criminal investigations without legal cause and with the intent to coerce and/or fabricate statements from these persons, under threat of punishment or material benefit. These interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

250.    As a result of these unconstitutional patterns, practices, and customs of the PPD in effect at the time of the investigation into the Anderson/Reynolds Murders for which Plaintiff Wilson was charged and convicted, a Consent Decree was entered by the Eastern District of Pennsylvania requiring wide-reaching reforms in the PPD, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia,* C.A. No. 96-6045.

251.    The unconstitutional policies, practices, and customs mentioned herein directly caused the incarceration and conviction of Wilson for the Anderson/Reynolds Murders due to the deliberate indifference of the PPD, City of Philadelphia, and the DA's Office.

### PPD's Custom, Pattern and Practice of Failing to Adequately Supervise and Discipline Problem Officers

252.    As mentioned in ¶ 250 above, the Consent Decree entered in *NAACP v. City of Philadelphia,* C.A. No. 96-6045 with Defendant City of Philadelphia was issued as a result of the NAACP's complaint regarding unconstitutional policies, practices, and customs of the PPD

"caused by the failure of defendant City of Philadelphia to properly train, supervise and discipline individual police officers in the Philadelphia Police Department." *See* Doc. PN-PA-0002-0012.

253.    Similarly, the constitutional violations that caused Wilson's wrongful conviction resulted directly from the PPD's failure to provide adequate supervision, discipline and training to deter its officers from: (i) coercing witnesses to obtain unreliable and falsified "information," including false identifications and statements that could be used to close cases, (ii) deliberately and frequently deeming credible and relevant tips, information, and evidence "unfounded" or "unrelated" based on false and unreliable grounds, and (3) knowingly failing to disclose exculpatory information contained within internal documents in its official police reports or to disclose such information to the defense through testimony or other means. The PPD also failed to provide adequate supervision, discipline, and training to its officers to ensure that officers, including supervisors, met their obligations to report and discipline misconduct by fellow officers.

254.    The PPD's supervisors and commanders not only knowingly permitted these types of officer misconduct alleged herein, they endorsed and rewarded it. Supervisors allowed officers to use whatever methods they chose to close cases and expended little or no effort to try to determine if the real perpetrator of a crime was arrested. In fact, superiors encouraged officers and detectives to use "activity sheets" when documenting critical eyewitness statements, dates, times, identifications, and other potentially exculpatory information instead of documenting that evidence in an official police report, with full knowledge that those activity sheets would never be disclosed to the defendant.

255.    Defendant PPD Officers' misconduct and illegal acts were widely known at every level of the PPD. Indeed, supervisors had both contemporaneous knowledge of the unconstitutional acts of its officers in Wilson's case and knowledge of a prior pattern of similar

incidents. *See* ¶¶ 242, 248. Although their misconduct was open and notorious, the Officers suffered no significant discipline or repercussions and continued their pattern and practice of misconduct in future cases.

256.    In fact, throughout Officers' careers with the PPD, supervisors up the chain of command knowingly permitted Officers to violate the constitutional rights of citizens with impunity. With little or no check on their conduct, Officers used the power of the badge to close cases by whatever means and frame innocent people for the crimes of others. No supervisor acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter Officers from constant and egregious violations of residents' constitutional rights, or to require other officers to report the misconduct.

257.    Defendant PPD Officers had operated so openly and for so long without any apparent repercussions, their regular actions of unconstitutional misconduct continued over decades, including those listed above in ¶¶ 242, 248.

258.    Despite the complaints referred to in ¶¶ 242, 248 and the open and notorious nature of Officers' misconduct, Officers' Internal Affairs records are minimal.

259.    Throughout Defendant Officers' tenure at the PPD, the Department failed to implement adequate policies, training, procedures, and guidelines to: (1) protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions, (2) require exculpatory information to be recorded in a format that would be disclosed to the prosecution and the defense after a suspect was arrested and charged, and (3) not discredit reliable, trustworthy, and consistent exculpatory information as "unfounded" or "irrelevant" and suppress that evidence from the defense. The lack of adequate and appropriate supervision for Officers and the failure to discipline and train Officers to report the misconduct of their colleagues demonstrates a deliberate

indifference toward the known risks that individuals would be accused and convicted of crimes that they did not commit.

260.    The PPD has failed to adequately discipline and train officers, detectives, and supervisors concerning the issue of disclosing exculpatory information and coercing informants, and immense and foreseeable risk of obtaining false and fabricated evidence as a result of such activity. This failure to discipline and train constitutes deliberate indifference to a substantially certain risk that the constitutional rights of citizens would be violated and that wrongful convictions would almost certainly occur.

261.    The PPD, through its encouragement, ratification, silent acquiescing, and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of Theo Wilson and other individuals in the community.

262.    The PPD has also failed to adequately supervise, discipline and train detectives and officers concerning disclosing and reporting exculpatory information and using fabricated and coerced evidence against innocent individuals. This failure to train constitutes deliberate indifference to a substantially certain risk that wrongful convictions would occur.

263.    The multiple red flags in this investigation, including without limitation the failure to conduct basic investigatory steps, the absence of proper documentation of investigatory steps, the absence of inculpatory information other than one dubious and unsupported eyewitness account from a self-professed murderer, the failure to gather or analyze any physical evidence, the failure to develop any evidence of motive did or should have alerted superiors that this case was part of the pattern of misconduct described in ¶¶ 242, 248 above, that the entire investigation was unreliable, and that the arrest and prosecution of Theo Wilson for these crimes was wrongful.

264.    Likewise, because the bulk of information in this case came from one informant who had been coerced – and who had already falsely implicated other individuals in crimes he later confessed to – supervisors, other detectives at the PPD, ADA Desiderio, and the DA's Office knew or should have known that White's statement was unreliable. But supervisors and other detectives nonetheless used the information to arrest and convict Wilson and clear tough cases.

265.    PPD, through its continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to Wilson, and other wrongfully accused individuals' constitutional rights. Indeed, the PPD's unconstitutional custom, practice, and polices of suppressing exculpatory evidence and fabricating inculpatory evidence was known to policymakers, and, in deliberate indifference to the substantial risk that similar constitutional violations would recur in the future, no action was taken to discipline officers who had committed such violations, improve policies, supervision, and/or training on these topics, or otherwise prevent such violations from occurring. As a predictable and foreseeable result of those failures to act, Wilson was wrongly convicted and incarcerated after an unconstitutional and unfair trial based on suppressed exculpatory information and a false confession, fabricated and coerced by Defendant PPD Officers and ADA Desiderio, in violation of the United States and Pennsylvania Constitutions.

## DAMAGES

266.    Wilson spent more than 28 years incarcerated for crimes he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences and resources that normally equip adults for that task.

267.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Wilson sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 28 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

268.     Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Wilson was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Wilson missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love, to legally marry, and the fundamental freedom to live one's life as an autonomous human being.

269.     Because of the foregoing, Wilson has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct. These damages continue to date and will continue into the future.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

## COUNT I

**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

*Against All Defendants*

270.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

271.    Defendants, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Wilson for the Anderson/Reynolds Murders, thereby caused Wilson to be implicated, arrested, charged, and prosecuted for those crimes, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments to the U.S. Constitution, to be free of prosecution absent probable cause.

272.    Specifically, as described in detail above, Defendants, acting individually and in concert, fabricated inculpatory evidence and intentionally or recklessly withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Wilson and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Defendants coerced or otherwise fabricated the only evidence against Wilson – White's statement and testimony. These actions caused Wilson continued confinement and prosecution.

273.    Wilson is innocent of the Anderson/Reynolds Murders, and his arrest was not based on probable cause.

274.    The case finally terminated in Wilson's favor on January 21, 2020 when his conviction was vacated and the charges dismissed.

275.    Wilson suffered damages arising from his 28 years of wrongful incarceration.

276.     Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Wilson's clearly established constitutional rights. No reasonable officer in 1989-1993 would have believed this conduct was lawful.

277.     The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Wilson's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Wilson.

## **COUNT II**

**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation in Violation of the Fourth and Fourteenth Amendments**

*Against All Defendants*

278.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

279.     Defendants, acting individually and in concert, under color of law and within the scope of their employment with the PPD, deprived Wilson of his clearly established constitutional right to due process of law and to a fair trial.

280.     Defendants deprived Wilson of his right to a fair trial by deliberately and improperly fabricating false inculpatory evidence by way of White's confessions to the Anderson/Reynolds Murders; fabricating false evidence to support the coerced and false confession; suppressing exculpatory evidence that would have contradicted the false confessions and impeached prosecution witnesses, and instead followed through with the unlawful prosecution of Wilson. Defendants then concealed the misconduct of fabricating and suppressing evidence

throughout the investigation and prosecution of Wilson as well as during post-conviction proceedings.

281.    These Defendants additionally deprived Wilson of his right to a fair trial by withholding material exculpatory and impeachment evidence from the defense, including without limitation, exculpatory statements of alleged witnesses prior to their coerced, false statements, corroborating evidence that another suspect committed the crime, relevant 911 calls and witness statements contradicting the Commonwealths' version of events at trial, and other exculpatory and impeaching eyewitness statements. Defendants then concealed the misconduct that had produced those statements as well as additional material exculpatory and impeachment evidence from defense attorneys and the court.

282.    Defendants intentionally or recklessly and in bad faith suppressed exculpatory statements and material that they knew would tend to show Wilson was innocent of the Anderson/Reynolds Murders. In particular, Defendants suppressed a statement from a confidential informant corroborating Anthony Thigpen's tip that the three Victims were in fact killed in a retaliatory drug gang shooting by Steplight for assaulting the leader of a gang. In addition, Defendants suppressed police descriptions and materials that related to two of the homicide scenes and refuted the testimony of White, undermining the reliability of Wilson's verdict.  Defendants further suppressed exculpatory evidence that police had and were investigating a "prime suspect," which would have credibly inculpated alternative suspects, and evidenced a growing war between the Victims, other Jamaican drug dealers, and the Junior Black Mafia.

283.    Had Defendants' fabrications and the suppressed material, exculpatory, and impeachment evidence been known to Wilson, been documented, and/or disclosed, Wilson would have tended to prove his innocence, cast doubt on the entire police investigation and prosecution,

and impeached critical trial testimony. The exculpatory and impeachment evidence withheld by Defendants undermined confidence in the verdict against Wilson, and the concealment of this evidence deprived Wilson of a fair criminal trial.

284.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Wilson's clearly established constitutional rights. No reasonable officer in 1989-1993 would believe this conduct was lawful.

285.    Defendants' misconduct did not cease with Wilson's conviction, but continued through his exoneration, thereby prolonging his wrongful incarceration. The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Wilson's injuries. These Defendants knew, or should have known, that their conduct would result in Wilson's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III

**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating and Coercing Evidence and Withholding Material Exculpatory and Impeachment Evidence in Violation of the Fourth and Fourteenth Amendments**

*Against All Defendants*

286.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

287.    Defendant ADA Desiderio, individually, and in concert with the District Attorney's Investigation Branch and Defendant PPD Officers, improperly and unconstitutionally coerced White to fabricate a false confession to the Anderson/Reynolds Murders, and used this coerced statement against Wilson in his criminal case, and also suppressed critical impeachment evidence that would have contradicted or impeached numerous witnesses who testified against Wilson,

including White and David Lee, thereby violating Wilson's Fourth and Fourteenth Amendment rights.

288.    ADA Desiderio and Defendant PPD Officers deliberately fabricated White's false testimony and suppressed exculpatory evidence of alternative suspects that would have contradicted and impeached White's testimony at trial. The incorrect, false, and fabricated testimony of White was intentional and/or caused by the recklessness or deliberate indifference of the officers and prosecutor to the constitutional rights of Wilson.

289.    Defendant ADA Desiderio and Defendant PPD Officers' unconstitutional conduct in coercing and fabricating witness and suspect statements, including James White's confession, was an investigative function normally performed by a detective or police officer as no prosecution or arrest had been instigated at the time of the unconstitutional conduct.

290.    Additionally, Defendant ADA Desiderio knowingly denied Wilson a fair trial and due process by suppressing evidence regarding the previous informant relationship between ADA Desiderio, former-ADA McMahon (Wilson's trial counsel), and David Lee, who testified against Wilson and Williams, at a joint trial for the Anderson/Reynolds murders. During pretrial discovery in Williams' retrial, ADA Shiver "mischaracterized Lee's role…[and] falsely informed the Court and Williams' counsel that 'David Lee was not involved in the investigation into the murder of David Rice.'" (Ex. B, at ¶ 87). Likewise, the Commonwealth admits that "[t]he repeated failure to provide the Lee information despite either personal involvement in the Coats prosecution or assurances that the material had been thoroughly reviewed cannot easily be attributed to ignorance. ADAs Desiderio, Kirn, and Shver – none of whom remains employed by the Philadelphia DA's Office – appear to have acted in bad faith." (Ex. B, at ¶ 92-93) The Commonwealth further admits that "the Commonwealth's suppression extends beyond *Brady's* blameless standard. Several of

the violations in this case appear purposeful at worse or reckless at best." (*Id.* at 25, ¶ 85) (emphasis added).

291.    Indeed, the Commonwealth admits that "[t]he ongoing suppression of David Lee's prior cooperation…cannot be attributed to a mere failure to review the record . . . [an]d continued after Williams' convictions were vacated." (Ex. B, ¶ 86-87)

292.    Had Defendants' fabrications, coercions, and suppressed, exculpatory material been known to Wilson, been documented, and/or disclosed, Wilson would have tended to prove his innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony. The exculpatory and impeachment evidence withheld by Defendants regarding White's coerced and false confession, including that White denied any involvement in the crime, that police and ADA Desiderio used coercive or otherwise improper tactics to elicit a false confession, or that the terms of White's plea deal – under which White allegedly confessed and implicated Wilson – were withheld at trial, undermined confidence in the verdict against Wilson, and the concealment of this evidence deprived Wilson of a fair criminal trial.

293.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Wilson's clearly established constitutional rights. No reasonable officer in 1989-1993 would believe this conduct was lawful.

294.    Defendants' misconduct did not cease with Wilson's conviction, but continued through his exoneration, thereby prolonging his wrongful incarceration. The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Wilson's injuries. These Defendants knew, or should have known, that their conduct would result in Wilson's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV

### 42 U.S.C. § 1983 Failure to Intervene

*Against Defendant PPD Officers and Supervisors*

295.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

296.    By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Wilson to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

297.    These Defendants' failures to intervene violated Wilson's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from suppressing exculpatory evidence, fabricating inculpatory evidence, or causing Wilson to be arrested and prosecuted without probable cause, were lawful.

298.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Wilson's injuries.  Defendants knew, or should have known, that their conduct would result in Wilson's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V

### 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendant PPD Officers and Supervisors*

299.    Plaintiff hereby incorporates by reference all the foregoing paragraphs.

300.     Defendants Harris, Ansel, Cimino, Hasara, Miller, Rodden, Santiago, Witcher, Schol, Jastrzembski, Dougherty, Durrant, Morton, Farrell, Hollinshead, Permint, Burke, Grier, and Margerum, acting within the scope of their employment and under color of state law, agreed among themselves and with others, including the coerced witness James White and the prosecutor of Wilson's case, ADA Desiderio, to act in concert in order to deprive Wilson of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency.

301.     In furtherance of the conspiracy, each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

     a.  Defendants Harris, Ansel, Cimino, and Hasara worked in concert with White to compel fabricated eyewitness testimony falsely implicating Wilson in the Anderson/Reynolds Murders and failed to document and disclose material exculpatory evidence to prosecutors and/or the defense, including, without limitation, the fact that White's account was false and that the details of his account originated with PPD Officers and ADA Desiderio, not White;

     b.  Defendants Miller, Rodden, Santiago, Witcher, Schol, Jastrzembski, Dougherty, Durrant, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint worked in concert with ADA Desiderio to suppress evidence of alternative suspects and evidence that would have contradicted and impeached White's perjury. The incorrect, false, and fabricated testimony of White was either intentional or caused by the deliberate indifference of the officers and prosecutor with knowledge that such testimony was false.

     c.  Defendants Harris, Ansel, Cimino, Hasara, Miller, Rodden, Santiago, Witcher, Schol, Jastrzembski, Dougherty, Durrant, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint as well as members of PPD's Jamaican Task Force worked in concert to deliberately fail to investigate multiple leads, disregard credible witness statements, dismiss connections to likely suspects, and suppress material, exculpatory evidence of the PPD's "prime suspect" Steplight.

302.    As a direct and proximate result of Defendants' actions, Wilson was wrongfully convicted and imprisoned for more than 28 years and suffered the other grievous damages and injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Defendants City of Philadelphia, PPD Officers and Supervisors, and Abraham*

303.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

304.    Defendants Harris, Ansel, Cimino, Hasara, Miller, Rodden, Santiago, Schol, Jastrzembski, Dougherty, Morton, Farrell, Hollinshead, Grier, Margerum, and Permint acted with impunity in an environment in which they were not adequately supervised, disciplined, or trained by the City of Philadelphia or Defendants Witcher, Durrant, Burke and Roger Roe supervisors in this case and as a matter of practice.

305.    Likewise, Defendant ADA Desiderio acted with impunity in an environment in which he was not adequately supervised, disciplined, or trained by then-District Attorney Lynne Abraham in this case and as a matter of practice.

306.    Defendants Abraham, Witcher, Durrant, Burke and Roger Roe supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the Defendant PPD Officers and ADA Desiderio, and thereby caused the individual Defendant PPD Officers and Desiderio to deprive Wilson of his clearly established constitutional rights, including his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial.

307.     Had Defendants City of Philadelphia, Abraham, Witcher, Durrant, Burke and the Roger Roe supervisors not provided grossly inadequate discipline, supervision and training of the Defendant PPD Officers and ADA Desiderio, they would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence, coerced false testimony, and recklessly, intentionally, and/or maliciously caused Wilson to be arrested and prosecuted without probable cause. Upon knowledge and belief, Defendants Abraham, Witcher, Durrant, Burke and the Roger Roe supervisors were directly involved in the investigation of Wilson and directly supervised the specific investigative acts taken by the PPD officer defendants and ADA Desiderio in this case.

308.     The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Abraham, Witcher, Durrant, Burke and the Roger Roe supervisors, all under color of state law violated their duty, which had been clearly established in 1989-1993, to supervise Defendant PPD Officers and ADA Desiderio, and no reasonable police supervisor or District Attorney in 1989-1993 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers or assistant district attorneys was lawful.

309.     As a direct and proximate result of Defendants' actions, Wilson was wrongly convicted and imprisoned for 28 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII

### 42 U.S.C. § 1983 *Monell* Claim

### Unconstitutional Customs, Policies, and Practices of Defendant City of Philadelphia

*Against Defendant City of Philadelphia*

310.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

311.    Defendant City of Philadelphia was at all times relevant to this Complaint responsible for the polices, practices, and customs of the PPD. The City of Philadelphia employed all of the individual Defendant PPD Officers from 1989-1992.

312.    Likewise, the City of Pennsylvania was at all times relevant to this Complaint responsible for the polices, practices, and customs of the DA's Office. The City of Philadelphia employed all of the individual Defendant ADAs from 1989-1992.

313.    Defendant City of Philadelphia by and through its respective final policymakers, had in force and effect during the investigation of the Anderson/Reynolds Murders and for years before and after, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including, in particular, the encouragement and use of coerced and unreliable witness statements and the failure to disclose material, exculpatory evidence including, but not limited to police activity sheets and/or the information contained therein.

314.    Indeed, the City of Philadelphia was aware of, yet showed deliberate indifference to the following unconstitutional misconduct of the PPD, the DA's Office and the individual officers and prosecutors at the time of Wilson's wrongful conviction and incarceration:

a.      using coercive techniques to obtain confessions, such as threats of violence, false promises, and the use of prolonged interrogations

b.      fabricating incriminating statements from White, and providing White with details of the crime only the perpetrator or police could know,

c.      fabricating inculpatory evidence,

d.      withholding exculpatory evidence,

e.      failing to adequately discipline officers or prosecutors who engaged in unconstitutional conduct,

       f.      failing to adequately train and supervise officers, ignoring systematic misconduct and abuse of civilians' rights,

       g.     failing to discipline officers or prosecutors who failed to report the unconstitutional conduct of fellow colleagues, and

       h.     failing to train officers and prosecutors on Brady evidence and/or PCRA procedures.

315.    Defendant City of Philadelphia by and through its respective final policymakers had in force and effect during the investigation of the Anderson/Reynolds Murders and for years beforehand a policy, practice, or custom of deliberately withholding exculpatory and impeachment evidence from criminal defendants like Wilson in violation of constitutional rights established by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

316.    Specifically, PPD Officers and prosecutors in the DA's Office systematically failed to turn over evidence that would undermine the reliability of witnesses who had given false, coerced testimony under the threat of arrest or other consequences, and PPD Officers and prosecutors in the DA's Office systematically failed to turn over evidence that was plainly exculpatory and cast doubt on the arrest of suspects.

317.    Defendant City of Philadelphia by and through its respective final policymakers, had in force and effect during the Anderson/Reynolds Murders investigation and for years beforehand, a policy, practice, or custom of failing to adequately supervise, discipline and train officers investigating serious felonies.

318.    Final policymakers for the City of Philadelphia had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that PPD Officers and prosecutors in the DA's Office used the misconduct described above to improperly investigate and

close cases. Final policymakers for the City of Philadelphia also had actual or constructive notice that widespread failures to supervise or discipline officers and prosecutors for misconduct committed during the course of serious felony investigations, such as fabrication of evidence, coercion of false testimony, and suppression of exculpatory evidence, enabled officers and prosecutors to engage in misconduct without repercussion. The continued adherence to these unconstitutional customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Wilson.

319.   Despite repeated opportunities to do so during the Anderson/Reynolds investigation and for years beforehand, final policymakers for the City of Philadelphia failed to adequately supervise, discipline, and train officers and prosecutors for failing to use proper and legal investigative tactics by coercing informants to provide false evidence, intentionally or recklessly discrediting exculpatory evidence leading to reliable leads, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

320.   The egregious acts of Defendant PPD Officers and Defendant ADAs were deliberately ignored by PPD and the DA's Office as multiple supervisors and policymakers knew about the misconduct but either encouraged it or turned a blind eye. Final policymakers for the City of Philadelphia knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to the use of false, fabricated or coerced testimony and perjury, false eyewitness reports, fabricated evidence, false identifications, wrongful arrests, malicious prosecutions, and wrongful convictions.

321.    Indeed, the Commonwealth of Pennsylvania has already admitted that "[t]he suppression [of evidence] may also be attributable in part to institutional failures, as disclosure of police activity sheets was not the general practice at the time of Wilson's trial" (Ex. B, p. 25, n.16). Additionally, it admits, "[f]or decades and with some frequency, it appears that the Philadelphia District Attorney's Office failed to comply with its obligations in regard to *Brady* and its progeny. Compounding that problem was a practice sanctioned by the leadership of the prior administrations' Law Division not to require PCRA prosecutors to review trial file boxes or make them available to defense counsel or the defendant for their review." *See* Ex. B, at 29, n. 18.

322.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind Wilson's arrest, prosecution, and 28 years of wrongful incarceration, as well as all the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

## COUNT VIII

### Malicious Prosecution under Pennsylvania state law

*Against All Defendants*

323.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs.

324.    Defendants initiated or continued proceedings against Wilson without probable cause and with malice. Specifically, they intentionally,  knowingly, or deliberately misrepresented the truth and withheld exculpatory facts from prosecutors that vitiated probable cause, including but not limited to the facts that the incriminating witness statement was fabricated and the product of coercion, that Defendants fed the witnesses nonpublic and false details they did not know and could not have known, and that a "prime suspect" was being investigated for the crime and had motive to kill the Victims, because Wilson was innocent.

325.    The proceedings ultimately terminated in Wilson's favor on January 21, 2020 when the District Attorney moved for a new trial, then immediately moved to dismiss charges, and Wilson was then released from prison after more than 28 years of wrongful incarceration.

326.    Defendants committed these acts within the scope of their employment.

327.    As a direct and proximate result of this malicious prosecution, Wilson sustained the injuries set forth above.

## COUNT IX

**Intentional or Reckless Infliction of Emotional Distress under Pennsylvania state law**

*Against All Defendants*

328.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs.

329.    Defendants intentionally and/or recklessly, and in breach of their duties owed to Wilson, directly and proximately caused Wilson, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 28 years.

330.    Defendants caused Wilson to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial to a jury on all issues so triable in this action.

**WHEREFORE**, Plaintiff Wilson prays as follows:

A.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims; and

E.  For any and all other relief to which Plaintiff may be entitled.

Date:  January 24, 2022                              Respectfully submitted,

                                                     /s/ *Kimberly K. Winter*
                                                     Michael J. Abrams (Admitted *Pro Hac Vice*)
                                                     Kimberly K. Winter (Admitted *Pro Hac Vice*)
                                                     Alana McMullin (Admitted *Pro Hac Vice*)
                                                     LATHROP GPM LLP
                                                     2345 Grand Boulevard, Suite 2200
                                                     Kansas City, MO 64108
                                                     Telephone: (816) 292-2000
                                                     Facsimile (816) 292-2001
                                                     michael.abrams@lathropgpm.com
                                                     kim.winter@lathropgpm.com
                                                     alana.mcmullin@lathropgpm.com

                                                     Francesco P. Trapani, Esquire
                                                     PA Bar ID No. 209123
                                                     KREHER & TRAPANI LLP
                                                     Two Penn Center Plaza, Suite 900
                                                     1500 JFK Boulevard
                                                     Philadelphia, PA  19102
                                                     Phone (215) 907-7289
                                                     Fax (215) 907-7287
                                                     Frank@krehertrapani.com

                                                     Attorneys for Plaintiffs